## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

DR. CHRISTINA M.I. KELTON              :

         Plaintiff,                    :         CASE NO. C-1-02-345

v.                                     :         Judge Weber

UNIVERSITY OF CINCINNATI, et al.       :

         Defendants.                   :

                                       :

                                       :

                                       :

---

**MEMORANDUM IN OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT**

---

MARC D. MEZIBOV
**MARC D. MEZIBOV**
**MICHAEL N. BUDESLKY**
**SUSAN E. BRABENEC**
920 Fourth and Race Tower
105 West Fourth Street
Cincinnati, Ohio 45202
Telephone (513) 721-4876
Telecopier (513) 721-0876

## COMBINED TABLE OF CONTENTS AND SUMMARY

I.  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

  A.  The Headship Search Committee Is Formed . . . . . . . . . . . . . . . . . . . . . . . 3

  B.  Dr. Kelton's Announcement of Her Application for Department Head . . . . . 3

  C.  Defendant Goddard Discourages Dr. Kelton From Seeking The Position . . . 4

  D.  Defendants' Interdepartmental Correspondence Reveals Gender Bias . . . . . 5

  E.  Search Committee Chairperson Howe Is Aware
      Of Defendants' Discriminatory Influence and Intervention . . . . . . . . . . . . . 5

  F.  Faculty Defendants Campaign Against Dr. Kelton . . . . . . . . . . . . . . . . . . . 6

  G.  Defendants Mills and Zandvakili Make "Venomous"
      Presentation Before The Headship Committee . . . . . . . . . . . . . . . . . . . . . . . 6

  H.  Dr. Kelton Interviews With The Headship Search Committee . . . . . . . . . . . 7

  I.  The Committee Selects Defendant Goddard As Head
      And Submits Its Report To Dean Caruso . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

  J.  Professor Escoe Is Appointed As Department Head . . . . . . . . . . . . . . . . . . 9

  K.  Retaliation against Kelton . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

III.  LAW AND ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

  A.  Summary Judgment Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

  B.  Plaintiff's Gender Discrimination Claims . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    1.  Plaintiff has presented direct evidence of
        gender discrimination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    2.  Plaintiff has established a *prima facie* case . . . . . . . . . . . . . . . . . . 13

    3.  Defendants' proffered reason is a pretext . . . . . . . . . . . . . . . . . . . . . 17

|  |  | a. | Defendants' explanation is not the real reason . . . . . . . . . . . 17 |

|  |  | b. | Defendants' explanation has no basis in fact . . . . . . . . . . . . 21 |

| C. | Plaintiff's Retaliation Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23 |

|  | 1. | Plaintiff has established a *prima facie* case . . . . . . . . . . . . . . . . . . . . 23 |

|  |  | a. | Plaintiff engaged in protected activity . . . . . . . . . . . . . . . . . . 23 |

|  |  | b. | Defendants were aware . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24 |

|  |  | c. | Plaintiff suffered an adverse action . . . . . . . . . . . . . . . . . . . . 25 |

|  |  | d. | A causal connection exists . . . . . . . . . . . . . . . . . . . . . . . . . . . 26 |

|  | 2. | Defendants' proffered reason is a pretext . . . . . . . . . . . . . . . . . . . . . 28 |

|  | 3. | Defendants are not entitled to Eleventh Amendment immunity . . . . 28 |

| D. | Plaintiff's Claims Against The Individual Defendants . . . . . . . . . . . . . . . . . 29 |

|  | 1. | Discrimination Claims Under § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . 29 |

|  | 2. | Conspiracy Claims Under § 1985 (3) . . . . . . . . . . . . . . . . . . . . . . . . . 30 |

|  |  | a. | Conspiracy Involving Two or More People . . . . . . . . . . . . . . 31 |

|  |  | b. | Purpose of Depriving Equal Protection . . . . . . . . . . . . . . . . . 32 |

|  |  | c. | Act in Furtherance of Conspiracy . . . . . . . . . . . . . . . . . . . . . 32 |

|  |  | d. | Injury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32 |

|  | 3. | Individual Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32 |

|  |  | a. | Haynes Goddard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32 |

|  |  | b. | Wolfgang Mayer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33 |

|  |  | c. | Saurushe Zandvakili . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33 |

|  |  | d. | Dabashis Pal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34 |

    e.    **Nicholas Williams** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

    f.    **Jeffrey Mills** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

    g.    **Harland Whitmore** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

**V.**    **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

# I.  INTRODUCTION

This is a civil rights action brought on behalf of Plaintiff, Dr. Christina Kelton, alleging that Defendants, University of Cincinnati ("the University"), and seven individual members of the Department of Economics ("the Faculty Defendants"), discriminated against her with respect to promotional opportunities on the basis of her gender and in retaliation for opposing her discriminatory treatment.  Defendants have moved for summary judgment on all of Plaintiff's claims. For the following reasons, Defendants' motion should be denied.

At the University of Cincinnati Department of Economics ("the Department") there exists a patent gender-biased academic culture which has seldom allowed and rarely encouraged female economists to thrive.  The Department has traditionally hired few female professors and has granted tenure and full-professorship to fewer still.  (Escoe Depo. at 13, 55).  The motivation behind and culture propagated by such a gender-imbalanced structure has manifested itself in the actions of faculty members, including referring to female professor applicants as "babes" and "stacked," and attributing professional success to a female's physical attributes, rather than merit.  (Mills Depo. at 65-66; Escoe Depo. at 56).  The Department's gender bias extends to students, as demonstrated by one Faculty Defendant's discouragement of a female student's career aspirations because she would "eventually marry and have a family."  (Natorp Affidavit at 1, Copy attached as Exhibit A).  The same Faculty Defendant was condescending toward female students during classes.  (Lett Depo. at 31).  Consistent with the atmosphere of gender bias, Faculty Defendants are critical of female professors who wish to take a leadership, rather than a supporting, role. (Mayer Depo. 34; C. Kelton Depo. at 105-06).  Indeed, females occupying positions of power are publicly denied the respect

enjoyed by males in the same positions.  (Escoe Depo. at 57; C. Kelton Depo. at 105-06).  Such was the ring into which Dr. Kelton threw her hat when she applied for Department Head in March 2000.

Defendants Haynes Goddard, Wolfgang Mayer, Jeffery Mills, Debashis Pal, Harland Whitmore, Nicolas Williams, and Sourushe Zandvakili ("Faculty Defendants") endeavored to taint the headship search process and prevent Dr. Kelton from becoming the Economic Department's first female Head.  Defendants undermined Dr. Kelton's application by discouraging her from seeking the position, spreading rumors, making hostile and accusatory presentations.   The Faculty Defendants overt gender bias was confirmed in interdepartmental correspondence expressing disdain at the prospect of a female head.  (Goddard Depo. at 19; Zandvakili Depo. at 106-107; Howe Depo. at 57;  Ex. 10).  Notwithstanding Dr. Kelton's complaints about discriminatory influence tainting the search process, Defendants' actions had the ultimate effect of preventing the Department from fairly considering Dr. Kelton for the headship position.  (C. Kelton Depo. at 65-66, 68, 83-84). Understanding the gender-charged nature of the process, the Dean declared the search a "failure" and appointed an Interim Department Head, thereby evading any review by the University Affirmative Action Office.  (Bowman Depo. at 22, 26-27).   Dr. Kelton's subsequent complaints about departmental retaliation were once again ignored.  (Escoe Depo. at 51-52).

The Faculty Defendants' discriminatory actions and the University's decision to allow such discriminatory acts to influence the headship search process denied Dr. Kelton the opportunity to fairly compete and be considered for the headship position on the basis of her gender. Gender bias was also the impetus behind the Faculty Defendants' retaliation and the University's decision to ignore Dr. Kelton's subsequent complaints.  Because both direct and indirect evidence could lead

a reasonable juror to recognize the Defendants' discriminatory conduct, Defendants' motion must be denied.

## II.  STATEMENT OF FACTS

### A.    The Headship Search Committee Is Formed

Dr. Joseph Gallo had served as Head of the Economics Department for at least four years when he decided to step down in 2000.  (C. Kelton Depo. at 16).  With Dr. Gallo's tenure set to conclude in the summer of 2000, Dean of the College of Arts and Sciences, Dr. Joseph Caruso, formed a Headship Search Committee on or about January 10, 2000.  (Caruso Depo. at 16-17; Ex. 7).  Dean Caruso appointed Department of Economics faculty members Al Berry, Ed Herman, and Debashis Pal to serve on the Headship Search Committee.  (*Id*).  Joel Wolfe and Steven Howe were also elected to the Committee and Dr. Howe was appointed Committee Chairperson.  (Caruso Depo. at 17).  The Committee subsequently elected one undergraduate student, Ms. Erin Moeller Suttman, and one graduate student, Ms. Nasrin Shahinpoor, to the Committee.  (Ex. 7, 11, 20).  The Committee was charged with conducting the application, interview, and selection process to fill the Department Head position.  (Caruso Depo. at 6, 10, 14).

