UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

DR. CHRISTINA M.L. KELTON          :
                                   :
          Plaintiff,               :        CASE NO. C-1-02-345
                                   :
v.                                 :        Judge Weber
                                   :
UNIVERSITY OF CINCINNATI, et al.   :
                                   :
          Defendants.              :

_____

AFFIDAVIT OF TINA NATORP

_____

                    )
STATE OF OHIO    ) S.S.:
                    )

Tina Natorp, after being duly cautioned and sworn upon her oath, states as follows:

1.      I am a female and employed by U.S. Bank in Cincinnati, Ohio as a Vice President of the International Banking Group.

2.      In 2002, I was an undergraduate student studying economics at the University of Cincinnati in Cincinnati, Ohio. During the spring quarter of 2002, I was enrolled in Professor Sourushe Zandvakili's Labor Economics class.

3.      During May 2002, I had a conversation with Professor Zandvakili in the hallway of the economics building. I asked Professor Zandvakili questions about careers in the banking industry and requested advice for pursuing a banking career.

4.      Professor Zandvakili told me that, at most, I could aspire to be bank branch manager in the banking industry because I eventually would marry and have a family.



5.    I was appalled by his statement and concerned that such comments could have the effect of discouraging and hindering female students' professional achievements.

6.    If called upon to do so, I could competently testify to the foregoing.

FURTHER AFFIANT SAYETH NAUGHT.



TINA NATORP
3599 Vineyard Haven Dr. #J
Loveland, Ohio 45140
Affiant

Sworn to and subscribed in my presence this 15th day of September 2003.

MICHAEL NEIL BUDELSKY
Attorney At Law
Notary Public, State of Ohio
My Commission Has No Expiration
Date, Sec. 147.03 R.C.

Notary Public

168 F.3d 490 (Table)
Unpublished Disposition

Page 1

(Cite as: 168 F.3d 490, 1998 WL 808222 (6th Cir.(Ohio)))
©

NOTICE:     THIS     IS     AN     UNPUBLISHED
OPINION.

(The Court's decision is referenced in a "Table of
Decisions Without Reported Opinions" appearing in
the Federal Reporter.  Use FI CTA6 Rule 28 and FI
CTA6 IOP 206 for rules regarding the citation of
unpublished opinions.)

United States Court of Appeals, Sixth Circuit.

Shelly RICHMOND-HOPES, Plaintiff-Appellant,
v.
CITY OF CLEVELAND, Defendant-Appellee.

No. 97-3595.

Nov. 16, 1998.

On Appeal from the United States District Court
for the Northern District of Ohio.

Before KENNEDY, WELLFORD and BOGGS,
Circuit Judges.

PER CURIAM.

**1 Plaintiff Shelly Richmond-Hopes ("Hopes")
appeals the District Court's order granting judgment
as a matter of law to the defendant, the City of
Cleveland (the "City"). Hopes, an employee of the
defendant, filed the instant action alleging both quid
pro quo and hostile environment sexual harassment,
and retaliation for having filed a sexual harassment
claim in violation of Title VII. Finding no error in
the District Court's conclusion, we shall AFFIRM.

I. BACKGROUND

Plaintiff Shelly-Richmond-Hopes ("Hopes") was an
electric meter service installer at Cleveland Public
Power (CPP), a division of the City of Cleveland,
during the summer of 1994. At the time, Hopes was
only one of two women working in non-secretarial
positions in the department. In the past, she had
served as the union shop steward and had filed
grievances regarding the failure of her supervisor,
Joseph Ricciarelli, to assign overtime work
according to the method prescribed by the collective

bargaining agreement. Several male employees had
also filed similar grievances against Ricciarelli in
the past. On May 17, 1994, Hopes confronted
Ricciarelli specifically about his failure to assign
overtime work to her in the prescribed manner.
Their exchange escalated into a heated argument in
which Ricciarelli allegedly accused Hopes of
causing trouble, called her a "bitch," grabbed his
crotch, made a gesture near his crotch mimicking
masturbation, and said, "Stroke me, stroke me."
She had seen Ricciarelli make this gesture before to
at least one other male employee. Hopes
immediately complained to Garland Hamilton,
Ricciarelli's supervisor. The following morning she
met with Hamilton, Vince Amato (a labor relations
manager), and two union representatives about
Ricciarelli's conduct. That day, she filed a
grievance regarding both the sexual harassment and
overtime issues with the union. Two days later, she
filed sexual harassment complaints based on that
incident with the EEOC and the city's EEO office.

