UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| CHRISTINA M.I. KELTON, | : | Case No. C-1-02-345 |
| Plaintiff, | : | Judge Weber |
| v. | : | |
| UNIVERSITY OF CINCINNATI, et al., | : | **DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| Defendants. | : | |

Pursuant to this Court's Scheduling Order, Defendants University of Cincinnati, Haynes Goddard, Wolfgang Mayer, Sourushe Zandvakili, Debashis Pal, Nicolas Williams, Jeffrey Mills and Harland Whitmore respectfully submit the following Proposed Findings of Fact and Conclusions of Law in support of their Motions for Summary Judgment, filed concurrently with this Court.

**PROPOSED FINDINGS OF FACT**

1. The University's economics department has been politically divided since at least the late 1960s. (Goddard Dep. 15; Mayer Dep. 18) One tenured female faculty member described the difference between the two groups as "largely personality and priorities." (Escoe Dep. 24) Another faculty member explained the difference as one group wanting to attract more students and the other group wanting a more rigorous program. (Whitmore Dep. 18) Other faculty members stated that the division is between researchers and teachers. (Mayer Dep. 18-21; Mills Dep. 7; Pal Dep. 26-27) This dispute led to complaints over teaching assignments; the "researchers" (Group 1 members) wanted lighter teaching loads in recognition of their research

work. (Mayer Dep. 40-41) Other issues included whether the professors in the labor relations section (Group A members) even belonged in the economics department (Id. at 20-21), disputes over hiring and promotion decisions (Id. at 17), disagreements about the governance and use of the department's Hewett-Kautz Fund as well as departmental funds in general (Id. at 36-37), and a host of other disagreements large and small that started, as the Chronicle of Higher Education noted, with questions about the department's mission and disputes over who was to blame for the loss of the department's doctoral program. (Ex. 51)

2. For many years, Group 1 members formed a minority of the economics department. (Whitmore Dep. 18) The seven individual Defendants, Goddard, Mayer, Zandvakili, Pal, Williams, Mills and Whitmore, have been identified with Group 1. Group 1 members chafed under the rule of the majority faction and were eager for an opportunity to make changes. (Id.)

3. Goddard has been at the University for 34 years and is a full professor. (Goddard Dep. 5)

4. Mayer has been at the University for more than 30 years and has been a full professor since 1978. (Mayer Dep. 4) Mayer is well-respected; Kelton testified that he "would have been my first choice for department head." (Kelton Dep. 60)

5. Zandvakili has been at the University for sixteen years. (Zandvakili Dep. 6)

6. Pal has been at the University for nine years and is a full professor. (Pal Dep. 9) Until late into the search process, Pal did not identify with either group in the economics department--he wanted to get tenure and learned that it was "always better off not to open your mouth" because of the departmental politics. (Pal Dep. 18, 26-27) He worked extensively with Kelton and had a good, collegial relationship with her. (Id. at 16-17) When Pal received an

offer from Wisconsin, Kelton tried to convince him to stay at the University; she even called Pal's wife and told her she would help her find a job at the University. (Kelton Dep. 195-96) Initially, Pal supported Kelton for the headship position and would have voted for her. (Pal Dep. 54)

7.      Williams recruited Kelton to the University. (Howe Dep. 56) He was on sabbatical in England during the headship search. (Kelton Dep. 58-59, 64-65)

8.      Mills has been at the University for ten years. (Mills Dep. 6) Mills and Kelton were good colleagues; he considered her to be "very friendly" and they "got along well." (Id. at 12) If Mills had to pick one of the Group A members as department head, Kelton would have been at the top of his list, because he felt she encouraged research. (Id. at 8-9, 19)

9.      Whitmore has been at the University for 36 years and is a full professor. (Whitmore Dep. 4) At the time of the headship search, Whitmore was not very active in the economics department. (Id. at 15)

10.     The University hired Kelton as an associate professor in the economics department in January 1996. (Kelton Dep. 16)

11.     Kelton was appointed Director of Graduate Studies by Department Head Joseph Gallo (a Group A member) in May 1997. (Id. at 18-19) Kelton's duties as Director of Graduate Studies included managing the doctoral students who remained in the program and developing a new master's degree program to launch in the absence of the doctoral program. (Id. at 19)

12.     Kelton applied for tenure in the fall of 1996. (Id. at 20) Zandvakili had a positive view of Kelton and encouraged her to apply for tenure. (Zandvakili Dep. 92) All three members of the department sub-committee, including Mayer and Whitmore, recommended that Kelton receive tenure. (Kelton Dep. 21) Out of all the tenured economics faculty, Kelton received only

one negative vote. (Id. at 22) Zandvakili voted in her favor for her tenure. (Zandvakili Dep. 92) Kelton was awarded tenure effective September 1997. (Id. at 20)

13.    In 1999, Gallo announced at a faculty meeting that he would be stepping down as department head. (Kelton Dep. 41) Group 1 had been unhappy with Gallo's administration. (Id. at 30) When Gallo announced that he was stepping down, Group 1 members felt that "this was a golden opportunity to effect positive change in the department." (Ex. 77; Whitmore Dep. 18) Mills and Williams had recently received tenure (Mills was turned down the first three times he applied) and felt they finally had the chance to speak out. (Mills Dep. 6, 21) Mills, Williams and Zandvakili approached Goddard about running for the headship position. (Goddard Dep. 11-12)

14.    Members of Group 1 saw Kelton, who was appointed Director of Graduate Studies by Gallo, as part of his administration, and "to the extent that she was part of that administration, she did not try to change the system." (Mayer Dep. 57) Kelton seemed to agree with Gallo's approach and said that she would continue his style. (Mills Dep. 9; Howe Dep. 161-162)

