UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| CHRISTINA M.I. KELTON, | : | Case No. C-1-02-345 |
| | : | |
| Plaintiff, | : | Judge Weber |
| | : | |
| v. | : | |
| | : | **REPLY MEMORANDUM IN** |
| UNIVERSITY OF CINCINNATI, et al., | : | **SUPPORT OF UNIVERSITY OF** |
| | : | **CINCINNATI'S MOTION FOR** |
| Defendants. | : | **SUMMARY JUDGMENT** |

## I. INTRODUCTION

The University's motion for summary judgment should be granted. This case has nothing to do with the University's conduct; it represents nothing more than Kelton's vendetta against the individual Defendants, her co-workers. Kelton identifies no evidence that could even suggest that the University's decision to declare the headship search a failure and reject **both Kelton and her male opponent** was motivated by her gender. To try to maintain conspiracy claims against the individual Defendants, Kelton even argues:

> [I]t is clear that the Faculty Defendants were not acting for or on behalf of the University when they campaigned against Dr. Kelton's candidacy for the headship. All the individual Defendants are members of a collective bargaining unit and none hold management positions with the University. Indeed, the Faculty Defendants were acting in their personal capacities and pursuant to their personal interests when they sought to effect [sic] the results of the search to determine **their** administrative head.

(Pl. Mem. Opp. at 30-31) (emphasis in original). Kelton's own argument requires the conclusion that the University is not responsible for anything the individual Defendants allegedly did (even

were Kelton's unsupported allegations against them true).  This alone requires summary judgment in the University's favor.[1]

Kelton's gender discrimination claim also fails for additional reasons.  Kelton failed to establish a prima facie case because she cannot establish that a male received the headship position; Dean Caruso undisputedly declared the headship search a failure, rejected the candidacy of Kelton's **male** opponent, and appointed a **female** interim head.  Kelton lacks direct evidence of discrimination; the Sixth Circuit recently affirmed this Court's rejection of a similar contention in Murphy v. University of Cincinnati, No. 01-3376, 2003 WL 21774157 (6th Cir. July 29, 2003) (attached).  As to pretext, Kelton's responses to Defendants' proposed findings of fact establish the absence of any issues of material fact as to the University's legitimate decision to make neither Kelton nor Goddard department head and instead to appoint a female professor nominated by Kelton as interim head.  Kelton ignores the Sixth Circuit's controlling decision in Betkerur v. Aultman Hosp. Ass'n, 78 F.3d 1079 (6th Cir. 1996), which affirmed summary judgment in favor of the hospital in connection with its search for a director of neonatology.  The Betkerur court rejected virtually every contention Kelton raises, including her reliance on the alleged actions of non-decisionmakers, conclusory assertions, hearsay and stray remarks.

Kelton's retaliation claim must also be dismissed.  There is no evidence the University retaliated against Kelton and the alleged "retaliation" by the individual Defendants is insufficient as a matter of law even were their actions attributable to the University (which they are not according to Kelton's own argument).

---

[1]     As explained in the individual Defendants' reply memoranda, Kelton's argument also requires summary judgment in favor of the individual Defendants because if their actions were truly outside the scope of their employment there would be no state action to support § 1983 or § 1985(3) claims against them.

## II.  ARGUMENT

**A.      Kelton's Gender Discrimination Claim Must Be Dismissed.**

**1.      Kelton failed to establish a prima facie case.**

**a.      Kelton was not rejected in favor of a male.**

Kelton concedes that the University declared the headship search a failure and that neither Kelton nor Goddard became department head.  (Pl. Resp. Defs. Proposed Findings of Fact ¶ 53) Instead, the Dean appointed Escoe, a tenured female professor nominated by Kelton, as acting head. (Id. ¶ 58)  There is no evidence the University continued the search; no new search committee was formed and Kelton herself admits that "nothing occurred with respect to a new search for more than two years." (Pl. Mem. Opp. at 8)

Despite these undisputed facts, Kelton asserts:  (1) the appointment of female professor Escoe as interim head should not be considered because Escoe did not become permanent head; (2) the law governing "failure to hire" (although Kelton was already a University employee) rather than "failure to promote" should apply; and (3) a "flexible" application of the law should excuse her inability to establish this prima facie case element.  (Id. at 15-16)

None of these arguments have merit.  Betkerur's facts disprove Kelton's legal argument that the prima facie case articulated by the Sixth Circuit in that case does not apply.  In Betkerur, the plaintiff (already a neonatologist at the hospital) sought to become director of neonatology. 78 F.3d at 1082, 1085.  There is no difference between Kelton's pursuit of the department head position and Betkerur's pursuit of the neonatology director position.  Like Betkerur, Kelton must show that "she was rejected in favor of another person with similar qualifications who was not a member of her protected class." Id. at 1095.  Kelton may not establish a prima facie case by using a "failure to hire" framework and showing that the headship position remained open and the University continued to

seek candidates with similar qualifications because under <u>Betkerur</u> this is not a "failure to hire" case. But even if it were, Kelton would still lose because the University undisputedly did not continue to seek candidates after the headship search.

