UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| CHRISTINA M. I. KELTON, | : | Case No. C-1-02-345 |
| | : | |
| Plaintiff, | : | Judge Weber |
| | : | |
| v. | : | |
| | : | **REPLY MEMORANDUM OF** |
| UNIVERSITY OF CINCINNATI, et al., | : | **DEFENDANT WOLFGANG MAYER** |
| | : | **IN SUPPORT OF HIS MOTION FOR** |
| Defendants. | : | **SUMMARY JUDGMENT** |

## I.  INTRODUCTION

Mayer's motion for summary judgment should be granted.  Kelton failed to address Mayer's qualified immunity defense, effectively admitting that her gender discrimination and conspiracy claims against him should be dismissed.  Even if Mayer were not entitled to qualified immunity, Kelton failed to present a scintilla of evidence supporting her claims against him. Kelton cannot demonstrate a prima facie case of gender discrimination against Mayer because she cannot establish that a male became department head or that Mayer, a non-decisionmaker, took an adverse action against her in connection with the headship search.  There is no evidence that the two gender-neutral memoranda submitted by Mayer to the Search Committee were a pretext for gender discrimination.  Kelton's conspiracy claim against Mayer is barred by the intracorporate conspiracy doctrine, and her argument that Mayer acted outside the scope of his employment is without merit and is fatal to all of her claims.  Even if her conspiracy claim were not barred, Kelton's conclusory allegations are insufficient to establish a conspiracy, let alone one motivated by gender.  Kelton's claims against Mayer should be dismissed.

## II.  ARGUMENT

**A.      Mayer Is Entitled To Qualified Immunity.**

In his motion for summary judgment, Mayer asserted qualified immunity as a defense to Kelton's gender discrimination and conspiracy claims against him.  Although the defense of qualified immunity is dispositive of her claims against Mayer and the other individual Defendants, Kelton failed to address qualified immunity in her memorandum in opposition.  Her failure to address this defense is tantamount to an admission that the individual Defendants should be dismissed based on qualified immunity.  See, e.g., Garcia v. ANR Freight Sys., Inc., 942 F. Supp. 351, 354 n.l (N.D. Ohio 1996) (deeming the plaintiff to have abandoned claim when the defendant's motion for summary judgment addressed claim and the plaintiff failed to contest the defendant's arguments in her memorandum in opposition).

In any event, Mayer's gender-neutral recommendation to the Search Committee in favor of Goddard (Ex. 58), his colleague of 30 years, did not violate any law, much less clearly established law.  Kelton cited no authority from any court, let alone the Supreme Court or the Sixth Circuit, that would have put Mayer on notice that a non-decisionmaker could be liable for making a gender-neutral recommendation in favor of a long-time colleague.  Mayer is entitled to qualified immunity and all of Kelton's claims against him should be dismissed.

**B.      Kelton's Gender Discrimination Claim Against Mayer Must Be Dismissed.**

**1.      Kelton failed to establish a prima facie case.**

Kelton cannot satisfy two prongs of her prima facie case of gender discrimination.  First, as explained in the University's motion for summary judgment and reply memorandum, Kelton

cannot demonstrate that a male became department head. This alone requires dismissal of her Title VII claim against the University and her § 1983 claims against the individual Defendants.

Second, Kelton cannot establish that Mayer took an adverse action against her in connection with the headship search. Kelton has not disputed that Mayer was a non-decisionmaker with respect to the headship search. As a non-decisionmaker, Mayer lacked the power to take adverse action against Kelton and cannot be individually liable under § 1983. See Betkerur v. Aultman Hosp. Ass'n, 78 F.3d 1079, 1085 (6th Cir. 1996) (affirming summary judgment in favor of individual defendants who were not members of search committee). Kelton never addressed this dispositive point; the individual Defendants (except for search committee member Debashis Pal) are all entitled to summary judgment for this reason.

### 2.    Kelton cannot establish that Mayer's actions were a pretext for gender discrimination.

Mayer submitted two memoranda to the search committee. In the first memorandum, dated April 3, 2000, Mayer presented his thoughts on the economics department and the headship search, stressing "the goal of establishing some form of cohesion and inclusiveness" and suggesting eight questions for the search committee to ask the candidates. (Ex. 57) This memorandum did not recommend Goddard over Kelton, or vice versa, and did not mention gender. (Id.)

