UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| CHRISTINA M. I. KELTON, | : | Case No. C-1-02-345 |
| | : | |
| Plaintiff, | : | Judge Weber |
| | : | |
| v. | : | **REPLY MEMORANDUM OF** |
| | : | **DEFENDANT HAYNES GODDARD** |
| UNIVERSITY OF CINCINNATI, et al., | : | **IN SUPPORT OF HIS MOTION** |
| | : | **FOR SUMMARY JUDGMENT** |
| Defendants. | : | |

## I. INTRODUCTION

Goddard's motion for summary judgment should be granted. Kelton failed to address Goddard's qualified immunity defense, effectively admitting that her gender discrimination and conspiracy claims against him should be dismissed. Even if Goddard were not entitled to qualified immunity, Kelton failed to present a scintilla of evidence supporting her claims against him. Kelton cannot demonstrate a prima facie case of gender discrimination against Goddard because she cannot establish that a male became department head or that Goddard, her opponent and a non-decisionmaker, took an adverse action against her in connection with the headship search. There is no evidence that Goddard's attempts to advocate on behalf of himself in his quest to become department head were a pretext for gender discrimination. Kelton's conspiracy claim against Goddard is barred by the intracorporate conspiracy doctrine, and her argument that Goddard acted outside the scope of his employment is without merit and is fatal to all of her claims. Even if her conspiracy claim were not barred, Kelton's conclusory allegations are insufficient to establish a conspiracy, let alone one motivated by gender. Kelton's claims against Goddard should be dismissed.

W0069861.1

## II. ARGUMENT

### A. Goddard Is Entitled To Qualified Immunity.

Goddard incorporates by reference the analysis and argument from Mayer's reply memorandum explaining that Kelton's failure to address the qualified immunity defense asserted by the individual Defendants is tantamount to an admission that they should be dismissed on that basis. (Mayer Reply Mem. at 2)

In any event, Goddard's attempts to advocate on behalf of himself in his quest to become the department head did not violate any law, much less clearly established law. Kelton cited no authority from any court, let alone the Supreme Court or the Sixth Circuit, that would have put Goddard on notice that he could be liable for advocating, without ever mentioning or even hinting at gender, on his own behalf to be the next department head. Kelton's claim against Goddard is frivolous; Kelton is claiming a male candidate who failed to receive the position discriminated against her and that his support for himself is evidence of "discrimination." Goddard is entitled to qualified immunity and all of Kelton's claims against him should be dismissed.

### B. Kelton's Gender Discrimination Claim Against Goddard Must Be Dismissed.

#### 1. Kelton has failed to establish a prima facie case.

Goddard incorporates by reference the argument and analysis from Mayer's reply memorandum explaining that Kelton cannot demonstrate that a male became department head or that Goddard, who was not on the search committee and was her opponent, took an adverse action against her in connection with the headship search. (Mayer Reply Mem. at 2-3)

### 2. Kelton cannot establish that Goddard's actions were a pretext for gender discrimination.

Goddard's legitimate reason is unimpeachable; he preferred his own candidacy over Kelton's. Even Kelton supports Goddard's reason; she admitted his approach to her in January was "self-serving" and "an attempt to increase his chances of obtaining the headship by removing her from the competition." (Pl. Resp. Defs. Proposed Findings of Fact ¶ 18) It is lawful for Goddard to prefer himself over Kelton; self-interest is not gender discrimination.

Although it would not have been gender discrimination for Goddard to threaten Kelton to advance his own self-interest, there is no support for Kelton's claim that Goddard discouraged her from seeking the headship position by threatening her with the denial of promotion to full professor. (Pl. Mem. Opp. at 4, 32-33) Both in his conversation with Kelton and his e-mail to her, Goddard mentioned two associate professors (one female and one male) who took department head positions and noted that their headship delayed their promotion to full professor. (Pl. Resp. Defs. Proposed Findings of Fact ¶ 16-17) Kelton agreed that Goddard's statements about these professors are "probably true." (Id. ¶ 16) Kelton admitted that Goddard cited his own nine years as Director of Latin American Studies as an example of an administrative position holding up a faculty member's promotional opportunities and stated that "[o]ne just gets no credit from colleagues for any kind of administrative activity." (Id. ¶ 17) Goddard did not in any way suggest that he would not support Kelton for full professor if she became department head; he merely pointed out that the department head position hindered some associate professors (including himself) from achieving full professor.