### B.    Dr. Kelton's Announcement of Her Application for Department Head

Prior to announcing her intentions to apply for Department Head, Dr. Kelton was well respected and received by Department faculty and University administrators.  (Howe Depo. at 69; Zandvakili Depo. at 16; Mills Depo. at 9).  Dr. Kelton's support of the Department graduate studies program earned her a reputation as a competent administrator.  (Goddard Depo. at 20).  Described as both "innovative" (Pal Depo. at 90),  and "cordial," (Zandvakili Depo. at 16),  Dr. Kelton was generally viewed positively and even served as a faculty mentor.  (Pasquale Depo. at 66).

3

Upon Dr. Kelton's announcement of her intent to seek the headship, Faculty Defendants Mills and Williams encouraged Defendant Goddard to also apply for the position.[1] (Mills Depo. at 21). Defendants Mills, Williams, and Zandvakili thereafter approached Dr. Goddard and explained that Dr. Kelton was applying for the position and that they did not want her to serve as Department Head. (Goddard Depo. at 11-12). Ultimately, Defendants Mills, Williams, and Zandvakili convinced Dr. Goddard to seek the position to prevent Dr. Kelton's appointment. (Goddard Depo. at 14).

## C.    Defendant Goddard Discourages Dr. Kelton From Seeking The Position

On or about January 13, 2000, Defendant Goddard met with Dr. Kelton to dissuade her from seeking the department headship. (Goddard Depo. at 19; C. Kelton Depo. at 45-47). Stating that he also sought the position, Defendant Goddard discouraged Dr. Kelton from applying and encouraged her to continue running the graduate studies program. (*Id.*). Defendant Goddard even indicated that he might be unsupportive of Dr. Kelton's future promotion to "full professor" should she decide to compete with him for the headship position.[2] (C. Kelton Depo. at 45).

On or about January 14, 2000, Defendant Goddard sent a follow-up email to Dr. Kelton (Ex. 8), in which he reiterated the points he made during the earlier conversation. (Goddard Depo. at 10). On January 16, 2000, Dr. Kelton forwarded Defendant Goddard's email to Headship Search Committee members Al Berry, Edward Herman, and Debashis Pal and explained her feelings of

---

[1] Dr. Mills felt Dr. Goddard was the " logical candidate" for department head, albeit for reasons unknown even to him. Dr. Mills had not worked with Dr. Goddard on either academic or administrative projects and had no personal work experience with Dr. Goddard. (Mills Depo. at 21-24).

[2] Defendant Goddard, a full professor himself, was entitled to vote on Dr. Kelton's promotion to full professor. (C. Kelton Depo. at 51).

4

harassment resulting from Dr. Goddard's reference to her attainment of full professor status and requested that the Committee advise her regarding Dr. Goddard's threat. (C. Kelton Depo. at 56, Ex. 9).

**D.    Defendants' Interdepartmental Correspondence Reveals Gender Bias**

Knowing that Dr. Kelton had forwarded his threatening email to members of the Headship Search Committee, Defendant Goddard contacted Defendant Harland Whitmore via email on March 1, 2000. (Ex. 68). In his email to Defendant Whitmore, Dr. Goddard stated, "Thinking cynically, if [Dr. Kelton] is ambitious, and there is no doubt about that, then she has every reason to milk [Dr. Goddard's email] for political advantage." (*Id.*). Dr. Goddard ended his correspondence with a request that Dr. Whitmore "bring this up in [his] presentations to the committee." (*Id.*). In Dr. Whitmore's email response to Goddard, dated March 1, 2000, Whitmore stated: "I can see how [Dr. Kelton] may have been affronted by your discouraging her from running against you. ***There probably are faculty in this department who would be threatened by a female head and I think Chris [Kelton] is probably aware of it." (Ex. 10)(emphasis added).

**E.    Search Committee Chairperson Howe Is Aware Of Defendants' Discriminatory Influence and Intervention.**

During this time, Dr. Howe, Search Committee Chairperson, became aware of Defendant Goddard's January 14, 2000 email to Dr. Kelton. (Howe Depo. at 42-43; Ex. 8). On or about February 7, 2003, Dr. Howe met with the University's Senior Equal Opportunity Specialist, Donna Bowman, to discuss generally the selection process and specifically Dr. Goddard's threatening email and its potential impact. (*Id.* at 46-47). Dr. Howe's concern about Dr. Goddard's "self-serving" email, was the "possibility that the committee might hear things that might be tainted," thereby

tainting the selection process itself.  (*Id.* at 48).  No actions were taken as a result of this meeting. (Bowman Depo. at 18; Howe Depo. at 47).

After Dr. Howe received Defendant Whitmore's March 1, 2000 email, he did not arrange to meet with Ms. Bowman again.  (Ex. 10; Howe Depo. at 48).  Although Dr. Howe took "seriously" Whitmore's statement that "There probably are faculty in this department who would be threatened by a female head," he chose not share it with Ms. Bowman.  (Howe Depo. at 48, 115; Bowman Depo. at 19).

**F.   Faculty Defendants Campaign Against Dr. Kelton**

On or about March 2, 2003, Dr. Kelton officially submitted her application for the Head position to the Headship Search Committee.  (C. Kelton Depo. at 11).  At the beginning of the headship selection process in March, Headship Committee Chairperson Steven Howe was in favor of Dr. Kelton's selection.  (Howe Depo. at 69).  Dr. Howe remained in favor of Dr. Kelton's section through the beginning of May 2000.  (*Id.* at 87).  However, throughout the spring of  2000, Faculty Defendants aggressively campaigned against Dr. Kelton in their effort to prevent her appointment. (Mills Depo. at 18-20; Zandvakili Depo. at 56-57, 76-77; Pal Depo. at 32; Ex. 13, 15).

**G.   Defendants Mills and Zandvakili Make "Venomous" Presentation Before The Headship Committee.**

Prior to the Headship Committee's vote on May 22, 2000, Defendants Mills and Zandvakili made presentations.  (Howe Depo. at 50-51).  Defendants Mills and Zandvakili "presented very, very strongly-worded criticisms of Professor Kelton," which were largely "about Professor Kelton's characteristics as a person."  (*Id*. at 51-52).  The presentations, which Chairperson Howe described

as "venomous" and "inappropriate," were designed to prevent Dr. Kelton's appointment to the headship position. (Howe Depo. at 57; Mills Depo. at 42; Zandvakili Depo. at 111).

Through Defendant Mills' presentation and the notes he prepared for the Committee, he accused Dr. Kelton of being opportunistic, abrasive, and a "main culprit" for the Department's decline. (Ex. 78; Mills Depo. at 44-46). In a similar, but intensified, presentation, Defendant Zandvakili accused Dr. Kelton of bringing forth proposals to Department meetings which had not been discussed or reviewed by the Graduate Studies Committee. (Ex. 80). Both Defendants Mills and Zandvakili encouraged the Committee to question Dr. Kelton's integrity by referring to her as "unethical." (Howe Depo. at 55; Pal Depo. at 69).

## H.    Dr. Kelton Interviews With The Headship Search Committee

Dr. Kelton interviewed with the Headship Search Committee on May 10, 2000. (Howe Depo. at 156). Because the Committee members had already been made aware of several accusations against Dr. Kelton (Howe Depo. at 51-52), a large part of Dr. Kelton's interview was spent refuting the Faculty Defendants' false accusations and dispelling the untruths. (C. Kelton Depo. at 68). At the end of her interview, Dr. Kelton voiced her concern that gender discrimination appeared to be tainting the headship selection process. (Howe Depo. at 107). Dr. Kelton provided Committee members with copies of the Defendant Whitmore's email to Defendant Goddard, in which Dr. Whitmore confirmed that gender was playing a role in the selection process by writing, "There are probably faculty in this department who would be threatened by a female head . . .." (Pal Depo. at 70-71; Ex. 10).