According to Hopes, Ricciarelli then retaliated
against her for reporting the incident. On May 18,
the day after the argument, Ricciarelli assigned
Hopes and her crew to a "dangerous" installation
job that they were unqualified to perform: it
required work on an 800 amp switch, while the
crew was qualified only up to 400 amps. Ricciarelli
also allegedly deprived her of overtime and
dispatching opportunities, and stopped giving her
instructions as to how to complete certain tasks.
Hopes reported the dangerous work assignment to
Hamilton, who promptly removed Hopes from the
assignment. Hopes also complained to Hamilton
about the deprivation of overtime dispatching work,
and he allowed her to work the overtime.

Allegedly on or around July 23, 1994, Hopes' day
off, Ricciarelli held a meeting with the rest of the
male employees in the office, instructed them not to
talk to her, told them Hopes would get all of them
in trouble, that he had engaged three lawyers to sue
the city and Hopes, and told them that he wouldn't
hold it against any of them if "something happened
on the job" to her. Finally, on or around August 11,
1994, again in Hopes' absence, Ricciarelli told the
employees that she was "taking food off his kids'
table," and that "payback is a bitch."

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

EXHIBIT

B

168 F.3d 490 (Table)                                                                      Page 2
(Cite as: 168 F.3d 490, 1998 WL 808222, **1 (6th Cir.(Ohio)))

**2 Two separate investigations grew out of these events. The first investigation was completed by the end of June 1994 and addressed only Ricciarelli's conduct on May 17th. Miguel Torres, the city's EEO Manager, recommended a three-day suspension for Ricciarelli. Because she was dissatisfied with the first investigation's failure to address the alleged retaliation, Hopes filed another complaint on July 5, 1994, this time with Mayor Michael White at the "Mayor's Night In" program. The Mayor's office began a second investigation in which Torres' findings were reviewed, and employees and supervisors at the CPP work site were interviewed. Based on this information, the Mayor's Executive Assistant circulated a report on August 2, 1994 that confirmed Hopes' allegations of retaliation and recommended a longer suspension for Ricciarelli, as well as disciplinary action against Hamilton and Amato.

Ricciarelli was suspended for a total of eight days: three for the May 17 th incident, and five days for the subsequent retaliation. Hamilton was suspended for three days for his negligence in failing to notify his supervisor of Hopes' sexual harassment complaints and in failing to investigate thoroughly. Amato was suspended for five days on the same grounds as Hamilton. All three men were ordered to attend a sexual harassment training seminar.

In the meantime, around late July or early August 1994, the City received an anonymous tip that Hopes was in violation of a work rule that requires all city employees to reside in Cleveland. The city conducted a hearing in mid-September 1994, where it proved that Hopes did not live in Cleveland, but rather just outside the city limits in Brooklyn, Ohio. Hopes was discharged from her position with CPP effective September 29, 1994.

## II. PROCEDURAL HISTORY

Hopes filed two charges with the Equal Employment Opportunity Commission (EEOC) against the City for gender discrimination, eventually handled by the Ohio Civil Rights Commission (OCRC). She filed her first charge on May 20, 1994 alleging sexual harassment. The OCRC made a finding of "Not Probable" in April 1995. In her second charge dated February 10, 1995, Hopes alleged retaliatory discharge. The OCRC also made a finding of "Not Probable" on this claim.