15.    On January 10, 2000, Dean Joseph Caruso introduced the Headship Search Committee: Economics faculty members Al Berry, Ed Herman and Debashis Pal, as well as Joel Wolfe, a member of the political science department, and Steven Howe, a member of the psychology department, who was appointed head of the committee. (Kelton Dep. 42; Ex. 7) Student organizations subsequently elected an undergraduate student, Erin Moeller Suttman, and a graduate student, Nasrin Shahinpoor, to serve on the committee. (Kelton Dep. 42-43)

16.    On January 13, 2000, Goddard came to Kelton's office and talked with her about the headship position. (Kelton Dep. 45-46) Goddard had heard that Kelton was interested in the

headship. (Id. at 46) Goddard told Kelton that he was also interested in the headship and

mentioned changes he would make if appointed department head, such as instituting differential

teaching loads and making faculty feel that their work, particularly research, was valid. (Id. at

46-47) Goddard also noted his qualifications for the department headship, referring to his full

professorship, his work for the Environmental Protection Agency, and his outside contacts. (Id.

at 46) Goddard complimented Kelton on her work as Director of Graduate Studies, stating that

he was supportive of her efforts to revive the doctoral program and implying that he would like

her to remain as his Director of Graduate Studies. (Id. at 46-47) Goddard also talked about two

professors, Paula Dubek in sociology and Robert South in geography, who took department head

positions while associate professors, and said that their headship delayed their promotion to full

professor. (Id. at 48) Kelton thinks Goddard's statements about Dubek and South are "probably

true." (Id.)

     17.    On January 14, Goddard sent an e-mail to Kelton reiterating the comments he had

made during their meeting the previous day. Goddard recognized "that anything I say can be

interpreted as self-serving, since you have an interest in the headship too." (Ex. 8) Goddard

again mentioned Professors Dubek and South, as well as his own nine years as Director of Latin

American Studies, as examples of an administrative position holding up a faculty member's

promotional opportunities. (Ex. 8 ("One just gets no credit from colleagues for any kind of

administrative activity.")) Goddard expressed his concern that the new master's program would

suffer without her leadership and his preference that she "continue the great job you have been

doing." (Id.) Goddard concluded the e-mail with a list of his community activities he thought

would be useful to the department. (Id.)

     18.    Kelton saw Goddard's e-mail as "self-serving" and as an attempt to increase his

chances of obtaining the headship by removing her from the competition. (Kelton Dep. 50) On January 16, she forwarded the e-mail to the economics faculty members on the Headship Search Committee, Berry, Herman and Pal, and implied that Goddard was "threatening" her. (Kelton Dep. 56; Ex. 9)

19.   At the end of January or early February of 2000, Kelton approached Mayer about the Goddard e-mail. (Kelton Dep. 59) Mayer "seemed rather pleased that two people were interested enough to want to take charge of the department." (Id. at 60) Mayer told Kelton that "perhaps Dr. Goddard was a little over zealous, he already saw himself as the next department head." (Id.)

20.   In early February of 2000, Search Committee Chairman Steve Howe consulted with Donna Bowman of the University's Office of Affirmative Action (as is routine in such searches) to discuss how to conduct the search. (Howe Dep. 41-43, 46) One item on his discussion agenda was the e-mail Goddard had sent to Kelton in mid-January (Ex. 9). (Id. at 46) Howe was concerned that the e-mail might cause Kelton to drop out of the headship process, which he did not want to happen. (Id.) Bowman told Howe if Kelton did not seek the headship position, he should consult with her immediately. (Id. at 47)

21.   After Goddard became aware that Kelton had claimed to search committee members that he had "threatened" her, Goddard sent an e-mail on March 1, 2000 to some of his colleagues, including Whitmore. (Ex. 68) In the e-mail, Goddard wrote that he had talked to Kelton and apologized if his comments had left the "wrong impression." (Id.) Goddard related Kelton's retort that his e-mail was "bizarre, and not the thing a senior faculty would said [sic] to a junior, female colleague" and he opined that "if she is ambitious, and there is no doubt about that, then she has every reason to milk this for political advantage, and probably will." (Id.)

22. About a half-hour later, Whitmore sent an e-mail to Goddard disapproving of Goddard's January 13 talk with Kelton and his follow-up e-mail. (Id.) Whitmore stated that he did not think that Kelton was "any more 'ambitious' than anyone else." (Id.) In response to Goddard's e-mailed report that Kelton had claimed that Goddard's note was "bizarre and not the thing a senior faculty would said [sic] to a junior, female colleague," Whitmore empathized with Kelton's reported sentiments and wrote that "[t]here probably are faculty in this department who would be threatened by a female head." (Id.) Whitmore explained this comment:

> [W]hat I meant was that Chris Kelton has said in her memo that this is not the thing a senior faculty would say to a junior female colleague, and I was empathizing with that. I wasn't saying she had - - that she feels right in her interpretations, I was just saying that I can understand, as a female, how she may react to what happened.

(Whitmore Dep. 35) Whitmore has no knowledge of any faculty members who would actually feel threatened by a female department head. (Id. at 36)

23. Whitmore provided his response to Goddard's e-mail (but not Goddard's e-mail) to Kelton with a handwritten note: "Lest you think that Haynes & I see things the same way . . . ." (Ex. 10) Whitmore explained the reason he sent this to Kelton:

> I wanted to separate myself from Haynes and I wanted to tell her that I disagreed with Haynes as to trying to discourage her from running. I wanted her to run. I didn't want Haynes' memo to discourage her from running. That's what I was saying.