Kelton's legally unsupported assertion that the University's appointment of Escoe as acting department head should not be considered is also without merit.  This argument misses the point; the fact that the University appointed a female as department head, even on an acting basis, negates the inference of discrimination which the prima facie case elements are designed to raise.  If the University were biased against women, it would not appoint a woman as department head on any basis.

Apparently recognizing that she has failed to establish this prima facie case element, Kelton's final fallback position is that her failure should be excused by "flexibly" construing the prima facie case.  But Kelton cites no law supporting the proposition that required elements of the prima facie case should be "flexibly" eliminated to enable a deficient claim to survive.  Even were that not so, there would be no reason to do so in this case, where it is undisputed that:  (1) the University rejected Goddard's candidacy for the same reason it rejected Kelton's; and (2) a female became interim department head.

Kelton's gender discrimination claim against the University (and all her claims against the individual Defendants) must be dismissed for lack of a prima facie case.

<b>b.    <u>Kelton does not have direct evidence of discrimination.</u></b>

Implicitly recognizing the absence of a prima facie case, Kelton attempts to circumvent <u>Betkerur</u> by claiming to have direct evidence of discrimination.  (Pl. Mem. Opp. at 11-13)

Kelton does not have direct evidence of discrimination.  In the Sixth Circuit, direct evidence is proof that establishes discrimination on its own.  <u>Terbovitz v. Fiscal Court of Adair Cty., Ky.</u>, 825

F.2d 111, 115 (6th Cir. 1987). The Sixth Circuit has ruled that evidence that requires a jury to infer a fact is not direct evidence. See Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1081 (6th Cir. 1994); Bush v. Dictaphone Corp., 161 F.3d 363, 370 (6th Cir. 1998) (stating that Manzer held "that evidence that would require the jury to infer a fact is not direct evidence"); Laderach v. U-Haul of Northwestern Ohio, 207 F.3d 825, 829 (6th Cir. 2000) (same). In Terbovitz, for example, the plaintiff testified that she was told explicitly that the employer would not hire a woman. Id. at 13. See also Smith v. Chrysler Corp., 155 F.3d 799, 805 (6th Cir. 1998) ("Such [direct] evidence would take the form, for example, of an employer telling an employee, 'I fired you because you are disabled.'").[2]

The Sixth Circuit recently affirmed this Court's conclusion that the plaintiff in Murphy v. University of Cincinnati, No. 01-3376, 2003 WL 21774157 (6th Cir. July 29, 2003) (attached), did not have direct evidence. In Murphy, the plaintiff asserted that statements by the decisionmaker that: (1) a seminar on affirmative action was a "waste of time"; (2) "expressed disdain over the fact that he was being forced to hire a woman while good men were left 'begging for a job,'"; and (3) the female plaintiff should not "get fat like the last girl" were direct evidence. Id. at *6. The Sixth Circuit found none of these statements were direct evidence. Id.

---

[2]    Kelton's reliance on Wright v. Southland Corp., 187 F.3d 1287 (11th Cir. 1999), for a broader definition of "direct" evidence is misplaced. (Pl. Mem. Opp. at 11-12) Wright is not the law of the Sixth Circuit. Indeed, Wright is not even the law of the Eleventh Circuit. The Eleventh Circuit has held that: "Direct evidence is evidence, which if believed, proves existence of fact in issue without inference or presumption." Burrell v. Bd. of Trs. of Georgia Military Coll., 125 F.3d 1390, 1393 (11th Cir. 1997) (citation and internal quotation marks omitted). The Wright opinion to which Kelton cites was not joined by either of the other two judges on the panel, presumably because it did not accurately reflect Eleventh Circuit law. Wright, 187 F.3d at 1306. See also Ferrell v. Masland Carpets, Inc., 97 F. Supp.2d 1114, 1122 n.11 (S.D. Ala. 2000) (declining to follow the opinion in Wright as dicta and inconsistent with Eleventh Circuit law).