Mayer's second memorandum, dated May 3, 2000, recommended that Goddard become the next department head based on Goddard's "promises to be inclusive and transparent in decision-making." (Ex. 58) This memorandum did not mention gender. (Id.)

Kelton did not address Mayer's memoranda to the search committee in her memorandum in opposition and did not attempt to show that either memorandum was a pretext for gender discrimination.  Kelton admitted the truthfulness of Mayer's reasons for recommending Goddard. (Pl. Resp. Defs. Proposed Findings of Fact ¶¶ 37-38)  As Mayer's gender-neutral reasons for recommending Goddard are undisputed, Kelton's gender discrimination claim against him must be dismissed.  See Betkerur, 78 F.3d at 1095 (affirming summary judgment for search committee member where the plaintiff offered no evidence indicating that the legitimate, non-discriminatory reason why the search committee member voted for the plaintiff's opponent was pretextual).

Kelton also admitted that:

- Mayer recommended that Kelton receive tenure (Pl. Resp. Defs. Proposed Findings of Fact ¶12);

- Mayer would have been Kelton's "first choice for department head" (Id. ¶ 4); and

- Mayer "seemed rather pleased" when he learned that Kelton was seeking the headship  (Id. ¶ 19).

These undisputed facts create and reinforce a presumption of non-discrimination on the part of Mayer.  See Buhrmaster v. Overnite Transp. Co., 61 F.3d 461, 463 (6th Cir. 1995).

Kelton conceded that Mayer joined in an e-mail to Dean Caruso criticizing all the Group A members, including eight males.  (Pl. Resp. Defs. Proposed Findings of Fact ¶ 56)  Kelton admitted that she had no reason to believe that the views expressed in this e-mail were not the true opinions of Mayer and the five other professors.  (Kelton Dep. 125-26)  This e-mail demonstrates that Mayer's recommendation in favor of Goddard was not influenced by gender but by previously existing political disputes within the economics department.

- 4 -

In her memorandum in opposition, Kelton does not base her accusations against Mayer on anything he submitted to the search committee, but on two memoranda prepared by Mayer and several other professors not in connection with the headship search.  Neither memorandum mentions gender.  Furthermore, neither memorandum was addressed to the search committee, and Kelton failed to present any evidence that either memorandum had any impact on the search committee's recommendation in favor of Goddard.  Therefore, these memoranda are (1) not evidence of pretext and (2) not relevant.  See Betkerur, 78 F.3d at 1097 (finding that there was no evidence suggesting that outside search consultant's report that a candidate was "American born, American trained" was "adopted or relied upon in any way by hospital decisionmakers").

The first memorandum, dated May 2, 2000, concerned the professors' "understanding" that motions introduced by Kelton at a department faculty meeting had not been reviewed by the graduate program committee.  (Ex. 13)  The professors sent the memorandum to Department Head Joseph Gallo, not the search committee.  (Id.)  The memorandum did not have anything to do with the headship search or Kelton's gender.  (Id.)  There is no evidence the search committee relied on this memorandum to support its recommendation in favor of Goddard.  This memorandum proves nothing.

The second memorandum, dated May 19, 2000, addressed various departmental issues and was directed to Dean Joseph Caruso, not the search committee.  (Ex. 15)  This memorandum addressed an altercation between Debashis Pal and Al Berry at a Hewett-Kautz Fund meeting, complained about a hostile work environment in the department as a result of a lack of respect for quality research and "the way decisions are made by the current Department Head [Gallo] and Director of Graduate Studies [Kelton]," and suggested that Group 1 "establish[ ] a separate unit

of economists."  (Id.)  The memorandum did not concern Kelton's gender in any way.  (Id.)  The memorandum criticized two male professors, Department Head Gallo and Professor Berry, as much or more than it did Kelton.  (Id.)  There is no evidence that the search committee or Dean Caruso relied on this memorandum in connection with the headship search.  Absent evidence that this memorandum somehow caused Kelton not to receive the headship position, it is irrelevant.