Goddard's use of the word "ambitious" in an e-mail to his colleagues is not evidence of gender bias. It is entirely reasonable for Goddard, whom Kelton had accused of "threatening"

her to members of the search committee, to resist those assertions and to view them as a political ploy to further Kelton's candidacy and to damage him.  As Goddard explained in his e-mail: "Thinking cynically, if she is ambitious, and there is no doubt about that, then she has every reason to milk this for political advantage, and probably will." (Ex. 68)  Kelton's speculation about Goddard's use of the word "ambitious" is stereotypical; both men and women are capable of being "ambitious."  Kelton cites no law supporting the proposition that describing a woman as "ambitious" is evidence of gender discrimination, much less unlawful.

As further "evidence" of gender bias, Kelton cites an "accusatory" memorandum prepared by Goddard and several other professors not in connection with the headship search. (Pl. Mem. Opp. at 33)  This memorandum, sent to Department Head Joseph Gallo, not the search committee, concerned the professors' "understanding" that motions introduced by Kelton at a department faculty meeting had not been reviewed by the graduate program committee.  (Ex. 13)  The memorandum did not have anything to do with the headship search or Kelton's gender.  (Id.) According to Kelton, the memorandum "falsely accused" her of violating of "non-existent rules." (Pl. Mem. Opp. at 33)  As noted in Zandvakili's reply memorandum, the professors did not allege the violation of any written rules, but of the longstanding practices and procedures of the department.  (Zandvakili Reply Mem. at 4)  Goddard testified that "we had a long-standing practice and tradition in the department that these kinds of decisions always went through the graduate program committee . . . and that was always the procedure." (Goddard Dep. 12)  The absence of one written document listing the committee's "rules" does not make Goddard's or the other professors' belief that Kelton had deviated from department practices and procedures false or a pretext for gender discrimination.  Furthermore, Kelton failed to present any evidence that this memorandum had any impact on the search committee's recommendation in favor of

Goddard.  Therefore, this memorandum is (1) not evidence of pretext and (2) not relevant.  See Betkerur v. Aultman Hosp. Ass'n, 78 F.3d 1079, 1097 (6th Cir. 1996) (finding that there was no evidence suggesting that outside search consultant's report that a candidate was "American born, American trained" was "adopted or relied upon in any way by hospital decisionmakers").

Kelton conceded that Goddard joined in an e-mail to Dean Caruso criticizing all the Group A members, including eight males.  (Pl. Resp. Defs. Proposed Findings of Fact ¶ 56) Kelton admitted she had no reason to believe that the views expressed in this e-mail were not the true opinions of Goddard and the five other professors.  (Kelton Dep. 125-26)  This e-mail demonstrates that Goddard's actions were not influenced by gender but by his own desire to become the next department head and by previously existing political disputes within the economics department.

Kelton has not offered a scintilla of evidence that anything Goddard said or did was motivated by her gender rather than his own desire to become the next department head. Kelton's gender discrimination claim against Goddard must be dismissed.

    **C.**    **Kelton's Conspiracy Claim Against Goddard Must Be Dismissed.**

        **1.**    **The intracorporate conspiracy doctrine bars Kelton's conspiracy claim.**

            **a.**    **The intracorporate conspiracy doctrine applies to conspiracy claims against only individual defendants.**

Goddard incorporates by reference the argument and analysis from Mayer's reply memorandum explaining that the intracorporate conspiracy doctrine applies to the actions of the individual Defendants.  (Mayer Reply Mem. at 7)

### b. Goddard acted within the scope of his employment.

Goddard incorporates by reference the argument and analysis from Mayer's reply memorandum explaining that conduct is within the scope of employment when it occurs during the course of working hours, is connected to the business of the employer, and addressed to the proper managerial authorities. (Mayer Reply Mem. at 7-9)