I.     **The Committee Selects Defendant Goddard As Head And Submits Its Report To Dean Caruso**

On May 22, 2000, the Headship Selection Committee selected Defendant Goddard as the new Department Head, by a vote of four (4) to three (3).  (Howe Depo. at 142, Ex. 20).  Steven Howe, Joel Wolfe, Debashis Pal, and Nasrin Shahinpoor voted in favor of Defendant Goddard, while Al Berry, Ed Herman, and Erin Moeller Suttman voted in favor of Professor Kelton.[3]  (C. Kelton Depo. at 91-92).  The final report of the Committee was accompanied by a letter to Dean Joseph Caruso, in which Dr. Howe admitted, "[the Committee has] known about the sex discrimination angle from the very beginning of our work together."  (Ex. 20).

Dean Caruso was one of the final decision makers in the headship selection process. (Caruso Depo. at 15).  Upon receiving the report, Dean Caruso, concerned about the perversion of the process by the Faculty Defendants, conducted a poll within the Department to gauge the faculty's preference for Department Head. (Caruso Depo. at 58; Ex. 21).  The poll revealed that the Department faculty members were "preponderantly" in favor of Dr. Kelton.  (Ex. 22). Ultimately, Dean Caruso chose to declare the headship search a failure.[4] (Ex. 22).  Dean Caruso chose not to accept the Committee's recommended candidate for the headship and claimed to started the selection process anew, although nothing occurred with respect to a new search for more than two years.  (Caruso Depo. at 15).

---

[3]  Defendant Pal admitted that his vote in favor of Defendant Goddard was influenced by discussions with Defendants Mayer, Williams, and Zandvakili.  (Pal Depo. at 73-74).

[4]  By declaring the selection process a failure, Dean Caruso's actions enabled the entire headship selection process, which deprived Dr. Kelton of fair consideration, to avoid any review for fairness.  (Bowman Depo. at 22).

8

**J.    Professor Escoe Is Appointed As Department Head**

Having declared the search a failure, Dean Caruso requested that the Department faculty submit names of individuals who might serve as an interim Acting Department Head. (Ex. 22).  Dean Caruso received names of recommended individuals to serve in the temporary capacity of Interim Department Head.  (Ex. 23, 24). On July 12, 2000, Dean Caruso announced that Professor Gisela Escoe would serve as Acting Head until another headship search could be conducted to hire a permanent Department Head.  (Ex. 22; Ex. 25).

**K.    Retaliation against Kelton**

As a result of the failed search and her treatment by Defendants, Dr. Kelton filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").  (Complaint, Ex. A; Kelton Depo. at 9).   As a result of complaining that Defendants allowed gender bias to have a discriminatory impact on the selection process, Dr. Kelton became the subject of retaliation.  (Escoe Depo. at 40-41, 50).

For example, Defendant Mills sent an email to Acting Head Escoe, in which he criticized Dr. Kelton's actions as Director of Graduate Studies and claimed she was "unwilling to perform" her duties.  (Ex. 27; Escoe Depo. at 50-51).   Aware of the "variety of emails and incidents" of harassment, Acting Head Escoe offered to assist Dr. Kelton in bringing her reports of harassment to Dean Tony Perzigian.[5]  (Escoe Depo. at 51).   On October 20, 2000, and January 31, 2001,Dr. Kelton sent emails to Dean Perzigian, bringing to his attention the pattern of harassment which was

---

[5]  Among the incidents of harassment was criticism of Dr. Kelton's decision to deny a doctoral student, Selcuk Misirlioglu, continued funding due to his failure to produce a dissertation description or proposal in four years.  (Ex. 104; C. Kelton Depo. at 38; Mills Depo. at 94-95). Mr. Misirlioglu's ultimate grievance of the denial, which he filed with the University College of Arts and Sciences, was dismissed. (Mills Depo. at 110-11;C. Kelton Depo. at 38).

affecting her performance as Director of Graduate Studies.[6] (Ex. 26; Ex. 33). Ultimately, Dr. Kelton suffered retaliation detailed at greater length in the discussion below because the University was aware of Faculty Defendants' attacks on Dr. Kelton's integrity and refused to take any action.  (Ex. 26; Ex. 29, Ex. 33).

### III.  LAW AND ARGUMENT

#### A.    Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, granting a motion for summary judgment is proper only when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344 (6th Cir. 1998).  In determining whether there exists a genuine issue of material fact, all inferences drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). A court must inquire "whether the evidence presents a sufficient disagreement to require submission to a jury or if it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The court may not make credibility determinations or weigh the evidence when ruling on a motion for summary judgment.  *Id.* at 255.

The burden is upon the <u>movant</u> to demonstrate the absence of a genuine issue of material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).  To carry its burden, the moving party must provide evidence that is uncontradicted and from disinterested witnesses.  *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000).  To defeat a motion for summary judgment, all

---

[6]  Dr. Kelton sent copies of the January 31, 2001 email to Dean Charles Groetsch, Associate Dean Joseph Scanio, Acting Department Head Escoe, and Associate Dean Wayne Hall. (Ex. 33).

that need exist is one genuine issue of material fact.  *See Middleton v. Reynolds Metals Co.*, 963 F.2d 881 (6th Cir. 1992).  As discussed below, in the present case, there are genuine issues of material fact on all relevant legal issues which preclude summary judgment.

**B.    Plaintiff's Gender Discrimination Claims**

**1.    Plaintiff has presented direct evidence of gender discrimination**

Under Title VII, a plaintiff may prove that gender was a motivating factor in an employment decision by showing either direct or indirect evidence of discrimination.  *See Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1081 (6th Cir. 1994).  The direct and circumstantial evidentiary paths are mutually exclusive and a plaintiff need only prove one or the other.  *See Kline v. Tennessee Valley Authority*, 128 F.3d 337 (6th Cir. 1997).  Direct evidence of discrimination is evidence which, if believed, requires the conclusion that unlawful discrimination was at least one of the motivating factors in the adverse employment action.  *See Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999).  With direct evidence, the existence of unlawful discrimination is "patent."  *Bartlik v. United States Department of Labor*, 73 F.3d 100, 103 fn. 5 (6th Cir. 1996), citing to *Talley v. Bravo Pitino Restaurant Ltd.*, 61 F.3d 1241, 1248 (6th Cir. 1995).

The Eleventh Circuit has closely examined and defined what constitutes direct evidence.  *See Wright v. Southland Corp.*, 187 F.3d 1287 (11th Cir. 1999).  The *Wright* court held that the proper definition of direct evidence is <u>not</u> evidence that proves the existence of a fact without inference or presumption (the so-called "dictionary definition").  *Id*. at 1294.  Rather, the court held "that direct evidence of employment discrimination is evidence from which a trier of fact could conclude, based on a preponderance of the evidence, that an adverse employment action was taken against the

11

plaintiff on the basis of a protected personal characteristic." *Id*. at 1288. Other Circuits have similarly held that statements which reflect discriminatory animus and which bear squarely on the contested employment decision constitute direct evidence. *See Taylor v. Virginia Union University*, 193 F.3d 219, 232 (4th Cir. 1999); *Thomas v. National Football League Players Association*, 131 F.3d 198, 204 (D.C. Cir. 1997).

In the context of sex discrimination, the Sixth Circuit has held that if believed, direct evidence requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's action. *See Laderach v. U-Haul of Northwestern Ohio*, 207 F.3d 825, 829 (6th Cir. 2000). In *Laderach*, the court held that statements by a supervisor of a repair shop that he would not promote the plaintiff because of her sex and did not want her to answer the hotline because "women are not mechanically inclined" constituted direct evidence of discriminatory animus. *Id*. In *Emmel v. Coca-Cola Bottling Co. of Chicago*, 95 F.3d 627, 632 (7th Cir. 1996), the court held that statements about not wanting women in management or in the beverage industry from the management employees responsible for employment practices which directly addressed the employment of women in upper-management positions constituted direct evidence.

In the present case, the direct written statements of Defendants Goddard and Whitmore constitute direct evidence of the presence of gender discrimination in the hiring process. (Ex. 68; Ex. 10). By stating "There probably are faculty in this department who would be threatened by a female head," Defendant Whitmore explained that the Department was (1) prone to gender bias; and (2) such gender bias would likely prevent the Department's selection of a female head. (Ex. 10). This statement reflects Defendants' discriminatory animus towards women and bears directly on the employment decision at issue, namely the selection of a new Department Head. *See Taylor*, 193

F.3d at 232. From this evidence, a jury could reasonably conclude that gender discrimination played

a role in motivating Defendants' campaign to sabotage Dr. Kelton's bid for Department Head.