Hopes then filed the instant action in the Northern District of Ohio against the City for retaliation and for *quid pro quo* and hostile environment sexual harassment. The District Court denied Hopes' motion for partial summary judgment and granted the defendant's motion on the hostile environment sexual harassment claim, and granted Rule 50(a) judgment as a matter of law in favor of the City of Cleveland at the close of the plaintiff's case on all her remaining claims.

## III. DISCUSSION

This court reviews the grant of summary judgment pursuant to Federal Rule of Civil Procedure 56 and judgment as a matter of law pursuant to Rule 50(a) de novo. *Hartleip v. McNeilab, Inc.*, 83 F.3d 767, 774 (6 th Cir.1996); *Snyder v. AG Trucking, Inc.*, 57 F.3d 484, 490 (6th Cir.1995). We apply the same standard on review as the district court applies in deciding such motions. *Middleton v. Reynolds Metals Co.*, 963 F.2d 881, 882 (6th Cir.1992); *Monette v. AM-7-7 Baking Co.*, 929 F.2d 276, 280 (6th Cir.1991). Before granting the motion:

  **3 [T]he district court must determine whether there was sufficient evidence presented to raise a material issue of fact for the jury. As applied in this context, "sufficient evidence" will be found unless, when viewed in the light of those inferences most favorable to the nonmovant, there is either a complete absence of proof on the issues or no controverted issues of fact upon which reasonable persons could differ.

*Monette*, 929 F.2d at 280 (citations omitted); *Middleton*, 963 F.2d at 882 (summary judgment grant should be sustained if pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits show there is no genuine issue as to any material fact and that moving party is entitled to judgment as a matter of law).

Hopes' sexual harassment and retaliation claims identify three situations that transpired during her employment with CPP. The first is a confrontation with her supervisor in May of 1994, which Hopes asserts was sexual harassment. The second is her discharge from employment in September of 1994, which Hopes claims was retaliatory. Finally, Hopes claims that her supervisor's course of conduct between these two events constituted either

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

168 F.3d 490 (Table)                                                                                    Page 3
(Cite as: 168 F.3d 490,  1998 WL 808222, **3 (6th Cir.(Ohio)))

retaliation or sexual harassment.

## A. Confrontation with Supervisor

Hopes alleges both "quid pro quo" and "hostile environment" sexual harassment under Title VII and Ohio Rev.Code § 4112.01 stemming from Ricciarelli's verbal abuse and masturbatory gesture during her confrontation with him on May 17, 1994. The District Court denied Hopes' motion for summary judgment, and then granted the defendant's motion for judgment as a matter of law.

Since the District Court rendered its decision, the United States Supreme Court has significantly clarified the standard of employer liability for sexual harassment by supervisors in two companion cases, *Faragher v. Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662, 66 U.S.L.W. 4643 (1998), and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633, 66 U.S.L.W. 4634 (1998)(holding that employers are vicariously liable for sexual harassment by supervisors). The Supreme Court observed that the dichotomy between "quid pro quo" and "hostile environment" sexual harassment that has evolved throughout the courts of appeals is not compelled by statute, as these terms appear nowhere in the text of Title VII. [FN1] *Ellerth*, 118 S.Ct. At 2264, 524 U.S. at ----, 118 S.Ct. 2257, 141 L.Ed.2d 633, 66 U.S.L.W. at 4637.

> FN1. Section 703(a) of Title VII forbids "an employer--
> (1) to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's sex." 42 U.S.C. § 2000e-2(a)(1).

The Court then observed that while not irrelevant to Title VII litigation, the terms are of "limited utility." *Id.*, at 2265. The terms are relevant to the "threshold question whether a plaintiff can prove discrimination in violation of Title VII," but unhelpful as to the nature of an employer's liability for sexual harassment by a supervisor. *Id.* The instant case, however, involves the "threshold question" as to whether Hopes can prove that Ricciarelli's May 17 th conduct constitutes discrimination in violation of Title VII.