(Whitmore Dep. 39)

24. On March 13, 2000, Howe advised Kelton and Goddard by e-mail that they represented the slate of candidates for the department head position and asked that they make themselves available for informal consultations with their colleagues to discuss their "candidacy and the challenges faced by the department." (Ex. 12)

25.    Kelton had informal consultations with her colleagues about her candidacy; no one discussed gender in these meetings.  (Kelton Dep. 72-73)

26.    Williams was on sabbatical in England during the headship search.  (Kelton Dep. 58-59, 64-65)  He interviewed Kelton and Goddard by telephone.  (Id. at 58-59)  Williams asked Kelton for her vision for the department.  (Id. at 65)

27.    The Hewett-Kautz Fund is a large endowment started by a donor, Jim Kautz, who was an undergraduate student at the University, in honor of a former economics professor, William W. Hewett.  (Kelton Dep. 85; Ex. 15)  The fund primarily funds undergraduate activities and fellowships and sponsors some faculty travel and purchases.  (Kelton Dep. 85-86)  The fund was run by a five-person committee with Berry serving as the head.  (Id. at 86)

28.    Pal heard Kelton and Berry talking about how they decided that Escoe would be the next chair of the Hewett-Kautz Fund committee, instead of having the committee members discuss the matter and elect the chair.  (Pal Dep. 20-22)  He expressed his disappointment to Kelton, who tried to pacify him and told him he was overreacting.  (Id. at 23-24)

29.    On May 2, 2000, Berry and Pal had a verbal altercation at a Hewett-Kautz Fund committee meeting.  (Kelton Dep. 86)  Pal and Zandvakili raised documentation issues about the committee, wanting to know more about how the fund was spent and how much money remained after student fellowships.  (Id. at 87)  Pal and Zandvakili were also concerned that there was an arbitrary process for obtaining faculty funds after the student fellowships were awarded.  (Id. at 88)  Pal wanted rules in place and a more organized system for requesting and receiving money from the fund.  (Id.)  Berry became angry and called Pal a "cretin."  (Id.)  According to Pal and Zandvakili, Berry used profanities, calling Pal a "stupid ass" and stating that "he wanted to shove the [committee's] bylaws up [his] stupid ass."  (Pal Dep. 37-38;

Zandvakili Dep. 119)  Escoe described Berry's behavior as "entirely inappropriate and unprofessional."  (Escoe Dep. 47)

30.    Soon after the committee meeting, Pal asked Kelton to sign an affidavit describing Berry's behavior because he was going to complain to the Dean.  (Kelton dep. 89; Pal Dep. 41-42)  Despite their long collegial relationship, Kelton refused to help Pal, claiming that Berry was "seriously provoked."  (Kelton Dep. 88)  Professors Leftwich and Herman, also members of Kelton's faction, expressed immediate support for Pal.  (Pal Dep. 42-43)  Given their relationship, Pal expected support from Kelton, and wanted to see the "future department head to stand up" against Berry's unprofessional conduct.  (Id. at 43-44)

31.    Pal had started on the search committee as a supporter of Kelton, and Goddard's e-mail leaned him even more towards her, but after the Berry incident he "started having great doubt" about having Kelton as department head:  "And if Professor Kelton that day stood up and told Professor Berry off, you know, or complaining to the dean that, do something, Professor Berry is out of control, I would have supported Professor Kelton."  (Id. at 46-47)  Pal, who had long "sat on the fence" between the two groups (Mills Dep. 17), started to turn against her after this and several other incidents in the spring of 2000.  (Pal Dep. 16-18, 46)

32.    After this incident, Pal went to Whitmore and complained about Berry's actions. (Whitmore Dep. 23)  Whitmore became upset; he felt that Kelton and the other department administrators (Gallo and Escoe) should have taken action in response to Berry's inappropriate behavior.  Whitmore explained:

> There were other committee members there who just sat silent. And when Professor Berry stormed out of the room, it's my understanding that the committee was critical of Professor Pal for raising the questions rather than to [sic] Professor Berry for causing the uproar.

> Professor Kelton, as I understand it, was in the room. And I felt that, as a chairperson, if she were the chair of the department, that she should have shown some leadership and said well, at least let's provide some answers to Professor Pal.

(Whitmore Dep. 21) After talking to Pal, Whitmore spoke to Gallo and Kelton and confirmed that Berry had acted inappropriately. (Id. at 22)

33. In a letter to Dean Caruso dated May 19, 2000, Mayer, Mills, Whitmore and Zandvakili complained about Berry's verbal assault of Pal at the Hewett-Kautz Fund Committee meeting and the failure of department administrators Gallo, Kelton and Escoe (the undergraduate program director) to protect Pal. (Ex. 15) This memorandum complained about: (1) the management of the Hewett-Kautz Fund; (2) a lack of respect for research in the department; and (3) the "way decisions are made by the current Department Head [Gallo] and Director of Graduate Studies [Kelton]." (Id.) The memorandum even suggested "establishing a separate unit of economists whose core is formed by the group we are representing." (Id.)

34. The Headship Search Committee invited economics faculty members to submit materials and meet with the committee. (Howe Dep. 28)

35. Some of the faculty members who made presentations before the committee, as well as certain members of the committee, were strongly partisan. (Id. at 50)

36. Berry and Herman, members of the committee, supported Kelton in a "blatant, eventually disruptive way." (Id.) Group A members Way and Escoe made presentations in support of Kelton. (Id. at 110)

37. On April 3, 2000, Mayer submitted a memorandum to the headship search committee to present his thoughts on the headship search. (Ex. 57) Mayer raised a number of concerns, including issues over teaching assignments and an absence of "commitment to the

department's research mission." (Id.) Mayer suggested eight questions for the committee to ask the candidates. (Id. at 2) Mayer prepared this memorandum himself without consulting anyone. (Mayer Dep. 33) The memorandum did not mention gender.