Kelton's claim that e-mails from Goddard and Whitmore (Exs. 10, 68) are direct evidence of gender discrimination is meritless.  These documents are not evidence of gender discrimination, much less direct evidence.  Kelton's attempt to twist Whitmore's attempt to **encourage her to seek the headship** into evidence of discrimination is bizarre; Kelton **admitted** Whitmore's benign motivation in providing her this note.  (Pl. Resp. Defs. Proposed Findings of Fact ¶ 23) ("I wanted her to run.  I didn't want Haynes' memo to discourage her from running.")  In this admittedly benign context, Whitmore explained that his comment that "[t]here probably are faculty in this department who would be threatened by a female head" (Ex. 10) was merely empathizing with Kelton's reported sentiments; Kelton **admitted** Whitmore's explanation was true.  (Pl. Resp. Defs. Proposed Findings of Fact ¶ 22)  Whitmore also testified, without contradiction, that he has no knowledge of any faculty members who would actually feel threatened by a female department head.  (Whitmore Dep. 36)  At best for Kelton, Whitmore's e-mail is no better than "evidence" the Sixth Circuit rejected in Betkerur.  The Sixth Circuit ruled:

> Next, much of Appellant's "evidence" challenging the hospital's proffered reason for its decision consists of her own deposition testimony that other hospital personnel, often unnamed, told her or implied that Aultman acted out of discriminatory motives.  Even if we were to overlook the obvious hearsay problems, **such statements "are nothing more than rumors, conclusory allegations and subjective beliefs which are wholly insufficient to establish a claim of discrimination as a matter of law."**

Betkerur, 78 F.3d at 1095-1096 (citation omitted) (emphasis added).  Whitmore's e-mail is not direct evidence of discrimination.

Likewise, Goddard's opinion that Kelton would "milk" his conversation and e-mail to her "for political advantage" is not evidence of discrimination, much less direct evidence.  It is entirely reasonable for Goddard, whom Kelton had accused of "threatening" her to members of the search committee, to resist those assertions and to view them as a political ploy to further Kelton's

candidacy and to damage him.  (Ex. 68)  Kelton admitted that **she** interpreted Goddard's email as "self-serving" and as "an attempt to increase his changes of obtaining the headship by removing her from the competition."  (Pl. Resp. Defs. Proposed Findings of Fact ¶ 18)  Even Kelton did not perceive Goddard's approach to her and subsequent e-mail as evidence of gender bias.  Kelton cites no authority for the proposition that such comments are evidence of gender bias, much less direct evidence.

Even assuming the Goddard and Whitmore e-mails are "evidence" of discrimination (which they are not), they are not direct evidence.  Neither Goddard nor Whitmore were decisionmakers; as non-decisionmakers, their motivations are irrelevant.  <u>Betkerur</u>, 78 F.3d at 1095 ("[T]he lower court properly discounted the discriminatory remarks that Appellant alleges were made by non-decisionmakers at Aultman.") (citation omitted).  Also, these communications are temporally disconnected from the University's decision to declare the headship search a failure; both are dated March 1, 2000, before Kelton had even formally declared her candidacy.  (Exs. 1, 10, 22, 68)  The Dean declared the headship search a failure on June 8, 2000 (Ex. 22); the e-mails dated March 1, 2000 are not direct evidence bearing on the Dean's decision.

As Kelton failed to establish a prima facie case, her gender discrimination claim must be dismissed without further analysis.

> **2.    Kelton cannot demonstrate that the University's legitimate reason for declaring the headship search a failure, rejecting the candidacy of her male opponent, and appointing a female as interim head was a pretext for gender discrimination.**

Even if Kelton established a prima facie case, she failed even to attack the University's rationale for declaring the headship search a failure, rejecting the candidacy of her **male** opponent, and appointing a **female** as interim head.  In this regard, Kelton's repeated attacks upon the individual Defendants are misplaced.  Kelton concedes that:  "All of the individual Defendants are

members of a collective bargaining unit and none hold management positions with the University."

(Pl. Mem. Opp. at 30)  And Kelton identifies no evidence that any of the various criticisms made by

various individual Defendants were adopted by the University.  In <u>Betkerur</u>, the Sixth Circuit

rejected the assertion that an allegedly discriminatory comment made in a consultant's report which

was submitted to the search committee was evidence of pretext.  The Sixth Circuit ruled:

> No evidence suggests that the statement was adopted or relied upon in
> any way by hospital decisionmakers; rather, the minutes of the search
> committee meeting at which the report was discussed show only that
> the report was passed out and that two of its recommendations, neither
> of which included the statement in question, were adopted.

<u>Betkerur</u>, 78 F.3d at 1097.  Kelton's misplaced focus on the individual Defendants rather than on the

University's decisionmaking is fatal to her discrimination claim.

    Kelton ignores Dean Caruso's rationale for declaring the headship search a failure.  Kelton

**admitted** that:  "Based on the close committee vote in favor of Goddard and the department vote in

favor of Kelton, Dean Caruso declared the headship search a failure on June 8, 2000.  Caruso felt

that he could not recommend either candidate due to the deep split in the department."  (Pl. Resp.