Kelton also claims that in the May 19, 2000 memorandum to Dean Caruso, Mayer "falsely accused" her of "acting unprofessionally," that he admitted to being absent from the Hewett-Kautz Fund meeting at which she "was allegedly unprofessional," and that his statements were "made in disregard for the truth."  (Pl. Mem. Opp. at 33)  Even though Mayer was not present at the Hewett-Kautz Fund meeting, the statements in the memorandum were not false. The memorandum stated that Kelton "did nothing to protect Professor Pal," that she was "not willing to provide a written affidavit of the event," and that she "finally shifted the blame on Professor Pal for having provoked the [incident]."  (Ex. 15)  Zandvakili, who was present at the Hewett-Kautz Fund meeting, testified that Kelton did not do anything to protect Pal.  (Zandvakili Dep. 121)  It is undisputed that Pal requested an affidavit from Kelton and that she did not provide him with one. (Pal Dep. 41-42; Kelton Dep. 88-89)  Finally, Kelton testified that Berry was "seriously provoked" by Pal.  (Kelton Dep. 88)  Based on the testimony of Kelton and others present at the Hewett-Kautz Fund meeting, the memorandum was accurate and was not "made in disregard for the truth."

Neither memorandum cited by Kelton had anything to do with her gender.  Kelton has failed to offer a scintilla of evidence that anything Mayer said or did was motivated by her gender.  Kelton's gender discrimination claim against Mayer must be dismissed.

C.    **Kelton's Conspiracy Claim Against Mayer Must Be Dismissed.**

    1.    **The intracorporate conspiracy doctrine bars Kelton's conspiracy claim.**

        a.    **The intracorporate conspiracy doctrine applies to conspiracy claims against only individual defendants.**

Kelton claims that the intracorporate conspiracy doctrine does not apply to Mayer's actions. Kelton first argues that her allegation that the individual Defendants conspired with each other, and not with the University, is sufficient to take this case outside the intracorporate conspiracy doctrine. In Hull v. Cuyahoga Valley Joint Vocational School District Board of Education, 926 F.2d 505 (6th Cir. 1991), the case in which the Sixth Circuit first recognized the intracorporate conspiracy doctrine in the civil rights context, the plaintiff alleged a conspiracy between the school district superintendent, the executive director of the district, and a school administrator--all individual defendants. Because all three of the defendants were employees or agents of the school board, the Sixth Circuit concluded that they were "members of the same collective entity" and thus "there [were] not two separate 'people' to form a conspiracy." Id. at 510. Based on the facts of Hull, Kelton's argument that the intracorporate conspiracy doctrine does not apply to a conspiracy alleged against only individual defendants is without merit.

        b.    **Mayer acted within the scope of his employment.**

Kelton argues that the exception to the intracorporate conspiracy doctrine for acts performed outside the scope of employment applies to Mayer's actions. Kelton herself alleges, in support of her § 1983 claims against the individual Defendants, that they "exercised their power as members of the Department." (Pl. Mem. Opp. at 29) Kelton cannot have it both ways--if Defendants acted within the scope of their employment for purposes of her § 1983 gender

discrimination claims, the same conduct was within the scope of their employment for purposes of her § 1985(3) conspiracy claims.

In <u>Johnson v. Hills & Dales General Hospital</u>, 40 F.3d 837 (6th Cir. 1994), the plaintiff, a physician, similarly claimed that the individual defendants, hospital employees, acted beyond the scope of their employment by making complaints about the plaintiff's performance.  In finding that the plaintiff failed to establish that the individual defendants acted outside the course of their employment, the Sixth Circuit noted several factors, including "the facts that the employees' complaints were made during the course of their working hours, the remarks were connected to the business of the hospital, and they were forwarded to the proper managerial authorities."  <u>Id.</u> at 841.