Kelton bases her conspiracy accusations against Goddard on the same reasons advanced in support of her gender discrimination claim against him--his discouraging her to apply for the department head position by threatening her with denial of promotion to full professor, his e-mail using the word "ambitious," his applying for the headship position, and the memorandum to Department Head Gallo complaining that Kelton introduced motions without the graduate program committee reviewing them. (Pl. Mem. Opp. at 32-33)

There is no support for Kelton's claim that Goddard threatened to not support her for full professor if she became department head, and the alleged "threat," without any evidence, should not be considered as evidence supporting her conspiracy claim. Goddard's use of the word "ambitious" is also not evidence of gender bias and should not be considered. Kelton's assertion that Goddard's application for the headship position is evidence of a conspiracy motivated by gender discrimination is meritless.

The statements in the memorandum to Department Head Gallo were made during the course of University business, were related to the activities of the economics department, and were forwarded to the appropriate administrative authority. Goddard's actions in joining this memorandum were within the scope of his employment as a member of the economics faculty.

Kelton claims that in the memorandum to Gallo, Goddard "falsely accused" Kelton of violating "non-existent rules." (Pl. Mem. Opp. at 33) As explained above, Goddard and the

other professors alleged that she deviated from the department's longstanding practices and procedures, not from any written rules.

Even if the statements in the memorandum were not true, Goddard's statements addressed the activities and morale of the economics department and therefore fell within the scope of his employment. (Mayer Reply Mem. at 9)

### c. If Goddard acted outside the scope of his employment, all of Kelton's claims fail.

Goddard incorporates by reference the argument and analysis from Mayer's reply memorandum explaining that Kelton's argument that the individual Defendants acted outside the scope of their employment is fatal to all of her claims. (Mayer Reply Mem. at 9-11)

### d. The independent personal stake exception does not apply.

Goddard incorporates by reference the argument and analysis from Mayer's reply memorandum explaining that the independent personal stake exception does not apply to the actions of the individual Defendants. (Mayer Reply Mem. at 11)

### 2. Kelton failed to present evidence of a conspiracy motivated by gender.

Goddard incorporates by reference the argument and analysis from Mayer's reply memorandum (id. at 12) explaining that Kelton's conclusory allegation that the individual Defendants "agree[d] to prevent Dr. Kelton from becoming the Department Head based on considerations of gender" (Pl. Mem. Opp. at 31), unsupported by any record evidence, is insufficient to establish a conspiracy claim. Kelton's conspiracy claim against Goddard must be dismissed.

### III. CONCLUSION

For each and all of the foregoing reasons, and those set forth in his motion for summary judgment, Goddard respectfully requests that this Court grant his motion and dismiss the claims against him.

>Respectfully submitted,
>
>Jim Petro
>Attorney General of Ohio
>
>By:   s/ Doreen Canton
>       Doreen Canton Bar Number 0040394
>       Attorney for Defendants
>       Taft, Stettinius & Hollister LLP
>       425 Walnut Street, Suite 1800
>       Cincinnati, Ohio 45202-3957
>       Telephone: (513) 381-2838
>       Fax: (513) 381-0205
>       E-mail: canton@taftlaw.com

OF COUNSEL:

W. Stuart Dornette (0002953)
Kerry P. Hastings (0066871)
Rachel S. Zahniser (0076065)
Taft, Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202-3957

Mitchell D. McCrate (0047403)
Associate Counsel
University of Cincinnati
300 Administration Building
Cincinnati, OH 45221-0623

## CERTIFICATE OF SERVICE

I hereby certify that on October 24, 2003, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following: Marc D. Mezibov, Michael N. Budelsky and Susan E. Brabenec, 920 Fourth & Race Tower, 105 W. Fourth Street, Cincinnati, Ohio 45202.

                                                s/ Doreen Canton
                                                Doreen Canton Bar Number 0040394
Attorney for Defendants
Taft, Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, Ohio 45202-3957
Telephone: (513) 381-2838
Fax: (513) 381-0205
E-mail: canton@taftlaw.com