When Defendant Goddard's statement that Dr. Kelton was "ambitious" is considered in light of

identified gender bias, it becomes clear that these statements directly articulate the motivation behind

Defendants' actions which followed. (Ex. 68). Dr. Kelton's direct evidence establishes that gender

discrimination was at least one of the motivating factors in the adverse employment action and,

therefore, defeats summary judgment. *See Jacklyn v. Schering-Plough Healthcare Prods. Sales

Corp.*, 176 F.3d 921, 926 (6th Cir. 1999).

### 2. Plaintiff has established a *prima facie* case

A plaintiff may prove her case of discrimination by either direct or circumstantial evidence.

*See Manzer*, 29 F.3d at 1081. The direct evidence and circumstantial evidence paths are mutually

exclusive and the plaintiff need only prove one or the other. *See Kline v. Tennessee Valley Authority*,

128 F.3d 337 (6th Cir. 1997). The United States Supreme Court has recently ruled that a plaintiff

need only demonstrate circumstantial, not direct, evidence to obtain a mixed-motive jury

instruction. *See Desert Palace, Inc. v. Costa*, 123 S. Ct. 2148, 2150 (2003). The Court's ruling

even indicates that circumstantial evidence is not only sufficient to establish discrimination but it

may also be "more certain, satisfying and persuasive" than direct evidence. *Id*. at 2154.

Generally, the elements of a *prima facie* case of gender discrimination are as follows: 1)

Plaintiff is a member of a protected class; 2) Plaintiff was qualified for her position; 3) Plaintiff was

subject to an adverse employment action; and 4) a similarly-situated, non-protected individual

received more favorable treatment than Plaintiff. *See McDonnell Douglas Corp. v. Green*, 411 U.S.

792, 802 (1973). If Plaintiff establishes the *prima facie* case by circumstantial evidence, Plaintiff

is benefitted by a presumption of discrimination. *See Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995). After Plaintiff meets her burden of establishing the elements of the *prima facie* case, the burden shifts to Defendant to articulate a legitimate, nondiscriminatory reason for the treatment. *See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981). Should Defendant carry this burden, Plaintiff is given the opportunity to demonstrate that the reason propounded by Defendant was merely a pretext. *Id.* At the summary judgment stage of the proceedings, Plaintiff need not meet the burden of persuasion. Plaintiff need only present evidence from which a fact-finder could determine that Defendants' proffered explanation is a pretext. *See EEOC v. Yenkin-Majestic Paint Corp.*, 112 F.3d 831, 835 (6th Cir. 1997). Proof that Defendant's proffered explanation is merely a pretext is persuasive evidence of underlying discrimination. *See Reeves*, 530 U.S. 133.

In this case, Defendants do not dispute that Dr. Kelton has met the first three prongs of the *prima facie* test. (Defendants' Brief at 18). First, as a female, she qualifies as a member of a protected group. *See* 42 U.S.C. § 2000e-2(a)(1). Second, Dr. Kelton was objectively qualified for the position of Department Head.[7] Third, Dr. Kelton was subject to an adverse employment action by being denied the position of Department Head.[8]

---

[7]Defendants do not dispute this point and the evidence on the record bears it out. (Howe Depo. at 69; Zandvakili Depo. at 16; Mills Depo. at 9; Goddard Depo. at 20; Pasquale Depo. at 66).

[8]Whether considered a denial of a promotion or refusal to hire, the fact that Dr. Kelton was denied the position of Department Head qualifies as an adverse job action. *See Gafford v. General Electric Co.*, 997 F.2d 150 (6th Cir. 1993); *See Nguyen v. City of Cleveland*, 229. F3d 559 (6th Cir. 2000).

Defendant contends that Dr. Kelton's claim of gender discrimination fails because she cannot prove the fourth prong, that a male colleague received the headship position. (Motion for Summary Judgment at 18). Defendants' argument is without merit. The hiring process was not completed and the Department Head position was not filled by a female through the hiring process. Had the hiring process been completed, (i.e., had one of the applicants been chosen to fill the position), the University Affirmative Action Office would have been able to review the selection process for fairness. (Bowman Depo. at 26-27). The Affirmative Action Office made no such review because the search was deemed a "failure" and no one who actually applied was hired to fill the headship position. (*Id*.) Dean Caruso even admits that he was required to initiate another search and "start anew" because he did not affirm the Headship Selection Committee's recommendation and fill the position. (Caruso Depo. at 15; Ex. 22).

Instead of selecting a Head to serve the Department for the customary five years, Gisela Escoe was appointed the acting head of the Department for one year on an emergency basis after the search had been declared a failure by the Dean. (Caruso Depo. at 18; Ex. 22; Escoe Depo. at 33). Dr. Kelton sought the position of Department Head, not the position of Interim Acting Head filled temporarily by Dr. Escoe. The distinction between the two positions is highlighted by the fact that Dr. Kelton formally applied for the Department Head position (Ex. 1), but submitted Gigi Escoe's name as a recommendation to serve as the emergency "Acting" Head. (Ex. 23). Unlike the Acting Head, the actual Department Head typically serves for five years and receives numerous benefits during the five-year appointment. (Caruso Depo. at 10, 18). Contrary to Defendants' assertions, the Department Head position for which Dr. Kelton applied was <u>not</u> filled by a female.

Defendants' argument on the fourth prong also fails because they attempt to strictly apply a test articulated in a "failure to promote" discrimination case. Generally, the *McDonnell Douglas* test is meant to provide a flexible framework for analysis of elusive and rarely admitted motivations and , thus, should never be rigidly applied. *See Loeb v. Textron, Inc.*, 600 F.2d 1003 (1st Cir. 1979), quoting *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, (1978) ("The Supreme Court has made it abundantly clear that *McDonnell Douglas* was intended to be neither 'rigid, mechanized, or ritualistic'").[9] It is not appropriate to preclude Dr. Kelton from being able to establish a *prima facie* case simply because the Department failed to complete the hiring process and select a permanent head. A violation of Title VII occurred when Dr. Kelton was denied a fair and equal opportunity to compete for the job because of her gender.

Finally, Defendants misapprehend the appropriate law for the fourth prong. Dr. Kelton's situation is not a promotion case because Dr. Kelton has not sought a promotion from her current position to a new position. Rather, she sought a new and additional position. (Caruso Depo. at 5).[10] Dr. Kelton's situation should be analyzed under the framework for "failure to hire" discrimination cases. In those cases, a plaintiff establishes the fourth prong if she was denied the position, the position remained open and the employer continued to seek applicants with similar qualifications to the plaintiff. *See Furnco Construction Corp. v. Waters*, 438 U.S. 567, 575 (1978). In this case, after Dr. Kelton was denied the position, the search for a Department Head continued. (Mayer Depo.

---

[9] *See also, Ackerman v. Diamond Shamrock Corp.*, 670 F.2d 66, 70 (6th Cir. 1982)

[10] A faculty member serving as a department head maintains two distinct sets of responsibilities under each position and receives separate compensation for each. (Caruso Depo. at 5).

16

at 5-6).  Thus, Dr. Kelton has satisfied the *prima facie* test and the burden shifts to Defendants to articulate a legitimate business reason.  *See Burdine*, 450 U.S. 248 (1981).

### 3.    Defendants' proffered reason is a pretext

If Defendants offer an explanation for the failure to hire, then Plaintiff may offer evidence that the proffered reason is merely a pretext.  *See Burdine*, 450 U.S. 248.  Plaintiff may satisfy this burden by presenting evidence: 1) that the explanation has no basis in fact (the employer's reasons are factually false); 2) that the explanation is not the real reason (circumstantial evidence indicates that discrimination was the true reason); or 3) that the explanation is insufficient to explain the adverse action (others were not treated similarly even though they engaged in the same conduct). *See Manzer v. Diamond Shamrock Chemicals Co*., 29 F.3d 1078, 1084 (6th Cir. 1994).  Plaintiff need not rebut each reason to prevail in opposition to a motion for summary judgment.  *See Wilson v. Susquehanna Township Police Dept*., 55 F.3d 126, 130 (3d Cir. 1995).  If evidence is relevant to show pretext, Plaintiff may use the same evidence that she used to establish her *prima facie* case. *See Talley*, 61 F.3d at 1248.  In the present case, there is sufficient evidence of pretext to avoid summary judgment.