**4 The District Court first cited *Kaufman v. Allied*

*Signal, Inc., Autolite Div.* for the rule that to state a prima facie case of *quid pro quo* sexual harassment, the plaintiff must demonstrate:

> (1) that the employee was a member of a protected class; (2) that the employee was subjected to unwelcome sexual harassment in the form of sexual advances or requests for sexual favors; (3) that the harassment complained of was based on sex; (4) that the employee's submission to the unwelcome advances was an express or implied condition for receiving job benefits or that the employee's refusal to submit to a supervisor's sexual demands resulted in a tangible job detriment; and (5) the existence of respondeat superior liability.

*Kaufman v. Allied Signal, Inc., Autolite Div.*, 970 F.2d 178, 186 (6 th Cir.1992) (quoting *Highlander v. KFC Nat. Management Co.*, 805 F.2d 644, 648 (6 th Cir.1986)). Without expressing an opinion with respect to elements 1-3 and 5, the District Court ruled in favor of the defendant on grounds that Hopes failed to state a prima facie case with respect to element 4. The District Court found as a threshold matter that Hopes was uncertain as to whether Ricciarelli's comment had any sexual import, and that even if she could show Ricciarelli's conduct was a sexual invitation, Hopes could not demonstrate that she was denied a job benefit or suffered a job detriment as a result of her failure to comply with his request.

The District Court also rejected Hopes' allegation that Ricciarelli's conduct constituted "hostile environment" sexual harassment. The Supreme Court clarified in *Faragher* and *Ellerth* what the plaintiff must show to have an actionable claim against an employer for sexual harassment by a supervisor:

> When a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII. For any sexual harassment preceding the employment decision to be actionable, however, the conduct must be severe or pervasive.

*Ellerth*, 524 U.S. at ----, 118 S.Ct. at 2265, (citing *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, ---- - ----, 118 S.Ct. 998, 1002-03, 140 L.Ed.2d 201, (1998); *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

168 F.3d 490 (Table)                                                              **Page 4**
(Cite as: 168 F.3d 490, 1998 WL 808222, **4 (6th Cir.(Ohio)))

367, 126 L.Ed.2d 295, (1993)).

The District found that Hopes had not demonstrated she was denied a job benefit or suffered a job detriment. We agree. The District Court also questioned whether Hopes established that Ricciarelli harassed her "because of sex." The Supreme Court recently has reiterated that harassment is not "automatically discrimination because of sex merely because the words used have sexual content or connotations." *Oncale v. Sundowner Offshore Svcs., Inc.,* 523 U.S. at ---, 118 S.Ct. at 1002, (1998). The fact that Ricciarelli's statement, "Stroke me," and his gesture, simulated masturbation, have a sexual connotation does not automatically qualify his conduct on this particular occasion as sexual harassment rather than a crude rebuke.

**\*\*5** By Hopes' own admission, she was uncertain as to whether Ricciarelli intended his statement and gesture as a sexual invitation, or as a vulgar way of telling her that he intended to ignore her complaint regarding overtime. Moreover, the record also shows that Ricciarelli had used this precise offensive gesture (grabbing his crotch, mimicking masturbation, and saying "Stroke me") in verbal exchanges with male employees. The plaintiff admitted she had previously observed such conduct directed toward a male employee. It is plausible that Ricciarelli's conduct was motivated by his frustration over Hopes' persistence in filing overtime complaints. The only other evidence of discrimination "because of sex" is Ricciarelli's occasional references to Hopes as a "bitch," both during and after the May 17 th incident. There is no evidence, however, that any conduct occurred beyond the isolated May 17 th incident that was "because of sex." As the Sixth Circuit recently observed, "[P]ersonal conflict does not equate with discriminatory animus." *Barnett v. Dep't of Veterans Affairs,* 153 F.3d 338, 342-43 (6 th Cir.1998), (upholding District Court's determination that witness's statements describing how supervisor made it known that "he disliked the plaintiff and used her as the butt of office jokes, are consistent with personal dislike rather than discriminatory animus"). Without first showing that Ricciarelli's conduct was discrimination "because of sex" rather than belligerence, neither a *"quid pro quo"* nor "hostile environment" theory of sexual harassment is viable against the city. In any event,

the conduct did not rise to a level that meets the *Harris* standard of severe or pervasive harassment.