38. On May 3, 2000, Mayer wrote a second memorandum to the search committee recommending Goddard. (Ex. 58) Mayer explained his recommendation:

> [Goddard] promises to be inclusive and transparent in decision-making. He already has reached out to many faculty members and has repeatedly told me that he will seek the input of the entire faculty. Importantly, he has the confidence of the group who are successful in research, who are essential for the teaching of up-to-date graduate and advanced undergraduate courses, and who are the future of this department. Professor Goddard has the ability to turn this department around. While not everyone will like the change, I am convinced that he will seek wide faculty support for al changes and that he will be fair. I have known him for 30 years and, whatever disagreements we might have had, I have always found him to be fair.

(Id.) Mayer prepared this memorandum himself without consulting anyone. (Mayer Dep. 48) This memorandum did not mention gender.

39. Zandvakili made a presentation to the search committee in favor of Goddard with strongly-worded criticisms of Kelton. (Howe Dep. 51) There was nothing related to Kelton's gender in his presentation. (Id. at 149-50) Zandvakili then prepared some comments for the committee summarizing his thoughts on Kelton's "management style." (Id. at 111-12; Ex. 80) The comments reflected his negative opinion of her managerial style; they did not mention gender. (Ex. 80)

40. After interviewing Kelton and Goddard, Williams spoke to the search committee by phone. (Howe Dep. 56; Pal Dep. 73) Williams recommended Goddard, but he also talked about Kelton's strengths and said that he had helped recruit her to the University. (Howe Dep.

56) Pal described Williams's interview as a "very even-handed discussion, he pointed out good things about Professor Goddard, he pointed out good things about Professor Kelton . . . ." (Pal Dep. 73)

41. Mills made a presentation in favor of Goddard with strongly-worded criticisms of Kelton. (Howe Dep. 51) There was nothing related to Kelton's gender in his presentation. (Id. at 149-50) He then prepared some notes for the committee because he "wanted to give them something that they could read and think about." (Id. at 29) Many of Mills's comments did not refer to Kelton; those that did were negative statements about his opinion of her managerial style. The notes did not mention gender. (Ex. 78)

42. On April 28, 2000, Whitmore sent search committee chairman Steve Howe an e-mail endorsing neither candidate. (Ex. 70) Whitmore stated: "Frankly, after all that I have heard and observed not only during this debate, but also during my 33 year tenure here, I am so disappointed in our inability to cooperate, communicate, trust or respect each other that I am not sure the head is going to matter that much." (Id.)

43. The Hewett-Kautz episode led Whitmore to send Howe an e-mail indicating that he "now [had] very serious reservations about Professor Kelton becoming our department head." (Ex. 71) After Howe expressed concerns that this e-mail would aggravate the division between search committee members Berry and Pal, Whitmore retracted this e-mail. (Howe Dep. 121; Ex. 73) Whitmore then sent Howe another e-mail assessing the strengths and weaknesses of both Goddard and Kelton. (Ex. 72)

44. Goddard interviewed with the Headship Search Committee on May 8, 2000. (Howe Dep. 98) Howe, who supported Kelton throughout the headship search, changed his opinion after Goddard's interview. (Id.) Howe had been uncomfortable with some of Goddard's

supporters as well as his decision to send the e-mail to Kelton discouraging her candidacy. (Id.) Also, Goddard did not have a great deal of departmental service on his resume. (Id.) Howe described Goddard's interview:

> . . . I asked him point blank to explain how he would be a credible candidate for the headship when he had behaved in ways that I viewed as questionable. And for the next hour, Professor Goddard proceeded to give remarkably thoughtful, calm, non-defensive, excellent answers to questions from myself and the other members of the search committee which revealed that he was very aware of the lack of collegiality inside the department, said positive things about Professor Kelton, talked about his willingness to do some of the things which, frankly, I had been under the impression that some of his supporters had not wanted to be done, such as to continue to support the master's program, talked about the need for inclusiveness in the department, talked about reaching out to Professor Kelton, talked about specific, concrete things that he would do to bring folks in the department together and move the department forward as a research unit, and I was stunned. . . . I completely altered my views of Haynes Goddard in the sixty minute period of time.

(Id. at 98-99)

45. Kelton interviewed two days after Goddard, on May 10, 2000. (Howe Dep. 156) Howe felt that she did "fine,"

> . . . but what bothered me about her presentation and what was ultimately, I think, decisive in my mind, was that I don't think that Professor Kelton had a thoughtful agenda for how to move the department forward in a way that would have garnered the support from most members of the faculty. In other words, I felt like Goddard, Professor Goddard, was willing to fight with his supporters a little bit in order to try to mend some fences with Professor Kelton, keep the graduate program in labor relations, or whatever it's called, that some of the members were attached to. I felt that Professor Goddard would have been willing to make accommodations to some of the senior members of the faculty that maybe were no longer able to be productive researchers.
>
> And it's not so much that I doubted that Professor Kelton could do those things, what bothered me was that during her presentation to the committee where the state of the department

> was paramount in my thinking because of all the craziness that I had seen swirling around the search process, what was disturbing to me was that Professor Kelton had not realized the importance of coming into the committee and addressing that head-on with a thoughtful plan that would have given something to some of the folks that disagreed with the direction that she wanted to go. And it just didn't measure up to Professor Goddard's presentation in my judgment.