Defs. Proposed Findings of Fact ¶ 53)  Caruso's decision was not based on Kelton's gender; he

rejected **Goddard** for exactly the same reason.  And Caruso appointed a **female** professor as acting

head.  Even Kelton admitted that Caruso did the "proper thing" by declaring the search a failure, and

she does not believe Caruso discriminated against her.  (Kelton Dep. 122, 127-128)  This admission

is sufficient to defeat her discrimination claim.

    Kelton also ignores the search committee's rationale for preferring Goddard.  For example,

search committee chair Steve Howe explained that Goddard's interview changed his mind about

who to support.  (Pl. Resp. Defs. Proposed Findings of Fact ¶ 44)  In her interview, Kelton did not

reveal a "thoughtful agenda for how to move the department forward in a way that would have

garnered the support from most members of the faculty." (Id. ¶ 45) Kelton **admitted** that Howe actually perceived the interviews this way. (Id.) Kelton further ignores the search committee's actual recommendation to the Dean. (Ex. 20) The search committee report cited the following as Goddard's strengths: (1) a long career at the University; (2) a demonstrated capability to do good quality research; (3) his distinction as a scholar and his status as a full professor; (4) his active engagement in the community and potential to create funding for research and graduate education; (5) his receipt of the endorsement of several members of the faculty; (6) his "thought-provoking and impressive statement about how he would approach the job"; and (7) his strong interview with the committee. (Ex. 20 at 3) **Kelton does not even attempt to disprove any of these articulated reasons for the search committee's recommendation in favor of Goddard**. And even if she had, she has not shown that the Dean adopted any of these reasons; he rejected Goddard as well as Kelton.

Rather than identify evidence impugning the motives of the search committee or Dean, Kelton focuses on the individual Defendants, particular Goddard, Whitmore and Zandvakili. As a threshold matter, none of these individuals were on the search committee and there is no evidence that any of their communications to which Kelton objects influenced the search committee or the Dean. On the contrary, the search committee viewed Goddard's approach to Kelton as a **negative**. Kelton admitted: "Howe had been uncomfortable with some of Goddard's supporters as well as his decision to send the e-mail to Kelton discouraging her candidacy." (Pl. Resp. Defs. Proposed Findings of Fact ¶ 44)

As Kelton has no evidence implicating the motivation or factual basis for the University's decision to declare the headship search a failure, summary judgment should be granted. See Betkerur, 78 F.3d at 1097 ("[A]ppellant has failed to produce evidence sufficient to support her subjective belief that she was passed up for the position of Director of Neonatology because of her

race, color, or national origin.  The limited evidence Appellant has offered simply does not establish

that the hospital's articulated non-discriminatory basis for its decision was pretextual.").

###### a. Kelton lacks circumstantial evidence of discrimination.

Kelton purports to rely upon six pieces of "circumstantial evidence" to attack the

University's decision to declare the headship search a failure:  (1) Goddard's testimony that

departmental "division" resulted from Kelton's suit; (2) the claim that the department divided into

Group A and Group 1 after Kelton filed her EEOC charge; (3) a supposed absence of evidence of a

division in the department; (4) the Goddard e-mail previously discussed; (5) the Whitmore e-mail

previously discussed; and (6) an affidavit asserting that Zandvakili made certain comments two

years after the headship search failed.  (Pl. Mem. Opp. at 17-19)[3/]

Kelton's assertion that no division in fact existed in the department is belied by the evidence

and her responses to Defendants' proposed findings of fact.  Kelton admitted the truth of the

following proposed finding of fact:

> Based on the close committee vote in favor of Goddard and the
> department vote in favor of Kelton, Dean Caruso declared the
> headship search a failure on June 8, 2000.  Dean Caruso felt that he
> could not recommend either candidate due to the deep split in the
> department.

(Pl. Resp. Defs. Proposed Findings of Fact ¶ 53)  The split in the department to which the Dean

referred undisputedly existed; the search committee did narrowly support Goddard and the

departmental poll did favor Kelton.  (Id. ¶¶ 48, 52)  None of Kelton's assertions regarding the

division in the department are attributable to the Dean; the Dean's motivation is unchallenged.  Even

were these facts not dispositive, Kelton's assertions regarding the division in the department are not

---

[3/]      Kelton also claims that certain of the individual Defendants' reasons for supporting
Goddard are untrue; the individual Defendants will address those points in their reply
memoranda.

supported by the record.  Kelton admitted that in an e-mail dated June 9, 2000 (well before Kelton

filed an EEOC charge), six individual Defendants criticized every single member of Group A,

including eight males.  (Id. ¶ 56)  Group 1 members had previously advocated moving to the College

of Business in a memorandum to the Dean dated May 19, 2000, well before Kelton's suit and before

the Dean declared the headship search a failure.  (Id. ¶ 33)  Kelton and her Group A colleagues

proposed separating from Group 1.  (Id. ¶ 62)

      Kelton also admitted the facts underlying the division between Group 1 and Group A.