Here, Kelton bases her accusations against Mayer on two memoranda prepared by Mayer and several other professors.  The first memorandum, dated May 2, 2000, was directed to Department Head Gallo and concerned the professors' "understanding" that motions introduced by Kelton at a department faculty meeting had not been reviewed by the graduate program committee.  (Ex. 13)  The second memorandum, dated May 19, 2000, was addressed to Dean Caruso and complained about:  (1) the management of the Hewett-Kautz Fund; (2) a lack of respect for research in the department; and (3) the "way decisions are made by the current Department Head [Gallo] and Director of Graduate Studies [Kelton]."  (Ex. 15)  The remarks in these letters, like the employee complaints in <u>Johnson</u>, were made during the course of University business, were related to the activities of the economics department, and were forwarded to the appropriate administrative authorities.  Mayer's actions in joining these letters were within the scope of his employment as a member of the economics faculty.

Kelton also claims that in the May 19, 2000 memorandum to Dean Caruso, Mayer "falsely accused" Kelton of "acting unprofessionally," that Mayer admitted to being absent from the Hewett-Kautz Fund meeting at which Kelton "was allegedly unprofessional," and that his statements were "made in disregard for the truth." (Pl. Mem. Opp. at 33)  As explained above, the statements in the memorandum are not false and are supported by the testimony of Kelton and others present at the Hewett-Kautz Fund meeting.

Even if the statements in the memorandum were not true, Mayer still acted within the scope of his employment as an economics faculty member.  The plaintiff in <u>Johnson</u> argued that employee complaints containing rumors and falsehoods were "per se" beyond the scope of employment.  The Sixth Circuit disagreed, stating that "it is not necessary that the complaints were based on fact--it is enough that they were directed to conditions that affected patient care and the morale of the hospital staff."  <u>Id.</u>  Even if Mayer's statements were not true, his statements addressed the activities and morale of the economics department and therefore fell within the scope of his employment.

        **c.**        **If Mayer acted outside the scope of his employment, all of Kelton's claims fail.**

Kelton's argument that Mayer and the other individual Defendants acted outside the scope of their employment is fatal to all of her claims.  If Mayer and the other individual Defendants acted outside the scope of their employment and acted pursuant to their own personal interests, then they did not act under color of state law, precluding her § 1983 gender discrimination claims.  To prevail on her § 1983 claims, Kelton must demonstrate that "a person acting under color of state law deprived [her] of a right secured by the Constitution or laws of the United

States." <u>Waters v. City of Morristown</u>, 242 F.3d 353, 359 (6th Cir. 2001). The Sixth Circuit has held that "a defendant's private conduct, outside the course or scope of his duties and unaided by any indicia of actual or ostensible state authority, is not conduct occurring under color of state law" and that "acts of state officials 'in the ambit of their personal pursuits' do not constitute state action." <u>Id.</u> at 359.

Kelton asserts that the individual Defendants "were not acting for or on behalf of the University when they campaigned against [her] candidacy for the headship" and "were acting in their personal capacities and pursuant to their personal interests." (Pl. Mem. Opp. at 30-31). If, as Kelton contends, the individual Defendants acted outside the scope of their employment with the University and "in the ambit of their personal pursuits," then their activities do not constitute state action, and her § 1983 gender discrimination claims fail as a matter of law.

Similarly, Kelton's § 1985(3) conspiracy claims require state action. Section 1985(3) is a remedial statute and "'provides no substantial rights itself' to the class conspired against. The rights, privileges, and immunities that § 1985(3) vindicates must be found elsewhere . . . ." <u>United Bhd. of Carpenters & Joiners of Am. v. Scott</u>, 463 U.S. 825, 833 (1983). Where "the violation alleged is of a right protected only against state interference, such as the rights guaranteed under the Fourteenth Amendment, then the corresponding level of state action must be proven." <u>Volunteer Med. Clinic v. Operation Rescue</u>, 948 F.2d 218, 226 (6th Cir. 1991). As Kelton alleges that the individual Defendants conspired to deny her "constitutional rights to equal protection of the laws under the Fourteenth Amendment" (Compl. ¶ 36), she must first demonstrate state action. If, as Kelton asserts, the individual Defendants acted outside the scope of their employment with the University and acted pursuant to their own personal interests, then

their activities do not constitute state action, and her § 1985(3) conspiracy claims fail as a matter of law.