### a.    Defendants' explanation is not the real reason.

Defendants' explanation is merely a pretext because circumstantial evidence demonstrates that their proffered reason is false and that gender discrimination was the true reason Dr. Kelton was denied the headship position.  *See Manzer*, 29 F.3d at 1084.  Defendants initially point to "division" as an overarching explanation for the failure to hire Dr. Kelton.  (Defendants' Brief at 2-3). However, Defendant Goddard testified that departmental "division" resulted from Dr. Kelton's lawsuit.  (Goddard Depo. at 35).  Support for his statement is found in the fact that the Department

17

divided into "Group A" and "Group 1" *after* Dr. Kelton made claims of gender discrimination and filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on October 24, 2000. (Ex. 3; Complaint, Ex. A; Kelton Depo. at 9).[11]   The 2001 restructuring of the Department, itself a reaction to Dr. Kelton's claims and charge, cannot serve as a non-discriminatory reason for Defendants' actions in 2000. Defendants' attempt to retroactively use the 2001 restructuring for this purpose is demonstrative of pretext.

Moreoever, for all of their claims of a "hostile" and historical departmental division, Defendants have neither defined the division nor explained its existence. (Motion for Summary Judgment at 2-3; Mayer Depo. at 53). At best, Defendants have claimed a "division" to result from differing "personalit[ies]." (Escoe Depo. at 24). However, when asked to explain the division, even Interim Department Head Gisela Escoe admitted that she "never quite got it." (Escoe Depo. at 25). Defendant Goddard similarly testified that he had not noticed any "animosity" within the "always very congenial" department. (Goddard Depo. at 15). The failure of Defendants to explain the nebulous "political division" cuts against any notion that the division played a key role in the present matter, if not also against the "division's" very existence.

Just as Defendants cannot explain a "political division," they cannot and do not adequately address the email Correspondence of March 1, 2000. In Defendant Goddard's email to Defendants Mayer, Mills, Whitmore, Williams, and Zandvakili, he referred to Dr. Kelton as "ambitious." (Ex. 68; Whitmore Depo. at 30). Defendant Whitmore construed Goddard's description of Dr. Kelton as negative and cautioned Defendant Goddard to be conscious of "gender inequality [as] a sensitive

---

[11]   Dr. Margaret Pasquale confirmed that, due to Dr. Kelton' s lawsuit, her affiliation with Dr. Kelton has proven to be a liability within the Department. (Pasquale Depo. at 74-75, 85).

issue." (Whitmore Depo. at 35). Regarding Defendants' references to Dr. Kelton's "ambition" in relation to her headship application, (Ex. 68; Ex 10), University of Cincinnati Senior Equal Opportunity Specialist Donna Bowman later stated that such a comment in this context is indicative of negative female stereotyping.[12] (Bowman Depo. at 19).

In his response to Defendant Goddard, Defendant Whitmore stated, "There probably are faculty in this department who would be threatened by a female head and I think Chris [Kelton] is probably aware of it." (Ex. 10; Whitmore Depo. at 35-36). Other witnesses confirm such gender bias in the Department.[13] (Escoe Depo. at 54-55; Natorp Affidavit at 1 (Copy attached as Exhibit A); Lett Depo. at 31). Such witness testimony about Faculty Defendants' gender bias renders pretextual Defendant Whitmore's claim to have been innocently speculating about potential views of faculty members. (*Id.*; Whitmore Depo. at 36). Regardless, Defendant Whitmore's self-serving and incredible testimony cannot be accepted for summary judgment purposes. A reasonable juror could easily see Defendant Whitmore's email for what it is -- evidence of the underlying reason for Defendants' actions, as it reveals the presence of gender bias among faculty members who would play deciding roles in the Headship Search Committee's selection. (Ex. 10).

---

[12] Had Ms. Bowman received Defendant Whitmore' s email of March 1, 2000, (Ex. 10), during the headship selection process, she would have discussed with Dr. Howe the potential for applicant-on-applicant "intimidation" based on gender. (Bowman Depo. at 20-21). However, because she "wouldn't know of the bias until the end of the search when [the Department would] want [the Affirmative Action Office's] approval," Dr. Howe's failure to act allowed the Department's headship search to proceed unmonitored for discriminatory bias. (*Id.* at 22).

[13] Witnesses testify to the gender bias present in the Department which is manifest in condescending treatment toward women, the paucity of female faculty members, and the blatant discouragement of females' academic and professional endeavors. (Escoe Depo. at 13, 55; Natorp Affidavit at 1 (Copy attached as Exhibit A); Lett Depo. at 31).

Additionally, Defendants' proffered reasons for actively discouraging Dr. Kelton's headship application are also pretextual. Evidence of pretext is demonstrated in Defendant Goddard's explanations of his January 13, 2000 meeting with Dr. Kelton and subsequent email, dated January 14, 2000. (Goddard Depo. at 20; Ex. 8). Upon meeting with Dr. Kelton, Defendant Goddard believed that, as Department Head, he could "help guide" Dr. Kelton and prevent rule "violations" about which Defendants Mills, Williams, and Zandvakili had spread false rumors. (Goddard Depo. at 20). However, only days later, Professor Goddard complimented Dr. Kelton's successful administration of the Graduate Studies Program and encouraged her to "continue the great job" she had been doing instead of applying for headship position. (Ex. 8). Defendant Goddard's inconsistent reasons for discouraging Dr. Kelton from applying for Head undermine the contention that his actions were spurred by his genuine concerns about Dr. Kelton's administration of the graduate studies program. *See Schwartz v. Gregori*, 45 F.3d 1017, 1021 (6th Cir. 1995) (A change in the offered reasons supports a finding that the offered reasons are pretexts).

Similarly, Defendants' proffered reasons for actively supporting Defendant Goddard's headship application are pretextual. For example, Defendant Mills claimed that Defendant Goddard was the "logical candidate" for Department Head. (Mills Depo. at 21). However, Dr. Mills had shared neither academic nor administrative experiences with Dr. Goddard and had no personal interaction upon which to base support for Dr. Goddard's appointment. (Mills Depo. at 22-24). In fact, Defendant Goddard had been physically absent from the Department for many years and had not been personally interacting with the faculty. (Goddard Depo. at 6). Dr. Mills' lack of understanding regarding his support of Goddard weighs against a finding that political support was rendered on the basis of "logical" criteria which cannot be articulated.

20

### b.    Defendants' explanation has no basis in fact

Defendants' explanations are also pretextual because their stated reasons are factually false. *See Manzer*, 29 F.3d at 1084.  Because Dr. Kelton was viewed positively prior to her applying for Department Head,  Defendants' sudden and vehement criticisms of her ring hollow.  (Howe Depo. at 69; Zandvakili Depo. at 16; Mills Depo. at 9).  Prior to announcing her intentions to apply for Department Head, Dr. Kelton was well respected and received by Department faculty and University administrators.  (Howe Depo. at 69; Zandvakili Depo. at 16; Mills Depo. at 9).  Dr. Kelton's support of the Department graduate studies program earned her a reputation as a competent administrator. (Goddard Depo. at 20).  Described as both "innovative" (Pal Depo. at 90),  and "cordial," (Zandvakili Depo. at 16),  Dr. Kelton was generally viewed positively and even served as a faculty mentor.  (Pasquale Depo. at 66).  Only after Dr. Kelton sought the Headship position did she draw the ire of her male colleagues.

The pretextual nature of Defendants' explanation is further supported by the fact that those spreading the rumors and making accusations against Dr. Kelton had little to no first-hand knowledge of the accusations' truth or lack thereof.[14]  (Mills Depo. at 16, 58-59; Mayer Depo. at 49-50; Zandvakili Depo. at 59; Whitmore Depo. at 23).  Furthermore, these accusations were simply not true.

Although there are no rules or regulations governing the procedure by which business is conducted at the Graduate Program, Admissions, or Financial Aid Committee meetings, Faculty

---

[14] Faculty Defendants routinely accused Dr. Kelton of irresponsible and unprofessional behavior based on nothing more than the representations of others and without having observed Dr. Kelton' s alleged " violations" at committee meetings.  (Mills Depo. at 16, 58-59; Zandvakili Depo. at 60; Mayer Depo at 49-50; Whitmore Depo. at 23).

Defendants Goddard, Mayer, Mills, and Zandvakili claimed to oppose Dr. Kelton because she committed "violations" of unspecified "rules" of the Graduate Program Committee.[15]  (Zandvakili Depo. at 106-107, 124-25; Mills Depo. at 13; Ex. 13; Ex. 15).  Defendant Zandvakili has since acknowledged that the Department "doesn't have any working document" governing the procedure to be followed at the Admissions and Financial Aid Committee meetings. (Zandvakili Depo. at 126). In light of their own admissions, Faculty Defendants' actions are indefensible.