### B. Retaliatory discharge

Hopes also alleges that her discharge from employment in September 1994 was illegal retaliation. The District Court determined that Hopes presented insufficient evidence of pretext. To grant summary judgment or judgment as a matter of law, the District Court must find that "viewing the admissible evidence most favorable to the party opposing the motion, a reasonable trier of fact could draw only one conclusion." *Hill v. Spiegel, Inc.,* 708 F.2d 233, 237 (6th Cir.1983); *see Monette,* 929 F.2d at 280; *Timmer v. Michigan Dept. of Commerce,* 104 F.3d 833, 843 (6 th Cir.1997).

Retaliatory discharge may be shown either by direct or circumstantial evidence. The order, allocation and standards of proof for discrimination cases based on circumstantial evidence under Title VII, which were announced by the United States Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), also apply to retaliatory discharge cases. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252-53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Johnson v. Dep't of Health & Human Services,* 30 F.3d 45, 47 (6th Cir.1994). To establish a prima facie case of retaliation, a plaintiff must demonstrate: (1) that she was engaged in activity protected under Title VII; (2) that she was the subject of an adverse employment action; and (3) that there is a causal link between the protected activity and the adverse employment action. *Johnson v. U.S. Dep't of Health and Human Services,* 30 F.3d 45, 47 (6th Cir.1994); *Canitia v. Yellow Freight Systems, Inc.,* 903 F.2d 1065, 1066 (6 th Cir.1990)(per curiam). In the instant case, The District Court appears to assume that Hopes stated a prima facie case of retaliation. We agree. Hopes has established that she engaged in activity protected under Title VII by filing a sexual harassment claim against her supervisor. *See* 42 U.S.C. § 2000e-3(a). The city certainly knew she had filed the claim as it had already conducted two internal investigations of the claim prior to discharging the Hopes from her position. Hopes alleges that the causal connection between her filing of the harassment charge and her discharge is supported by circumstantial evidence that her supervisor placed an anonymous call to the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

168 F.3d 490 (Table)                                                                              Page 5
(Cite as: 168 F.3d 490,  1998 WL 808222, **5 (6th Cir.(Ohio)))

city to report Hopes.

**6 If the plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate some legitimate nondiscriminatory reason for its actions. *Id.* Then the plaintiff, who bears the burden of persuasion throughout, "must demonstrate 'that the proffered reason was not the true reason for the employment decision.' " *Id.* (citing *Canitia*, 903 F.2d at 1066. *Burdine*, 450 U.S. at 256). In this case, the reason offered by the city for Hopes' discharge is nondiscriminatory. While Hopes submits that the city discharged her in retaliation for having filed a sexual harassment charge against her supervisor, the city contends that it discharged Hopes because she violated an ordinance that required all city employees to reside within city limits. There is no evidence here that the ordinance was not uniformly enforced against all employees who were reported as violators. Moreover, Hopes was aware that her failure to comply would result in termination. Thus, the burden of proof remains on Hopes to persuade the trier of fact that the city's proffered reason was pretextual. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 510-11, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). A reason cannot be proved to be "a pretext for discrimination" unless it is shown both that the reason was false, and that discrimination was the real reason. *Id.* at 515, (citing *Burdine*, 450 U.S. at 253). To prove pretext, the plaintiff must show by a preponderance of the evidence either that the proffered reason had no basis in fact, did not actually motivate the discharge, or was insufficient to motivate discharge. *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6 th Cir.1994).

Hopes proved neither that the city's reason for terminating her was factually false nor that its reason was insufficient to motivate discharge. Indeed, upon applying for her position with CPP, Hopes signed a sworn statement certifying her understanding of the residency requirement and that "[f]ailure to comply will result in an action to discharge from employment." Accordingly, we find no error in the District Court's finding that Hopes failed to establish pretext for the discharge.