(Id. at 100-01)

46. Pal as well felt that Kelton performed poorly relative to Goddard during her interview. (Pal Dep. 65) He was also disappointed that she mentioned only Group A faculty when she was asked about the "assets" of the department, and that she referred to herself as "number two in the department" when Pal was the assistant department head. (Id. at 65-66) Pal was not influenced by Mills's or Zandvakili's presentations to the committee; he was influenced by Mayer's and Williams's presentation and by his "own experience dealing with Professor Kelton." (Id. at 69, 72-73)

47. At the end of her interview, Kelton claimed she had been subjected to gender discrimination. (Howe Dep. 107) When asked what she meant, Kelton distributed her version of the Whitmore e-mail (of which she had made copies for the entire committee) (Ex. 10) and referenced the Goddard e-mail (Ex. 8). (Id. at 108) Howe explained that: "She put it [gender discrimination] on the table as a reason why we had to appoint her to be department head." (Id. at 138) Howe did not view the two e-mails as anything "new"; he had already discussed Goddard's comments with Bowman in February and he did not see the Whitmore e-mail as new information. (Id. at 142-144)

48. On May 22, 2000, the Headship Search Committee voted four to three in favor of Goddard. (Kelton Dep. 91) Economics professors Berry and Herman and undergraduate student

Suttman voted for Kelton; outside professors Howe and Wolfe, economics professor Pal, and graduate student Shahinpoor voted for Goddard. (Id. at 91-92)

49.    On May 26, 2000, Kelton sent an e-mail to Headship Search Committee Head Howe requesting that the final headship report to Dean Caruso include a comparison of her academic service record, teaching evaluations, and scholarly activities versus Goddard's, evidence that the search committee contacted some of her outside references, and a letter from an affirmative action officer verifying that the process was fair with respect to gender opportunity. (Ex. 19) Howe viewed this e-mail as part of a larger campaign by Kelton along with her partisans Berry and Herman (who had begun raising last minute procedural objections to the presence of Shahinpoor on the committee (Ex. 16)) to influence the committee at the eleventh hour. (Howe Dep. 135) Howe forwarded this e-mail to the Dean and recommended that the Dean's office investigate Kelton's allegations of gender discrimination. (Ex. 54)

50.    Howe submitted the committee's report to Dean Caruso on May 31, 2000. (Ex. 20)

51.    The Dean is the final decisionmaker with respect to headship decisions. (Kelton Dep. 118) If the Dean disagrees with the committee's recommendation, the Dean may reject their recommendation and appoint someone else as interim head. (Kelton Dep. 118)

52.    In light of the close Headship Search Committee vote, Dean Caruso decided to poll the economics department. (Kelton Dep. 119) The department voted ten to two for Kelton. (Kelton Dep. 120) Caruso understood that this vote understated Goddard's support because a number of Group 1 members who were eligible to vote were not included in the poll.

53.    Based on the close committee vote in favor of Goddard and the department vote in favor of Kelton, Dean Caruso declared the headship search a failure on June 8, 2000. (Ex. 22)

Dean Caruso felt that he could not recommend either candidate due to the deep split in the department. (Caruso Dep. 28)

54.    Dean Caruso asked the economics faculty members to nominate persons to serve as acting head. (Ex. 22)

55.    On June 5, 2000, Whitmore sent Goddard an e-mail indicating he no longer wished to be involved in "department politics." (Ex. 76) He stated that "[m]oving to the business school is not an option for me, since I now view myself as a social scientist who happens to teach in a discipline that is also helpful to business, not as someone in business administration." (Id.) Whitmore explained:

> Most of all, I am tired of the acrimony and the backbiting (of which I am also guilty) within our department and now prefer not to become involved in personnel or program issues any longer. I wish you well in becoming department head. I have voted for you in the Dean's poll. But I prefer not to sign the proposed letter to the Dean because I truly no longer care what happens within the department. Any program or personnel changes that happen in the department will be of absolutely no interest to me. I just want to spend my last 5-7 years here teaching macro and studying global economy issues.

(Id.)

56.    Six of the individual Defendants, Mayer, Mills, Pal, Williams, Zandvakili and Goddard sent an e-mail dated June 9, 2000 to the Dean explaining why each of ten economics faculty members (all Group A members, including Kelton) should not be appointed acting head. (Ex. 24) This e-mail harshly criticized most of the male Group A members, stating that: (1) Berry had acted unprofessionally in the Hewett-Kautz Committee and had done "little or no research"; (2) Gallo had "cost us our Ph.D. program and a research center" and caused Group 1 members to become "disenfranchised and withdrawn"; (3) Herman was "untrusted by the

researchers," "fundamentally unacceptable," and had done "little or no research"; (4) Leftwich was "not an economist, but rather an industrial relations specialist," who had done "little or no research"; (5) Rebelein was "untenured"; (6) Way had a "lack of credentials," a "degree not in economics," and had done "little to no research"; (7) Wellington was "retiring"; and (8) Powers had engaged in "fringe activities (law and economics)," and had done "no research." (Id.) The e-mail concluded that: "None of the above mentioned department members are acceptable." (Id.)

57.    In an e-mail dated June 10, 2000, Kelton nominated economics professors Gisela Escoe and Herman as well as two outside professors for the acting head position. (Kelton Dep. 124-25; Ex. 23)

58.    On July 12, 2000, Dean Caruso announced that Escoe, a tenured female professor and one of Kelton's nominees, had been appointed acting head. (Kelton Dep. 127; Ex. 25)

59.    Kelton claims that beginning in fall 2000, she found it hard to be productive as Director of Graduate Studies or to be able to conduct committee meetings very well. (Kelton Dep. 130) The committee meetings were contentious, as certain Group 1 members challenged her decisions and made it difficult to move forward with the committee's agenda. (Id. at 130, 143-44) Kelton brought Acting Head Escoe or Associate Dean Scanio to all committee meetings. (Id. at 130, 151) Over the fall of 2000, the graduate programs and financial aid committees met two or three times. (Id. at 154)