Kelton admitted that issues actually existed between the groups including "personality and

priorities," tension between "wanting to attract more students" and "wanting a more rigorous

program," a "division between researchers and teachers," "complaints over teaching assignments"

based on the teaching/research division, the validity of the labor relations section (containing Group

A members), disputes over hiring and promotion decisions, disputes over the governance and use of

the department's Hewett-Kautz Fund and departmental funds in general, and even questions about

the department's mission and disputes over who was to blame for the loss of the department's

doctoral program.  (Id. ¶ 1)  Kelton also admitted in the Group A proposal to split the department

that the Group 1 members "have been highly critical of the previous and current departmental

administrations," "recently have sought separation from the Department," had a "goal of

independence from the present departmental administration," and had "expressed the wish to be part

of an academic unit in which research is a top priority."  (Id. ¶ 62)  **All of these facts are admitted

to be true**.

      The Whitmore and Goddard e-mails are also not evidence of discrimination as explained in

the "direct" evidence section of this brief (infra at 6-7).

      The comment attributed to Zandvakili that in May of 2002 he told Tina Natorp that "at most,

[she] could aspire to be bank branch manager in the banking industry because [she] eventually

would marry and have a family" (Pl. Mem. Opp. Ex. A ¶¶ 3-4) is also not evidence of

discrimination.  Assuming this comment was made, it is a gender-neutral observation regarding the

familiar tension between upper level jobs and family life.  This observation applies equally to males

and females; it is not evidence of discrimination.  At best for Kelton, this comment is an isolated,

ambiguous stray remark made by a non-decisionmaker **two years** after the headship search which

should not be considered on summary judgment.  See Betkerur, 78 F.3d at 1096 (an ambiguous

comment by a decisionmaker that the plaintiff was "not a selling person" made years before the

decision regarding the neonatology director position insufficient to avoid summary judgment).

Further, there is no evidence Zandvakili's alleged comment was adopted by any decisionmaker nor

could it have been since it post-dates the headship search.  Id. at 1097 (finding with respect to a

different allegedly discriminatory comment that "no evidence suggests that the statement was

adopted or relied upon in any way by hospital decisionmakers").

     In sum, Kelton's repeated attacks on non-decisionmakers are both meritless and irrelevant.

Summary judgment is in order.

        **b.**     **The University's reasons for declaring the headship search a**
                    **failure were based on fact.**

     As demonstrated above, Kelton has admitted that Dean Caruso declared the headship search

a failure based on the division he perceived in the department based on the narrow search committee

vote for Goddard and the department vote in Kelton's favor.  (Pl. Resp. Defs. Proposed Findings of

Fact ¶ 53)  The factual basis for the search committee's recommendation and the Dean's decision

are admittedly true; Kelton's argument lacks merit.  (Id. ¶¶ 44-46, 48, 53)  In addition, there is no

evidence that the University adopted the criticisms of the individual Defendants of which Kelton

complains.  Betkerur, 78 F.3d at 1097 (finding the absence of evidence that hospital decisionmakers adopted an allegedly discriminatory comment precluded plaintiff from relying on the comment).

    **B.**    **Kelton's Retaliation Claim Should Be Dismissed.**

        Kelton's mish-mash of generalized assertions regarding retaliation are insufficient to avoid summary judgment.  Kelton's assertions are difficult to understand.  For example, she purports to rely upon filing an EEOC charge on October 24, 2000 as "protected activity" (Pl. Mem. Opp. at 9), but she also claims that the "adverse action" which represented the retaliation was the denial of the headship position, which occurred months **earlier**.  (Id. at 25)

        **1.**    **Kelton failed to establish a prima facie case of retaliation.**

        **a.**    **Kelton did not engage in protected activity.**

        Kelton failed to respond to the University's opening brief which established that Kelton's belated assertions of gender discrimination were both objectively and subjectively baseless.  Instead, Kelton strings together a list of alleged protected activity:  (1) complaining to headship search committee members (Ex. 9) about Goddard's e-mail of January 14, 2000; (2) submitting Whitmore's e-mail (Ex. 10) to the search committee after her interview at the end of the search process; (3) complaining to Provost Tony Perzigian about alleged "harassment" **after** the headship search (Ex. 33); and (4) filing an EEOC charge on October 24, 2000, **after** the headship search.  (Pl. Mem. Opp. at 23-24)