Kelton's Title VII claim against the University also fails if the individual Defendants acted outside the scope of their employment. Any actions outside the scope of the individual Defendants' employment cannot be attributed to the University. See Jones v. Federated Fin. Reserve Corp., 144 F.3d 961, 965 (6th Cir. 1998) ("[A] principal is only held vicariously liable for torts committed by an agent when the agent acts for the benefit of his principal within the scope of his employment."). Therefore, to the extent Kelton's Title VII claim is based on the actions of the individual Defendants, it must be dismissed.

### d.  The independent personal stake exception does not apply.

According to Kelton, Mayer's actions fell within yet another exception to the intracorporate conspiracy doctrine--the independent personal stake exception. That exception, however, has never been adopted by the Sixth Circuit. See Nurse Midwifery Assocs. v. Hibbett, 918 F.2d 605, 613, 615 (6th Cir. 1990) ("[O]n two occasions this court, while not specifically rejecting the independent personal stake exception, has noted that '[t]here are rather substantial policy reasons for not adopting such an exception.'"). In any event, the independent personal stake exception "applies only where a co-conspirator possesses a personal stake independent of his relationship" to the entity. ePlus Tech., Inc. v. Aboud, 313 F.3d 166, 179 (4th Cir. 2002). Mayer had nothing to gain personally from any alleged conspiracy to prevent Kelton from becoming department head. Mayer possessed only a professional interest in the outcome of the headship search.

2.    **Kelton failed to present evidence of a conspiracy motivated by gender.**

To establish a conspiracy claim under § 1985(3), Kelton must demonstrate a conspiracy motivated by a class-based animus, such as gender.  Johnson v. Hills & Dales Gen. Hosp., 40 F.3d 837, 839 (6th Cir. 1994).  Kelton failed to present a scintilla of evidence that Mayer entered into a conspiracy, much less one motivated by gender.  It is undisputed that Mayer personally prepared the memoranda he wrote to the Search Committee without consulting with anyone. (Mayer Dep. 33, 48; Pl. Resp. Defs. Proposed Findings of Fact ¶¶ 37-38)  Mayer, a well-respected, senior professor who has been at the University more than 30 years, did not conspire with his professional colleagues; such an allegation is frivolous.  Kelton's conclusory allegation that the individual Defendants "agree[d] to prevent Dr. Kelton from becoming the Department Head based on considerations of gender"  (P1. Mem. Opp. at 31), unsupported by any record evidence, is insufficient to establish a conspiracy claim.  See Gutierrez v. Lynch, 826 F.2d 1534, 1538 (6th Cir. 1987) ("[V]ague and conclusory allegations unsupported by material facts will not be sufficient to state" a conspiracy claim.).  Kelton's conspiracy claim against Mayer must be dismissed.

### III.  **CONCLUSION**

For each and all of the foregoing reasons, and those set forth in his motion for summary judgment, Mayer respectfully requests that this Court grant his motion and dismiss the claims against him.

Respectfully submitted,

Jim Petro
Attorney General of Ohio


By:    /s/ Doreen Canton
        Doreen Canton Bar Number 0040394
        Attorney for Defendants
        Taft, Stettinius & Hollister LLP
        425 Walnut Street, Suite 1800
        Cincinnati, Ohio 45202-3 957
        Telephone:  (513)381-2838
        Fax:  (513) 381-0205
        E-mail:  canton@taftlaw.com

OF COUNSEL:

W. Stuart Dornette (0002953)
Kerry P. Hastings (0066871)
Rachel S. Zahniser (0076065)
Taft, Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202-3957

Mitchell D. McCrate (0047403)
Associate Counsel
University of Cincinnati
300 Administration Building
Cincinnati, OH 4522 1-0623

## CERTIFICATE OF SERVICE

I hereby certify that on October 24, 2003, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system which will send notification of such filing to the

following:  Marc D. Mezibov, and Michael N. Budelsky and Susan E. Brabenec, 920 Fourth &

Race Tower, 105 W. Fourth Street, Cincinnati, Ohio 45202.


s/ Doreen Canton
Doreen Canton Bar Number 0040394
Attorney for Defendants
Taft, Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, Ohio 45202-3957
Telephone:  (513) 381-2838
Fax:  (513) 381-0205
E-mail:  canton@taftlaw.com

W0066674.1