Similarly, Defendants Pal and Zandvakili claimed to oppose Dr. Kelton's headship application because she "violated bylaws" concerning the acceptance of money from the Hewett-Kautz Fund endowment to take students on a study field trip.  (Pal Depo. at 32-33; Zandvakili Depo. at 27; C. Kelton Depo. at 67-68, 85).   In actuality, Dr. Kelton had supplemented the Hewett-Kautz grant with personal finances to ensure the student trip could take place.  (C. Kelton Depo. at 67-68). Additionally, as a result of a verbal altercation between Defendant Pal and Al Berry at a Hewett-Kautz meeting, Defendants Mayer, Mills, Whitmore, and Zandvakili claimed that Dr. Kelton would be a poor Department Head because she endorsed verbal abuse.  (Ex. 81; Zandvakili Depo. at 123). In actuality, Dr. Kelton made no statement and took no action either during or after the meeting to suggest that she endorsed Dr. Berry's behavior.  (Zandvakili Depo. at 123; Pal Depo. at 44).  Finally, Defendant Zandvakili's failed to act upon or even discuss with Dr. Kelton the alleged student complaints about Dr. Kelton's national origin discrimination.   There are no facts to support his accusations -- they are not based in fact and are instead pretextual.  (Zandvakili Depo. at 73, 75-77).

---

[15]   In Department Head Gallo's response to faculty Defendant's May 2, 2000 email, he verified that no rule "violations" had occurred at the Graduate Program Committee.  (Ex. 101).  In fact, Dr. Gallo noted that, after his investigation of the matter, it was clear that all committee proposals in question had been discussed and considered by the committee as a whole.  (*Id*). Defendant Mills later admitted the Committee " discussed" the proposals. (Mills Depo. at 58).

Plaintiff has presented sufficient evidence from which a finder of fact could determine that Defendants' proffered reasons are merely pretext masking discriminatory animus. *See Yenkin-Majestic Paint Corp.*, 112 F.3d at 835. Accordingly, summary judgment on Plaintiff's gender discrimination claims is not warranted.

## C.    Plaintiff's Retaliation Claims

### 1.    Plaintiff has established a *prima facie* case

Title VII makes it unlawful for an employer to discriminate against any employee for making a charge with the appropriate agency or otherwise opposing discrimination. *See* 42 U.S.C. §2000e-3(a). Under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), Plaintiff first has the burden of proving by a preponderance of the evidence a *prima facie* case of discrimination. In order to establish a *prima facie* case, Plaintiff must show that 1) she engaged in an activity protected by Title VII; 2) the exercise of her civil rights was known to Defendants; 3) thereafter, Defendants took adverse employment actions against Plaintiff; and 4) there was a causal connection between the protected activity and the adverse employment action. *Wrenn v. Gould*, 808 F.2d 493 (6th Cir. 1987). Second, if Plaintiff succeeds in proving the *prima facie* case, the burden shifts to Defendants to articulate some legitimate, non-discriminatory reason for the alleged discrimination. Third, should Defendants carry this burden, Plaintiff must have the opportunity to prove, by a preponderance of the evidence, that the legitimate, non-discriminatory reason offered by the defendant was not the true reason, but was a pretext for discrimination. *See Burdine*, 450 U.S. 248.

### a.    Plaintiff engaged in protected activity

A person opposing apparently discriminatory actions must only have a good faith belief that the practice is unlawful. *See Booker v. Brown & Williamson Tobacco Co.*, Inc., 879 F.2d 1304 (6th

23

Cir. 1989). When Dr. Kelton complained to Headship Search Committee members about Defendant Goddard's threatening email of January 14, 2000, she believed she was being threatened by Defendant Goddard with not receiving a future promotion to "full professor" if she applied for the headship. (C. Kelton Depo. at 56, Ex. 9). Dr. Kelton's good faith belief that she was the victim of gender discrimination is supported by Defendant Whitmore's email in which he stated,"There probably are faculty in this department who would be threatened by a female head and I think Chris [Kelton] is probably aware of it." (Ex. 10; Whitmore Depo. at 35-36). When Dr. Kelton raised the issue of gender discrimination with the Headship Search Committee, she believed that Committee members had been unlawfully influenced by faculty Defendants' gender bias. (C. Kelton Depo. at 113). Finally, upon receiving harassing emails and criticisms as a result of her complaints, Dr. Kelton opposed the University's toleration of the harassment, believing it to be unlawful. (Ex. 33). In addition to her complaints of gender discrimination within the Department, Dr. Kelton also filed an EEOC charge. (Complaint, Ex. A; Kelton Depo. at 9).

**b.    Defendants were aware**

Defendants do not dispute that the University was aware of Dr. Kelton's complaints about gender discrimination. Headship Selection Committee Chairperson Howe admitted he was aware of Defendant Goddard's email to Dr. Kelton, dated January 14, 2000. (Howe Depo. at 42-43). Further, three members of the Committee were aware of the threatening email by January 16, 2000. (C. Kelton Depo. at 56, Ex. 9). Additionally, the University's Senior Equal Opportunity Specialist Donna Bowman was made aware of Defendant Goddard's threatening email as early as February 7, 2000. (Bowman Depo. at 13-14).

Defendant Pal knew that Dr. Kelton had raised the issue of gender discrimination, as he was a member of the Headship Search Committee. (C. Kelton Depo. at 129). Defendants Williams and Mills knew that Dr. Kelton had raised gender discrimination as an issue, as they consulted Acting Head Gigi Escoe about their concerns that Dr.Kelton might seek legal action. (Ex. 67). Defendant Mayer knew that Dr. Kelton had complained of gender discrimination because Defendant Pal shared that Dr. Kelton had raised the issue at her interview with the Committee. (Mayer Depo. at 11). Defendant Goddard knew that Dr. Kelton intended to file discrimination charges due to the outcome of the headship selection process. (Goddard Depo. at 34-35). As early as March 1, 2000, Defendant Whitmore knew that gender bias was playing a role in the headship selection process. (Ex. 10).

At Dr. Kelton's interview on May 10, 2000, she provided all Committee members with copies of Defendant Whitmore's email of March 12, 2000, in which he stated "There are probably faculty in this department who would be threatened by a female head." (Pal Depo. at 70-71). In his letter to Dean Caruso dated May 31, 2000, Dr. Howe admitted "[the Committee has] known about the sex discrimination angle from the very beginning of our work together." (Ex. 20). Finally, the University was aware that Dr. Kelton was receiving harassing emails and criticisms as a result of her complaints. (Ex. 33; Escoe Depo. at 40-41; Ex. 26). Clearly, Defendants were aware of the Dr. Kelton's complaints about gender discrimination.

### c.    Plaintiff suffered an adverse action

First, Dr. Kelton's denial of the position on May 22, 2000, qualifies as an adverse action. (Ex. 20). Prior to Defendants' concerted campaign against her headship application and the ultimate denial of the position, Dr. Kelton made Defendants aware of her complaints of gender discrimination. (Howe Depo. at 42-43; C. Kelton Depo. at 56, Ex. 9; Bowman Depo. at 13-14).

Through a "variety of emails and incidents," Faculty Defendants retaliated against Dr. Kelton for having complained about gender discrimination and the failure of the headship search. (C. Kelton Depo. at 128-29; Ex. 27; Escoe Depo. at 40-41, 50-51).

Dr. Kelton's receipt of harassing emails and unfounded criticisms of her performance as Director of Graduate Studies also qualifies as adverse actions. (Ex. 27; Escoe Depo. at 50-51). Generally, retaliatory harassment must be "severe or pervasive" to constitute an adverse employment action. *See Richmond-Hopes v. City of Cleveland*, 1998 WL 808222 (6th Cir. November 16, 1998) (Copy attached as Exhibit B).  Courts have held that hostility and professional snubbing can constitute adverse employment actions. *See Knox v. Indiana*, 93 F.3d 1327, 1333-34 (7th Cir. 1996) (allegations that plaintiff's co-workers retaliated against her by making insulting and demeaning statements about her and letting her know that they intended to make her life "hell" sufficed as adverse employment actions).  As a result of Dr. Kelton's complaints about gender discrimination, she suffered emotional distress and damage to her professional reputation. (C. Kelton Depo. at 207-210).  After Defendants' treatment had made the Department an unbearably hostile place in which to work, Dr. Kelton accepted a temporary appointment at Pennsylvania State University and upon her return transferred out of the University's Economics Department to the University's College of Business. (C. Kelton Depo. at 171, 199).