### C. Pre-Discharge Retaliation

Both in her written submissions and at oral

argument, Hopes asserts a "hostile environment" claim for the hostility she experienced at work between May 17, 1994 and her termination. Her claim encompasses two alternative theories of liability. On one hand, Hopes seems to argue that the hostility in itself constituted hostile work environment sexual harassment and that the city should be liable for failing to discipline Ricciarelli promptly and adequately. On the other hand, she characterizes the inhospitable working conditions that Ricciarelli created as retaliation. With respect to Hopes' sexual harassment claim, the District Court granted summary judgment in favor of the defendant on the grounds discussed in Part A *supra*, but reserved the retaliation claim for trial. At the close of the plaintiff's evidence, the District Court granted judgment as a matter of law in favor of the defendant with respect to the retaliation claim. The Court concluded that no reasonable juror could find that Hopes suffered "the type of adverse job impact that is normally considered to be the basis of a cause of action in this particular area." The District Court added that the city responded to Hopes' complaints, disciplined the perpetrator, and "it does not seem fair that the city should be held liable for its actions in this regard." The plaintiff appeals the District Court's rulings with regard to both her hostile environment sexual harassment and retaliation arguments.

### (i) "Hostile Environment" as a Hostile Environment Harassment Claim

**7 Hopes appears to argue that the sum total of the retaliatory actions allegedly taken against her by Ricciarelli and her co-workers prior to her discharge had the combined effect of inducing the humiliation, emotional distress and severe anxiety for which she seeks damages. For harassment preceding an employment decision to be actionable, the conduct must, as a threshold matter, be "because of sex," *Oncale*, 523 U.S. at ---- - ----, 118 S.Ct. at 1002-03,, and must be "severe or pervasive." *Ellerth* 524 U.S. at ----, 118 S.Ct. at 2265; *Harris v. Forklift Systems*, 510 U.S. at 21.

Having dismissed Hopes' sexual harassment claim aside from retaliation, the District Court's opinion did not address whether the pre-discharge hostility rose to severe or pervasive sexual harassment. We must conclude that the District Court disposed of the plaintiff's sexual harassment theory of liability,

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

as the record reveals that the "hostile environment" endured by the plaintiff at work was in response to her filing of the sexual harassment complaint. The timing of the complained-of conduct, including the dangerous work assignment, reassignment of overtime, the "cold shoulder" given to her by her co-workers, and Ricciarelli's alleged meetings with the male employees about Hopes, tend to show that Hopes was isolated and disparaged by her supervisor and co-workers not based on sex, but because she *filed* a sexual harassment complaint. We shall therefore evaluate Hopes' pre-discharge hostile environment claim as a claim for retaliation under Title VII.

### (ii) "Hostile Environment" as a Retaliation Claim

Framed as retaliation under 42 U.S.C. § 2000e-3(a), Hopes' claim is subject to the same standard as her retaliatory discharge claim, discussed in Part B *supra*. Hopes must demonstrate that she was engaged in activity protected under Title VII, that she suffered adverse employment action, and that there is a causal link between the protected activity and the adverse employment action. *Johnson, supra*, 30 F.3d at 47; *Canitia v. Yellow Freight Systems, Inc.*, 903 F.2d at 1066. Then, only if the plaintiff establishes a prima facie case does the burden of production shift to the defendant to articulate a legitimate nondiscriminatory reason for the employment action. *See id.* (citing *Burdine*, 450 U.S. at 256).

At issue is whether Hopes states a prima facie case of retaliation. Hopes engaged in protected activity by filing a sexual harassment charge. She presents circumstantial evidence that Ricciarelli's hostility towards her after May 17, 1994 was in response to her filing the charge. Yet she must also demonstrate that she suffered some sort of "adverse employment action" between filing her EEO claim and her discharge from employment.