60.    After the headship search, Kelton received e-mails from two Group 1 members, Mills and Williams, challenging her decisions as Director of Graduate Studies. In September 2000, Mills sent Kelton an e-mail questioning why software for the graduate students had not been installed in a computer lab when Kelton and Gallo had given the impression in the spring

that funds were available to purchase the software and that the software could be installed by the fall. (Kelton Dep. 130; Ex. 27) Also in September 2000, Mills requested via e-mail that the graduate program committee meet to discuss the financial aid situation of Selcuk Misirilioglu, a fifth-year graduate student who was denied an assistantship, and to discuss the procedure used to distribute financial aid in general. (Kelton Dep. 130, 134-35; Ex. 28) In November 2000, Williams, in response to Kelton's e-mail denying his request to teach a particular course, sent an e-mail requesting a meeting of the graduate program committee with the economics faculty teaching in the graduate program to discuss the needs of the program and how those needs matched up with the faculty's preferences and talents. (Kelton Dep. 140; Ex. 30-32) Mills sent another e-mail in January 2001 to Kelton about some graduate students being turned down for funding for a sixth quarter while other graduate students, particularly those in the joint MBA program, were granted funding. (Kelton Dep. 145-46; Ex. 33)

61. On October 3, 2000, Provost Anthony Perzigian charged an Economics-College of Business Administration ("CBA") Study Committee with: (1) examining the programmatic linkages between the CBA and the College of Arts and Sciences in the economics area; (2) determining the University's needs in the area of economics instruction and research; and (3) making recommendations to improve the programmatic linkages and the allocation of resources and personnel. (Ex. 36)

62. On November 30, 2000, the economics department held a faculty meeting with Provost Perzigian and Interim Dean Groetsch. (Ex. 34) At this meeting, Herman presented the idea of restructuring the economics department into two self-governing units. (Kelton Dep. 155; Ex. 2) Group 1 would make up the Institute for Economic Research and primarily focus on producing high quality published economic research. (Ex. 2) The remaining faculty members

would constitute the Department of Economics and focus on teaching. (Ex. 2) The Group A members (including Kelton) acknowledged that:

> Seven faculty members [Group 1], who have been highly critical of the previous and current departmental administrations, recently have sought separation from the Department. Under the proposed restructuring, the Seven would achieve their goal of independence from the present departmental administration. This group also has expressed the wish to be part of an academic unit in which research is a top priority. The merits of their contention that the present Department of Economics needs to place more emphasis on research will not be examined here. It is clear, however, that under the proposed restructuring the Seven would comprise an academic unit in which research is given the highest priority.

(Ex. 2) Kelton agreed with this Group A proposal. (Kelton Dep. 24-25)

63.    The Economics-CBA Study Committee presented its report on March 7, 2001. (Ex. 36) The study committee recommended that the economics faculty remain a single department and that an outside mediator be made available for consultative or facilitative purposes if the economics faculty requested. (Ex. 36) Kelton agreed with the study committee's recommendation that third-party professional intervention was needed. (Kelton Dep. 158-59)

64.    On April 2, 2001, Provost Perzigian and Interim Dean Groetsch issued directives for the functioning of the economics department. (Ex. 37) Under these directives, the economics faculty would remain in a single department in the College of Arts and Sciences. (Ex. 37) Herman was appointed to serve as Acting Head of the Department. (Kelton Dep. 162; Ex. 37) The economics department would be restructured into two subdivisions: Group 1 (the individual Defendants) and Group A (the rest of the department). (Ex. 37) Group 1 would relocate to another floor. (Ex. 37) Each group would develop its own internal rules of governance, have its own director, and review only the files of candidates within its own group for reappointment, promotion, and tenure purposes. (Ex. 37) Group 1 condemned these

directives as "unacceptable, punitive and violating our rights specified in the labor contract." (Ex. 63)

65.    On April 23, 2001, Provost Perzigian and Interim Dean Groetsch sought the department's participation in mediation with Jerry Lawson, Director of the Center for Resolution of Disputes. (Ex. 39) In May 2001, the University set up mediation sessions with Lawson. (Ex. 45)

66.    By letter dated April 12, 2001, Kelton received an offer for a three-year appointment as a senior research associate at Penn State. (Kelton Dep. 170; Ex. 40) Kelton's husband had received an offer as a department head at the university, which made Kelton an offer as part of its dual career program. (Kelton Dep. 170) Kelton accepted the offer and requested a one-year leave of absence from the University. (Id. at 171) Kelton did not intend to return to the University but sought the leave of absence as "an insurance policy in case something goes wrong." (Id. at 172) On May 5, 2001, Dean Groetsch recommended that Kelton receive a one-year leave of absence. (Ex. 41)

67.    Kelton left Cincinnati in June or July 2001. (Kelton Dep. 172) Kelton did not have any problems with Group 1 during her leave of absence. (Id. at 173)

68.    After Kelton left the University, the division and problems in the department continued. (Id. at 131)

69.    On July 30, 2001, Provost Perzigian rescinded the economics department directives issued on April 2, 2001, so that the mediation process could be conducted on a "clean slate." (Ex. 46) In a memorandum dated August 8, 2001, Group A condemned the rescission of the directives. (Ex. 47)

70.    By December 31, 2001, Kelton advised Dean Groetsch that she would be

returning to the University. (Kelton Dep. 176) Kelton's request to transfer to the College of Business Administration was granted. (Id. at 189) She has never returned to the College of Arts and Sciences as a faculty member. (Id.) She does not seek instatement to the headship position in this case.