        As to Goddard's e-mail, Kelton objectively could not and subjectively did not perceive this e-mail to be gender discrimination.  Goddard undisputedly did not mention gender in his e-mail or in their prior conversation.  (Pl. Resp. Defs. Proposed Findings of Fact ¶¶ 16-17)  Kelton's e-mail to three search committee members (not to the affirmative action officer or to any normal avenue to complain about gender discrimination) asserted that Goddard "threatened" her, not discriminated against her.  (Id. ¶ 18)  Kelton **subjectively** admitted that she saw Goddard's e-mail as "self-serving"

and as an "attempt to increase his chances of obtaining the headship by removing her from the competition." (Id.) That is subjectively not a gender-based motivation. Kelton has no evidence to support her conclusory claim that her response to Goddard's e-mail had anything to do with gender discrimination, much less that her response was based on a good faith belief that she had experienced gender discrimination.

Kelton's reaction to Whitmore's note (Ex. 10) was also neither objectively nor subjectively reasonable. No reasonable person could construe Whitmore's encouragement of her to seek the headship position as gender discrimination. (Pl. Resp. Defs. Proposed Findings of Fact ¶ 23) The University has previously addressed the speculation contained in the e-mail regarding the possibility that unidentified faculty members in the economics department could be threatened by a female head. Kelton's purported reliance on such speculation, particularly in the context in which she received Whitmore's note, is insufficient to establish protected activity. In addition, Kelton waited to use Whitmore's March 1, 2000 note until May 10, 2000 in front of the **search committee** rather than any established avenue at the University to challenge gender discrimination, which further confirms her tactical deployment of the gender card in an attempt to win the position. If Kelton truly believed that the Whitmore note was gender discrimination, why did she wait more than two months and until the very end of her interview with the search committee to use that "evidence"? Kelton offers no answer to this question; there is none. In any event, the Whitmore note would be insufficient as a matter of law to sustain a good faith belief in gender discrimination; this case is exactly like Clark County School Dist. v. Breeden, 532 U.S. 268 (2001), which Kelton does not even try to distinguish.

As to the e-mail to Perzigian, Kelton could not have reasonably believed that receiving a few e-mails from co-workers addressing University business was retaliation in any legally prohibited

sense.  Once again, this complaint was nothing more than a power play to attempt to silence individuals with whom Kelton had disagreements.  Kelton offers no defense of this e-mail, either.

Although Kelton's filing of an EEOC charge on October 24, 2000 is protected activity under the participation clause, none of the supposedly "adverse" actions occurred after this filing (or after the Perzigian e-mail).  The headship search concluded in June of 2000; the e-mails to which she objected were sent in September of 2000.  (Pl. Resp. Defs. Findings of Fact ¶ 60)

Kelton has failed to rebut the University's analysis regarding her objective and subjective lack of good faith and she has failed to identify any objective basis supporting her conclusory allegations of discrimination.  Her retaliation claim therefore fails.

### b.    <u>Kelton did not suffer an adverse employment action.</u>

In her brief, Kelton claims to have suffered two distinct adverse employment actions:  (1) denial of the headship position; and (2) the e-mails mentioned previously.  While denial of the headship position would be an adverse action, the e-mails are undeniably not.  As a threshold matter, Kelton has failed to respond to the Sixth Circuit law requiring that retaliatory harassment come from supervisors, not co-workers.  (University Br. at 27)  This alone is sufficient to defeat her retaliatory harassment claim.

Even had the e-mails come from Kelton's supervisor, they would still be insufficient as a matter of law.  As the University explained without contradiction in its opening brief, the Sixth Circuit has refused to define poor performance evaluations (from supervisors) as adverse employment actions.  (University Br. at 26)  It necessarily follows that job-related inquiries from co-workers are also not adverse actions.  Contrary to Kelton's assertion, the Seventh Circuit did not hold that "hostility and professional snubbing" can constitute adverse employment actions in <u>Knox v. Indiana</u>, 93 F.3d 1327 (7th Cir. 1996).  The issue in <u>Knox</u> was whether the employer took adequate corrective action against the plaintiff's co-workers after her complaint.  <u>Id.</u> at 1335.

Even if Kelton somehow established "severe and pervasive" retaliatory harassment, the University undisputedly took prompt remedial action, which would defeat this claim. It is undisputed that interim Department Head Escoe and Associate Dean Scanio attended graduate program committee meetings at Kelton's request. (Kelton Dep. 130, 150-151) In a situation involving tenured professors and objectively job-related e-mails, this action is more than enough to respond to Kelton's asserted complaints. Kelton did not address this issue in her brief.