**d.    A causal connection exists**

To establish a causal connection, Plaintiff must produce sufficient evidence from which an inference can reasonably be drawn that the adverse action was taken because of the exercise of protected activity. *See Allen v. Michigan Dept. of Corrections*, 165 F.3d 413 (6th Cir. 1999). Generally, the proximity in time between the protected activity and the adverse action may give rise

to an inference of a causal connection.  *See Moon v. Transport Drivers, Inc.*, 836 F.2d 226, 229 (6th Cir. 1987).  On May 10, 2000, Dr. Kelton alleged that gender discrimination had tainted the hiring process and by May 22, 2000, Dr. Kelton was denied the headship position.  (Pal Depo. at 70-71; Ex. 20).  Upon knowledge that Dr. Kelton intended to pursue legal claims, Faculty Defendants launched a responsive campaign of harassment.  (Ex. 27; Ex. 29; Escoe Depo. at 50-51).

In addition to the timing, other evidence on the record establishes links between Dr. Kelton's complaints of gender discrimination in the headship selection process and her denial of the position. For example, Dr. Howe chose to ignore evidence of gender discrimination and intimidation when Dr. Kelton presented it to him, as he failed to share faculty Defendants' emails with the Affirmative Action Office.  (Bowman Depo. at 20-21).  The Headship Selection Committee also chose to ignore evidence of gender bias in Defendant Whitmore's email and refused to recognize the unlawful effect that Defendants' emails, rumors, accusations, and "venomous" presentations had on the selection process.  (Howe Depo. at 111).  Defendants' acts of wilful ignorance denied Dr. Kelton fair consideration in the hiring process.

Similarly, the Faculty Defendants' subsequent treatment of Dr. Kelton were close in time to her protected activity and other evidence which is causally linked to her claims that gender discrimination played a role in the headship selection process.  Defendant Mills has condescendingly described Dr. Kelton's complaints of gender discrimination as "making noise." (Mills Depo. at 63). Similarly, Defendant Mayer has expressed that Dr. Kelton should have removed herself as Director of Graduate Studies because she intended to file the instant lawsuit.  (Mayer Depo. at 36). Defendants' sentiments, when viewed in connection to Defendants'  harassing emails and

accusations received by Dr. Kelton after her denial of the headship position, demonstrate a causal link between Dr. Kelton's complaints and adverse actions taken against her. (Ex. 27).

### 2.    Defendants' proffered reason is a pretext

Defendants do not propose a legitimate business reason for the adverse actions against Dr. Kelton, but presumably they rely on the same explanation as propounded for the discrimination section. As discussed previously, Dr. Kelton has satisfied this burden by: 1) presenting circumstantial evidence which indicates that discrimination was the true reason for the adverse action; and 2) demonstrating that Defendants' reasons are factually false. *See Manzer v. Diamond Shamrock Chemicals Co*., 29 F.3d 1078, 1084 (6th Cir. 1994).

### 3.    Defendants are not entitled to Eleventh Amendment immunity

Defendants' position that the Eleventh Amendment bars Dr. Kelton's Title VII retaliation claim is utterly without merit. The Sixth Circuit has repeatedly allowed litigants to bring Title VII retaliation claims in federal court unhindered by the Eleventh Amendment. *See eg., Johnson v. University of Cincinnati*, 215 F.3d 561 6th Cir. 2000. Indeed, Defendants are unable to cite a single case that stands for their novel proposition that "Congress exceeded its enforcement authority in enacting Title VII's retaliation provisions [and that Dr.] Kelton's Title VI retaliation claim against the University is barred by the Eleventh Amendment." (Defendants' Brief, p. 30). It would be inappropriate to dismiss Dr. Kelton's claim for retaliation against the University under Title VII on Eleventh Amendment grounds.

**D.      Plaintiff's Claims Against The Individual Defendants**

In addition to her claims against the University, Dr. Kelton has claims for discrimination pursuant to 42 U.S.C. § 1983 and for conspiracy pursuant to 42 U.S.C. § 1985(3) against the seven individual Defendants.

**1.      Discrimination Claims Under § 1983**

The *prima facie* analysis for a claim of discrimination under § 1983 is the same as that under Title VII. *See Risinger v. Ohio Bureau of Workers' Compensation*, 883 F.2d 475 (6th Cir. 1990). Defendants do not dispute that Dr. Kelton meets the first three prongs of the *prima facie* test: 1) Dr. Kelton is a member of a protected classification; 2) she was qualified for the Department Head position; and 3) she was denied fair consideration for the headship position and was not hired. (Defendants' Brief at 18).  Regarding the fourth prong of the test, a similarly-situated, non-protected individual (i.e., Defendant Goddard) received more favorable treatment than Dr. Kelton.[16] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  Defendant Goddard competed for the position in the absence of gender bias against him and was considered for the position.  The position was not filled through the headship selection process, as the search was declared a failure and an interim head was appointed.  (Ex. 22).  Therefore, because Defendants exercised their power as members of the Department to ensure that Dr. Kelton could not be hired as Department Head, Plaintiff has satisfied the *prima facie* elements with respect to the individual Defendants.

_____

[16] Additionally, under a " failure to hire" analysis, Dr. Kelton establishes the fourth prong because she was denied the position and the University continued to seek applicants.  *See Furnco Construction Corp.*, 438 U.S. at 575.

### 2.    Conspiracy Claims Under § 1985 (3)

In order to establish a claim of conspiracy under § 1985(3), a plaintiff must show: 1) a conspiracy involving two or more people; 2) the individuals have the purpose of depriving a person of the equal protection of the laws; 3) there is an act in furtherance of the conspiracy; and 4) their acts cause injury or a deprivation of any right or privilege of a U.S. citizen.  *See Johnson v. Hills & Dales General Hospital*, 40 F.3d 837, 839 (6th Cir. 1994).

The Faculty Defendants contend that the conspiracy claims are barred by the intracorporate conspiracy doctrine.  Under this doctrine, defendants who are members of the same collective entity do not qualify as two separate "people" to form a conspiracy.  *See Hull v. Cuyahoga Valley Joint Vocational School District Bd. of Educ.*, 926 F.2d 505, 509-10 (6th Cir. 1991).  The "intracorporate conspiracy" rule, however, is subject to exceptions.  First, it is well established that acts performed outside an employee's scope of employment are not subject to the  intracorporate conspiracy rule. *See Johnson v. Hills & Dales General Hospital*, 40 F.3d 837, 839 (6th Cir. 1994); *see also Nurse Midwifery Associates v. Hibbett*, 918 F.2d 605, 614 (6th Cir. 1990).  Thus, it is sufficient that the Faculty Defendants conspired with each other, and not with the University, to take this matter outside the general rule.   *See Hull*, 926 F.2d at 509 ("This court has adopted the general rule in civil conspiracy cases that a *corporation cannot conspire* with its own agents or employees....") (emphasis added.).

Moreover, it is clear that the Faculty Defendants were not acting for or on behalf of the University when they campaigned against Dr. Kelton's candidacy for the headship.  All of the individual Defendants are members of a collective bargaining unit and none hold management positions with the University.  Indeed, the Faculty Defendants were acting in their personal capacities

and pursuant to their personal interests when they sought to effect the results of the search to determine *their* administrative head.  It is beyond question that each Faculty Defendant perceived an independent and personal stake in the outcome of the headship competition.

The facts in this case should be determined by the "independent personal stake" exception to the intracorporate conspiracy doctrine.  *See Nurse Midwifery Associates v. Hibbett*, 918 F.2d 605, 614 (6th Cir. 1990) (Court noted that although there was no conspiracy between the hospital and its employees, the intracorporate conspiracy doctrine does not preclude conspiracy among members of the hospital staff.). The Faculty Defendants, like the doctors in *Nurse Midwifery Associates*, were free to, and did, compete with one another for administrative, intellectual, and professional control of the Department.  There is no reason basis, therefore, to imply the intracorporate conspiracy rule to the purely individual actions of these Faculty Defendants.

### a.    Conspiracy Involving Two or More People

In this case, the individual Defendants acted outside the scope of their employment by agreeing to prevent Dr. Kelton from becoming the Department Head based on considerations of her gender.  Although it may be within the scope of their employment to be involved in the selection of a new Department Head, that involvement is premised on considerations of an applicant's credentials and a determination whether that candidate is objectively qualified.  By bringing personal gender biases into the considerations, Defendants' actions cease to be employment-related and thus may form the basis for a conspiracy.  Thus, because multiple persons, and not merely one entity, conspired to prevent Dr. Kelton from ascending to Department Head, she has satisfied the first prong of the test.