"Adverse employment action" must typically constitute a "materially adverse change in the terms of ... employment," such as "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 885-86 (6 th

Cir.1996)(quoting *Crady v. Liberty Nat'l Bank and Trust Co.*, 993 F.2d 132, 136 (7th Cir.1993)); *see Yates v. Avco Corp.*, 819 F.2d 630, 638 (6th Cir.1987)(reassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims); *accord Cross v. Cleaver*, 142 F.3d 1059, 1073 (8 th Cir.1998)(employment actions sufficiently adverse to sustain a retaliation claim must take form of material employment disadvantage).

**8 Hopes appears to have suffered two types of negative job conditions after filing her EEO claim and before her termination from employment. First, she alleges that Ricciarelli altered her actual job responsibilities by assigning her to more dangerous work than she was qualified to perform, and by depriving her of dispatching and overtime opportunities. Second, Hopes alleges that Ricciarelli isolated her from the rest of the department by ignoring her, calling her a "bitch" behind her back to other employees, and actively encouraging the other employees to ostracize her.

Our decision in *Kocsis* indicates that "significantly diminished material responsibilities" can constitute material adverse employment action sufficient to state a prima facie case of retaliation. In that case, however, the panel found that the plaintiff, who had been nominally demoted, suffered no real change in her job responsibilities. In *Kocsis*, a nurse alleged that she was the victim of disability discrimination when her employer reassigned her from the position of nursing supervisor to registered nurse. The panel found that she did not establish that the employment action in question was "materially adverse" to satisfy this element of a prima facie case of retaliation. In her new position, "she enjoyed the same (or greater) rate of pay and benefits, and her duties were not materially modified," and there was "no evidence that she lost any prestige in her position because of her working conditions or her title change." *Kocsis*, 97 F.3d at 886.

In the present case, Hopes experienced no demotion, no change of title, nor any change in rate of pay or benefits after she filed her EEO charge. Hopes' most plausible argument is that Ricciarelli modified her duties by assigning her to a job that required her to work on an 800 amp switch when she was only qualified up to 400 amps. Hopes never

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

168 F.3d 490 (Table)                                                                 Page 7
(Cite as: 168 F.3d 490, 1998 WL 808222, **8 (6th Cir.(Ohio)))

actually had to perform this assignment, however, because Ricciarelli's supervisor, Hamilton, removed her from the assignment before she was ever required to begin it. Likewise, although Ricciarelli's reassignment of dispatching opportunities that he had customarily given to Hopes might qualify as a modification of her duties and loss of an opportunity to earn overtime pay, Hopes never experienced these adverse consequences because the city remedied the problem immediately: Hamilton promptly reassigned the work to Hopes upon receiving her complaint. As the court observed in *Kocsis*, the "change in employment conditions 'must be more disruptive than a mere inconvenience or an alteration of job responsibilities.' " *Id.* at 886 (citing *Crady v. Liberty Nat'l Bank and Trust Co.*, 993 F.2d 132, 136 (7 th Cir.1993)).

Hopes also contends that our reference in *Kocsis* to the Court's ability to consider "indices that might be unique to a particular situation" in determining whether an employment action is materially adverse should encompass intangible work conditions such as the hostility and isolation she experienced at work after filing her EEO charge. Thus far, we have not specified what such "indices" might include. In *Kocsis*, the focus of plaintiff's retaliation claim was her employer's alteration of her job title rather than the general atmosphere of her working environment. The plaintiff in *Kocsis* did complain, however, that her employer inflicted "antagonism and hostility" sufficient to constitute constructive discharge. The panel rejected her claim on grounds that the plaintiff could not describe one instance of such conduct. Because she could not show that "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign," the plaintiff could not maintain an action for constructive discharge. *Id.* at 887 (quoting *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6 th Cir.1982); *Bourque v. Powell Electrical Mfg. Co.*, 617 F.2d 61, 65 (5 th Cir.1980)). Hopes' case is distinguishable from *Kocsis* because she did not resign and cannot claim constructive discharge. Instead, Hopes argues that the antagonism and hostility she suffered amounts to retaliation.