## PROPOSED CONCLUSIONS OF LAW

1. To establish a prima facie case of gender discrimination based on a failure to promote, Kelton must demonstrate that: (1) she was a member of a protected group; (2) she applied for and was qualified for the desired position; (3) she was considered for and denied the promotion; and (4) she was rejected in favor of an employee with similar qualifications who was not in the protected class. Betkerur v. Aultman Hosp. Ass'n, 78 F.3d 1079, 1095 (6th Cir. 1996).

2. As the headship position was filled by a female faculty member, Kelton cannot establish a prima facie case and her gender discrimination claims against the University and the individual Defendants fail as a matter of law.

3. In Betkerur, the Sixth Circuit affirmed summary judgment in favor of individual physicians who were not members of the search committee. Betkerur, 78 F.3d at 1095.

4. Individual Defendants Goddard, Mayer, Zandvakili, Williams, Mills and Whitmore were not decisionmakers with respect to the headship; they merely presented their views to the search committee (Whitmore did not even endorse a candidate). These individual Defendants lacked the power to take adverse action against Kelton and cannot be individually liable under § 1983. Kelton cannot establish a prima facie case and her gender discrimination claim against these individual Defendants fails as a matter of law.

5. Even if she could demonstrate a prima facie case of gender discrimination, Kelton fails to create a genuine issue of fact as to whether the University's reasons for declaring the

headship search a failure or whether the individual Defendants' communications to the search committee and reasons for supporting Goddard were a pretext for gender discrimination.

6.    There is no evidence that Dean Caruso (the final decisionmaker), the search committee, or the individual Defendants were motivated by Kelton's gender.

7.    "[I]n cases where the hirer and firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer." Buhrmaster v. Overnite Transp. Co., 61 F.3d 461, 463 (6th Cir. 1995).

8.    There is a presumption of nondiscrimination on the part of Mayer, Zandvakili and Whitmore because they supported Kelton's tenure application.  There is a presumption of nondiscrimination on the part of Williams because he recruited Kelton to the University.

9.    "'[R]umors, conclusory allegations and subjective beliefs . . . are wholly insufficient evidence to establish a claim of discrimination as a matter of law.'" Betkerur, 78 F.3d at 1096 (quoting Mitchell v. Toledo Hosp., 964 F.2d 577, 585 (6th Cir. 1992)).

10.    Hearsay may not be considered on summary judgment.  Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp., 176 F.3d 921, 927 (6th Cir. 1999).

11.    Kelton's "reasons" why she believes that she was not recommended for the department head position because of her gender are based on speculation and hearsay and are insufficient even if admissible to create a genuine issue of fact as to pretext in order to defeat summary judgment.

12.    Kelton's gender discrimination claims against the University and the individual Defendants fail as a matter of law.

13.    To establish a prima facie case of retaliation under Title VII, Kelton must show

that: (1) she engaged in activity protected by Title VII; (2) this exercise of protected rights was known to the University; (3) the University thereafter took adverse employment action against her, or she was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment. Morris v. Oldham County Fiscal Court, 201 F.3d 784, 792 (6th Cir. 2000).

14.    In Clark County School Dist. v. Breeden, 532 U.S. 268 (2001), the Supreme Court unanimously ruled that, assuming the Ninth Circuit's standard that it is protected activity to oppose employment practices one could "reasonably believe were unlawful" was correct, an employee did not engage in "protected activity" when she complained about one objectionable sexist remark that no reasonable person could have believed violated Title VII. Id. at 271. See also Little v. United Technologies, Carrier Transicold Div., 103 F.3d 956, 960 (11th Cir. 1997) (holding that the plaintiff did not have an objectively reasonable belief that he was opposing an unlawful employment practice where the plaintiff never complained about a co-worker's racist remark until eight months after the comment was made); Pasqua v. Metropolitan Life Ins. Co., 101 F.3d 514, 518 (7th Cir. 1996) (finding that the plaintiff did not have a reasonable belief that rumors constituted harassment based on sex where there was no evidence that the rumors were motivated by any disparate consideration of gender); Curd v. Hank's Discount Fine Furniture, Inc., 272 F.3d 1039, 1041 (8th Cir. 2001) (finding that an employee's e-mail complaining about a salesman standing "with his pants open tucking in his shirt" was not protected activity under Title VII).

15.    Kelton could not "reasonably believe" that Goddard's January conversation with her and subsequent e-mail (neither of which mentioned gender) or Whitmore's e-mail violated Title VII in any way. In addition, Kelton's subjective motivation for making these assertions

was to influence the search committee in her favor.

16.    Kelton's allegations of gender discrimination were both objectively and subjectively baseless.

17.    To establish an adverse employment action, Kelton must show that she "has suffered a materially adverse change in the terms or conditions of employment because of the employer's actions." Allen v. Michigan Dep't of Corrections, 165 F.3d 405, 410 (6th Cir.1999) (quotation marks omitted).

18.    A materially adverse change in the terms and conditions of employment includes a "termination in employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." Kocsis v. Multi-Care Mgmt., 97 F.3d 876, 886 (6th Cir. 1996).

19.    The Sixth Circuit has consistently refused to define poor performance evaluations as adverse employment actions.  See Primes v. Reno, 190 F.3d 765, 767 (6th Cir. 1999) (low score on mid-term evaluation); Hollins v. Atlantic Co., 188 F.3d 652, 657 (6th Cir. 1999) (lowered performance ratings).

20.    The criticisms of Kelton's performance as Director of Graduate Studies by co-workers who were not even evaluators of her performance, and challenges to her authority in committee meetings, are not adverse employment actions.

21.    The Sixth Circuit has declined to address whether an employer can be liable for a co-worker's retaliatory harassment. Morris, 201 F.3d at 791 n. 8.

22.    Kelton's retaliatory harassment claims fails because not one of the faculty members who allegedly retaliated against Kelton was her supervisor.