### c.    Kelton failed to establish a causal connection between "protected activity" and the "retaliation."

Kelton's entire basis for a causal connection with respect to the headship search is the timing between her mentioning the Whitmore note at her search committee interview on May 10, 2000 and the search committee vote on May 22, 2000. (Pl. Mem. Opp. at 26-27) But it is well-established that timing alone is insufficient to establish a causal connection in the Sixth Circuit. Nguyen v. City of Cleveland, 229 F.3d 559, 566 (6th Cir. 2000) (temporal proximity in the absence of other evidence insufficient, discussing prior Sixth Circuit decisions). And this is particularly true when the timing is created by Kelton's decision to raise the issue at the very end of the search process.

There is no evidence that the University would not have declared the headship search a failure but for Kelton's mention of the Whitmore note at the end of her interview with the search committee. As explained in the pretext section of this brief (infra at 7-10), the University's rationale for declaring the headship search a failure is unimpeachable. Kelton's assertion that Howe and the search committee "chose to ignore evidence of gender bias" is incorrect. Howe did not ignore Kelton's assertions; he promptly forwarded the information to the Dean and recommended that the Dean's office investigate Kelton's allegations of gender discrimination. (Pl. Resp. Defs. Proposed Findings of Fact ¶¶ 47, 49) Kelton cites no legal authority for the proposition that it violated Title VII for the search committee to proceed while forwarding Kelton's allegations to the Dean for

further review, particularly when these allegations did not implicate the search committee and especially under circumstances where Kelton's eleventh hour allegations were based on events occurring months earlier.

As to the e-mails Kelton received from co-workers, Kelton identifies no evidence that those e-mails would not have been sent but for "protected activity."  The e-mails concern Kelton's position as Director of Graduate Studies; they do not mention any "protected activity."  As to the individual Defendants' disparagement of Kelton's claims, the individual Defendants may lawfully reject Kelton's unsupported assertions against them.

## 2.    Kelton failed to establish pretext.

As explained in the pretext section of this brief (infra at 7-10), Kelton failed to establish that the University's legitimate reason for declaring the headship search a failure was pretextual.  As to the e-mails sent by two individual Defendants, Kelton has no evidence that these e-mails, which related to her position as Director of Graduate Studies, would not have been sent but for her "protected activity."

Kelton's retaliation claim should be dismissed for this reason as well.[4]

## III.    KELTON SIGNIFICANTLY MISSTATES THE RECORD.

Although the undisputed facts discussed above are sufficient to require summary judgment, some of Kelton's assertions are so outrageous as to warrant a separate response.  For example, there is **no support** in this record for Kelton's smear statement in her Introduction that there is "a patent gender-biased academic culture which has seldom allowed and rarely encouraged female economists

---

[4]    Kelton's retaliation claim is also barred by the Eleventh Amendment as explained in the University's opening brief.  (University Br. at 29-30)  Other than labeling this argument as "utterly without merit," Kelton did not respond to the analysis of Sixth Circuit decisions which leads to the inescapable conclusion that the anti-retaliation provision of Title VII does not enforce the Fourteenth Amendment.

to thrive." (Pl. Mem. Opp. at 1)  Who are these female economists?  Who were the applicants?

What was the applicant pool?  Who were the decisionmakers?  What were the reasons for prior

employment decisions?  Kelton needs **evidence**, not generalized conclusions.

Kelton cites exactly three examples of faculty bias towards female economists:

(1)    "referring to female professors as 'babes' and 'stacked'" (Pl. Mem. Opp. at 1)

Mills heard Professor John Powers (a member of Kelton's group and one of her supporters) make those comments about female job candidates.  Kelton did not sue Powers and the comments had nothing to do with her.  (Mills Dep. 65-66; Kelton Dep. 32, 93-94, 147)

(2)    "attributing professional success to a female's physical attributes" (Pl. Mem. Opp. at 1)

That statement is hearsay:  Escoe testified "it's one of those someone said that someone said kind of thing." (Escoe Dep. 56)  The statement had nothing to do with Kelton.  (Id.)

(3)    "Faculty Defendants are critical of female professors who wish to take a leadership, rather than a supporting role. . . . females occupying positions of power are publicly denied the respect enjoyed by males in the same positions." (Pl. Mem. Opp. at 1-2)

The testimony cited by Kelton says nothing about criticism of female professors or lack of respect for them.  Escoe actually testified that in the same circumstances, a male administrator would have been treated the same way she was.  (Escoe Dep. 57-58)

None of this "evidence" is even admissible, let alone as evidence of an alleged "gender imbalanced

structure." Betkerur, 78 F.3d at 1095-1096 (rejecting alleged discriminatory comments by non-

decisionmakers, conclusory assertions of discrimination, hearsay and stray remarks, affirming

summary judgment).