31

### b. Purpose of Depriving Equal Protection

Dr. Kelton has also satisfied the second prong of the test because the individual Defendants sought to deprive her of the equal protection of the law. Specifically, Defendants sought to deprive her of an employment opportunity due to considerations of her gender.

### c. Act in Furtherance of Conspiracy

Dr. Kelton satisfies the third prong because the individual Defendants engaged in acts in furtherance of the conspiracy. Specifically, they worked to sabotage Dr. Kelton's headship candidacy with the selection committee. The specific overt acts of each individual Defendant are outlined below.

### d. Injury

Finally, Dr. Kelton has been injured and had her right to equal protection violated as a result of Defendants' actions. Dr. Kelton was denied the position of Department Head because of considerations of her gender. Viewed in a light appropriate at this phase, Dr. Kelton has presented sufficient evidence to demonstrate a material issue of fact to preclude summary judgment on the issue of conspiracy by the individual Defendants.

### 3. Individual Defendants

The following Faculty Defendants played various roles in the conspiracy against Dr. Kelton and ultimately achieved their goal of preventing the fair consideration of Dr. Kelton's application for the headship.

### a. Haynes Goddard

Defendant Haynes Goddard conspired with Faculty Defendants initially by discouraging Dr. Kelton from applying for the headship position at the request of Defendants Mills, Williams, and

Zandvakili by threatening her with the denial of future promotions. (Goddard Depo. at 11-12, 20 ; Ex. 8). Defendant Goddard thereafter sent an email to Defendants Mayer, Mills, Whitmore, Williams, and Zandvakili, in which he made disparaging remarks about Dr. Kelton and called her "ambitious." (Ex. 68).

Although he applied for Department Head in furtherance of the conspiracy to prevent Dr. Kelton from obtaining the position, Defendant Goddard's application did not prevent him from adding his name to an accusatory letter to Head Gallo, dated May 2, 2000. (Ex. 13). In the letter, Dr. Goddard falsely accused Dr. Kelton of violating the non-existent rules of the Graduate Program Committee. (*Id.*)

### b.    Wolfgang Mayer

Defendant Mayer joined Faculty Defendants as a signatory to two accusatory letters designed to tarnish Dr. Kelton's reputation in the Department and ultimately cost her fair consideration for the headship position. (Ex. 13; Ex. 15). Defendant Mayer admits to having largely written a letter to Dean Caruso, dated May 19, 2000, in which he falsely accused Dr. Kelton of, among other things, acting unprofessionally. (Mayer Depo. at 49; Ex. 15). However, Defendant Mayer also admits to being absent from the meeting at which Dr. Kelton was allegedly unprofessional. (Mayer Depo. at 49-50). His actions, made in disregard for the truth, furthered the campaign of disparagement against Dr. Kelton.

### c.    Saurushe Zandvakili

Defendant Zandvakili jointly initiated the conspiracy with Defendants Mills and Williams. The three Defendants approached Defendant Goddard, relayed to Goddard false accusations about Dr. Kelton's performance and professionalism, and convinced Goddard to apply for Head to defeat

33

Dr. Kelton's application.  (Goddard Depo. at 11-12).  Defendant Zandvakili was a signatory to the letter of May 2, 2000 (Ex. 13), sent to Head Gallo, and the letter of May 19, 2000 (Ex. 15,) sent to Dean Caruso.  In both letters, Defendant Zandvakili joined the  Faculty Defendants in falsely accusing Dr. Kelton of rule violations.  (Ex. 13; Ex. 15).  Defendant Zandvakili spread false rumors to Defendants Pal, Mills, Williams, and Mayer that Dr. Kelton was discriminatory to students on the basis of national origin. (Zandvakili Depo. at 73, 75-77).  Defendant Zandvakili also falsely accused Dr. Kelton of accepting funding from the Hewett-Kautz fund in violation of existing bylaws.  (*Id*. at 27).  In his most direct efforts to defeat Dr. Kelton's application, Defendant Zandvakili made a "venomous" presentation to the Headship Search Committee, in which he encouraged the Committee to question Dr. Kelton's integrity. (Howe Depo. at 55-57; Pal Depo. at 69).

### d.    Dabashis Pal

Defendant Pal, as a member of the Headship Search Committee, furthered the conspiracy by influencing the Committee itself.  (Howe Depo. at 84).  Defendant Pal relayed false rumors to Defendant Whitmore that Dr. Kelton had behaved unprofessionally. (Ex. 71).  Defendant Whitmore subsequently sent an email to Dr. Howe on May 3, 2000, in which he persuaded Dr. Howe to not recommend Dr. Kelton for the headship.  (*Id.*).  Defendant Pal also falsely accused Dr. Kelton of violating bylaws of the Hewett-Kautz fund.  (Pal Depo. at 32).

### e.    Nicholas Williams

Upon learning that Dr. Kelton intended to apply for Head, Defendant Williams approached Defendant Mills to discuss how Dr. Kelton's application could be defeated.  (Mills Depo. at 21).  Defendant Williams was among the three Faculty Defendants to encourage Defendant Goddard to apply for Head to defeat Dr. Kelton's application.  (Goddard Depo. at 11-12).  Defendant Williams

relayed to Defendant Goddard that Dr. Kelton mishandled the graduate studies program. (*Id*. at 14). By spreading such rumors, Defendant Williams convinced Defendant Goddard to apply for the position. (*Id.*).

### f.    Jeffrey Mills

Upon learning that Dr. Kelton intended to apply for Department Head, Defendant Mills asked Defendant Goddard to run for the position to defeat Dr. Kelton's application. (Mills Depo. at 21; Goddard Depo. at 11-12). Defendant Mills was thereafter a signatory to the letter of May 2, 2000 (Ex. 13), sent to the Head, Dr. Gallo, and the letter of May 19, 2000 (Ex. 15,) sent to Dean Caruso. In both letters, Defendant Mills falsely accused Dr. Kelton of rule violations. (Ex. 13; Ex. 15).

### g.    Harland Whitmore

In his email of March 1, 2000, to Defendant Goddard, Defendant Whitmore revealed that he was aware of gender biased faculty sentiment regarding a female in the headship position. (Ex. 10). Based on gender bias, Defendant Whitmore was a party to the May 19, 2000 letter from Faculty Defendants to Dean Caruso. (Ex. 15). On May 3, 2000, only days before Dr. Kelton's interview, Defendant Whitmore sent a letter to Dr. Howe in which he discouraged Dr. Howe from recommending Dr. Kelton as head and falsely suggested that Dr. Kelton was unethical. (Ex. 71).

## V.    CONCLUSION

For the reasons stated above, summary judgment on Plaintiff's claims is inappropriate because a genuine issue of material fact exists as to whether the Defendants discriminated against Plaintiff on the basis of her gender and retaliated against her for opposing the gender discrimination in the headship selection process. Plaintiff has met her burden both through the introduction of direct evidence of discrimination and by making out a *prima facie* case through circumstantial

35

evidence.  Accordingly, Plaintiff requests that the Court deny Defendants' motion for summary judgment.

Respectfully submitted,

SIRKIN, PINALES, MEZIBOV & SCHWARTZ LLP


_____/s/ Marc D. Mezibov_____
MARC D. MEZIBOV (Ohio Bar No. 0019316)
MICHAEL N. BUDELSKY (Ohio Bar No. 0069573)
SUSAN E. BRABENEC (Ohio Bar No. 0075200)
920 Fourth & Race Tower
105 W. Fourth Street
Cincinnati, Ohio 45202
Telephone (513) 721-4876
Telecopier (513) 721-0876
Counsel for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing has been served upon Doreen Canton, Kerry P. Hastings, W. Stewart Dornett, Taft, Stettinius & Hollister LLP, 425 Walnut Street, Suite 1800, Cincinnati, Ohio 45202-3957, by electronic service, and Mitchell D. McCrate, Office of the General Counsel, University of Cincinnati, P.O. Box 210623, 300 Administration Building, Cincinnati, Ohio 45221-0623, by U.S. Mail, postage pre-paid or by electronic service, this 26th day of September, 2003.


_____/s/ Marc D. Mezibov_____
MARC D. MEZIBOV (Ohio Bar No. 0019316)