**\*\*9** Retaliatory harassment may be actionable as long as the adverse employment action suffered is material. Therefore, as with hostile environment sexual harassment, retaliatory harassment by a supervisor that occurs prior to any tangible employment decision must be severe or pervasive to be actionable. *Cf. Ellerth*, 524 U.S. at ----, 118 S.Ct. at 2265, (citing *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, ---- - ----, 118 S.Ct. 998, 1002-03, 140 L.Ed.2d 201.; *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). Other Circuits have recently confirmed that under certain circumstances, employers may also be liable for retaliatory harassment by co-workers. The Tenth Circuit held in *Gunnell v. Utah Valley State College* that an employer can be liable for co-workers' retaliatory harassment where its supervisory or management personnel either (1) orchestrate the harassment or (2) know about the harassment and acquiesce in it in such a manner as to condone and encourage the co-workers' actions. *Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1265 (10 th Cir.1998). *See also Knox v. State of Ind.*, 93 F.3d 1327, 1334 (7 th Cir.1996)("No one would question the retaliatory effect of many actions that put the complainant in a more unfriendly working environment ... Nothing indicates why a different form of retaliation-- namely, retaliating against a complainant by permitting her fellow employees to punish her for invoking her rights under Title VII-- does not fall within the statute.").

In the instant case, however, we need not determine whether the plaintiff proved that she suffered actionable retaliatory harassment at the hands of or orchestrated by her supervisor because the city has a defense. Because the pre- discharge retaliation involved no tangible employment action, the city can assert an affirmative defense by showing that it exercised reasonable care to prevent and correct promptly any retaliatory behavior and that the plaintiff unreasonably failed to take advantage of preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Cf. Faragher*, 524 U.S. at ----, 118 S.Ct. at 2293.

The evidence adduced at trial supports the conclusion that the City of Cleveland exercised reasonable care to prevent and correct retaliatory behavior. The city had an anti-sexual harassment policy and instituted grievance procedures of which the employees were aware, and which the plaintiff in fact used to pursue her complaint. For the period of time in question, the plaintiff suffered no

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

168 F.3d 490 (Table)                                                                                     Page 8
(Cite as: 168 F.3d 490, 1998 WL 808222, **9 (6th Cir.(Ohio)))

retaliation that went uncorrected. With regard to the alleged harassment by co-workers, Hopes did not claim in either her May 18 or July 5, 1994 complaint that Ricciarelli was orchestrating retaliation against her by instructing her co-workers to ostracize her. Rather, the record supports at most that Hopes complained only about the alleged May 17 sexual harassment and the dangerous work assignment (which Hopes never had to perform because it was promptly reassigned by Ricciarelli's own supervisor). In fact, Hopes' allegations of hostility are substantiated only by evidence that on two occasions, July 23 and August 11, 1994, Ricciarelli held meetings with the other employees in the department where he announced his intention to sue the city because it had already gone "too far" in its investigation and recommended discipline, and complained that Hopes would get them all in trouble, advised them not to talk to her, informed them that "payback is a bitch," and told them that Hopes was taking food off their kids' tables. By the time the first of the two meetings occurred, the City had already announced its plans to discipline Ricciarelli and was in the middle of its second investigation. Within approximately three weeks of the first meeting and four days of second meeting, the city held disciplinary hearings and increased the period of Ricciarelli's suspension based upon his conduct at these meetings and upon an unrelated incident with another female employee. Given the facts on the record, we conclude the City did all that it reasonably could have done to prevent and correct the retaliatory conduct of which it was aware. The plaintiff's retaliatory harassment claim therefore must fail.

IV. CONCLUSION

**10 Having carefully considered the record on appeal, the briefs of the parties, the arguments of counsel, and the applicable law, we AFFIRM the District Court's disposition of each of the plaintiff's claims.

168 F.3d 490 (Table), 1998 WL 808222 (6th Cir.(Ohio)), Unpublished Disposition

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works