23. In Morris, the Sixth Circuit adopted the Supreme Court's standard from hostile work environment cases for retaliatory harassment claims:

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment -- an environment that a reasonable person would find hostile or abusive -- is beyond Title VII's purview. . . . Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the "terms and conditions of employment."

Id. at 790 (internal quotation marks and citations omitted).

24. A plaintiff alleging severe or pervasive retaliatory harassment must show that "the workplace is permeated with discrimination, intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment." Ceckitti v. City of Columbus, Dept. of Public Safety, Div. of Police, 14 Fed. Appx. 512, 516 (6th Cir. 2001) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).

25. Even if Kelton could bring a retaliatory harassment claim against the University based on the conduct of her colleagues, the alleged harassment (e-mails criticizing her performance as Director of Graduate Studies and challenges to her authority in committee meetings) was not sufficiently severe or pervasive to create a work environment that a reasonable person would find hostile or abusive.

26. Furthermore, the University took remedial action in response to alleged problems in the department.

27. Even assuming that e-mails and difficult committee meetings could be "adverse action," Kelton cannot establish a causal connection between these events and any "protected activity."

28. The Sixth Circuit has recognized that the right to be free from retaliation for

opposing discrimination in violation of Title VII is a right created by Title VII, not a right created by the Equal Protection Clause of the Fourteenth Amendment. See Day v. Wayne County Board of Auditors, 749 F.2d 1199, 1205 (6th Cir. 1984) (concluding that retaliation for filing an EEOC complaint, a Title VII violation, could not be the basis of a § 1983 claim, necessarily implying that the right to be free from retaliation under Title VII is a right solely derived from Title VII and not from the Equal Protection Clause of the Fourteenth Amendment); Morris v. Oldham County Fiscal Court, 201 F.3d 784, 794-95 (6th Cir. 2000) ("Whatever the scope or source of a constitutional claim of improper retaliation in other circumstances, where the plaintiff asserts that she has been retaliated against for filing a complaint under Title VII, her sole federal remedy is the cause of action provided for under Title VII.").

29.    As the right to be free from retaliation for opposing practices made unlawful by Title VII is solely a statutory right and not one derived from the Fourteenth Amendment, Congress exceeded its enforcement authority in enacting Title VII's retaliation provisions.

30.    Kelton's Title VII retaliation claim against the University is barred by the Eleventh Amendment.

31.    Kelton's retaliation claim against the University fails as a matter of law.

32.    Kelton's conspiracy claim against the individual Defendants fails because there is no evidence the individual Defendants were motivated by Kelton's gender.

33.    There is also no evidence the individual Defendants entered into a conspiracy with each other.

34.    The Sixth Circuit has recognized that it is impossible as a matter of law for employees or agents of an entity to enter into a conspiracy. Hull v. Cuyahoga Valley Jt. Vocational School Dist. Bd. of Educ., 926 F.2d 505, 509-10 (6th Cir. 1991).

35. Although the Sixth Circuit has recognized an exception to the intracorporate conspiracy doctrine for acts performed outside the employees' scope of employment, the individual Defendants' actions in connection with the headship search were within the scope of their employment with the University; they would have no role in the department headship search otherwise.

36. Kelton's conspiracy claim against the individual Defendants fails as a matter of law.

37. Qualified immunity furthers important public policies by preventing the fear of costly litigation from inhibiting public employees such as the individual Defendants from doing their jobs. Poe v. Hayden, 853 F.2d 418, 423 (6th Cir. 1988).

38. The Sixth Circuit has established a two-part test to determine whether qualified immunity protects the individual Defendants. First, this Court must decide whether Kelton has identified a clearly established constitutional right. Johnson v. Estate of Laccheo, 935 F.2d 109, 111 (6th Cir. 1991). Kelton must also demonstrate that each of the individual Defendants would have known that his particular conduct violated that right. Id. If reasonable individuals could disagree about whether the particular conduct alleged violated Kelton's rights, qualified immunity requires dismissal. Gossman v. Allen, 950 F.2d 338, 341 (6th Cir. 1991).

39. Assuming Kelton has identified a clearly established constitutional right, Kelton has failed to establish that the particular conduct of each of the individual Defendants violated that right.

40. No reasonable individual would believe that the Constitution prohibited Mayer, Zandvakili, Williams, Mills and Whitmore from making gender-neutral recommendations to the search committee.

41. No reasonable individual would believe that the Constitution prohibited Pal from voting for Goddard after his disappointing experiences with Kelton and her poor interview with the search committee.

42. No reasonable individual would believe that the Constitution prohibited Goddard from advocating on his own behalf, without ever mentioning or even hinting at gender, to be the next department head.

43. It is also not clearly established that Goddard, Mayer, Zandvakili, Williams, Mills and Whitmore, non-decisionmakers, could be liable under any circumstances.

44. The individual Defendants are entitled to qualified immunity.

45. Summary judgment is appropriate in favor of the University and the individual Defendants on each of Kelton's claims.

Respectfully submitted,
Jim Petro
Attorney General of Ohio

By: Doreen Canton

Doreen Canton (0040394)
Taft, Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202-3957
(513) 381-2838

Trial Attorney for Defendants

OF COUNSEL:

W. Stuart Dornette (0002953)
Kerry P. Hastings (0066871)
Taft, Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202-3957

Mitchell D. McCrate (0047403)
Associate Counsel
University of Cincinnati
300 Administration Building
Cincinnati, OH 45221-0623

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the foregoing Defendants' Proposed Findings of Fact and Conclusions of Law was sent to Marc D. Mezibov and Michael N. Budelsky, 920 Fourth & Race Tower, 105 W. Fourth Street, Cincinnati, Ohio 45202 by hand delivery, this 29th day of August, 2003.

[signature]