Other examples of Kelton's unsupported statements are equally as blatant and include:

| Plaintiff Memorandum in Opposition | Record Evidence |
|---|---|
| "Dr. Whitmore confirmed that gender was playing a role in the selection process. . . (Pal. Depo. at 70-71; Ex. 10)"  (Pl. Mem. Opp. at 7) | Whitmore did not "confirm" that gender played a role in the selection process, in the cited testimony or exhibit, or anywhere else. |
| "Dean Caruso, concerned about the perversion of the process by the Faculty Defendants, conducted a poll within the Department to gauge the Faculty's preference for Department Head. (Caruso Dep. at 58; Ex. 21)"  (Pl. Mem. Opp. at 8) | Caruso did not testify, in the cited testimony or exhibit, or anywhere else, that he was concerned about anything the Faculty Defendants did. |
| "Dean Caruso. . . claimed to started [sic] the selection process anew. . . (Caruso Depo. at 15)"  (Pl. Mem. Opp. at 8) | Dean Caruso did not testify that he started the selection process over; he testified he appointed Gigi Escoe as interim department head.  (Caruso Dep. 67) |
| "Defendant Whitmore explained that the Department was (1) prone to gender bias; and (2) such gender bias would likely prevent the Department's selection of a female head. (Ex. 10)"  (Pl. Mem. Opp. at 12) | There is no record support for this statement. |
| "Had Ms. Bowman received Defendant Whitmore's e-mail of March 1, 2000 (Ex. 10), during the headship selection process, she would have discussed with Dr. Howe the potential for applicant-on-applicant 'intimidation' based on gender. (Bowman Depo. at 20-21)"  (Pl. Mem. Opp. at 19 n.12) | Bowman did not mention gender at all. (Bowman Dep. at 20-21.  She said that as long as Kelton remained a candidate, the e-mails from Goddard (Ex. 8) and Whitmore (Ex. 10) would not concern her.  (Bowman Dep. 21) |
| "Witnesses testify to the gender bias present in the Department which is manifest in condescending treatment toward women, the paucity of female faculty members, and the blatant discouragement of females' academic and professional endeavors. (Escoe Depo. at 13, 55; Natorp Affidavit at 1; Lett Depo. at 31)"  (Pl. Mem. Opp. at 19 n.13) | This gross misstatement is supported by <u>one</u> alleged comment by <u>one</u> faculty member made nearly two years after the headship search failed.  Escoe, a full-time tenured female professor in the department, testified that she has never heard any faculty member express reservations about females as faculty members or as economists (Escoe Dep. 18), that faculty did not question her authority when she was interim department head (<u>id.</u> at 34-35), and that she does not believe Kelton was discriminated against because of her gender (<u>id.</u> at 51-52, 67). |

## IV. **CONCLUSION**

For each and all of the foregoing reasons, and for the reasons set forth in the University's

initial brief, the University's motion for summary judgment should be granted.

Respectfully submitted,

Jim Petro
Attorney General of Ohio

By:    s/ Doreen Canton
       Doreen Canton Bar Number 0040394
       Attorney for Defendants
       Taft, Stettinius & Hollister LLP
       425 Walnut Street, Suite 1800
       Cincinnati, Ohio 45202-3957
       Telephone: (513) 381-2838
       Fax: (513) 381-0205
       E-mail: canton@taftlaw.com

OF COUNSEL:

W. Stuart Dornette (0002953)
Kerry P. Hastings (0066871)
Rachel S. Zahniser (0076065)
Taft, Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202-3957

Mitchell D. McCrate (0047403)
Associate Counsel
University of Cincinnati
300 Administration Building
Cincinnati, OH 45221-0623

W0064959.1                                        -20-

**CERTIFICATE OF SERVICE**

I hereby certify that on October 24, 2003, I electronically filed the foregoing with the Clerk

of Court using the CM/ECF system which will send notification of such filing to the following:

Marc D. Mezibov, Michael N. Budelsky and Susan E. Brabenec, 920 Fourth & Race Tower, 105 W.

Fourth Street, Cincinnati, Ohio  45202.


                                        s/ Doreen Canton
                                        Doreen Canton Bar Number 0040394
                                        Attorney for Defendants
                                        Taft, Stettinius & Hollister LLP
                                        425 Walnut Street, Suite 1800
                                        Cincinnati, Ohio 45202-3957
                                        Telephone:  (513) 381-2838
                                        Fax:  (513) 381-0205
                                        E-mail:  canton@taftlaw.com

W0064959.1