UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| CHRISTINA M. I. KELTON, | : | Case No. C-1-02-345 |
| | : | |
| Plaintiff, | : | Judge Weber |
| | : | |
| v. | : | **REPLY MEMORANDUM OF** |
| | : | **DEFENDANT SOURUSHE** |
| UNIVERSITY OF CINCINNATI, et al., | : | **ZANDVAKILI IN SUPPORT OF HIS** |
| | : | **MOTION FOR SUMMARY** |
| Defendants. | : | **JUDGMENT** |

**I. INTRODUCTION**

Zandvakili's motion for summary judgment should be granted. Kelton failed to address Zandvakili's qualified immunity defense, effectively admitting that her gender discrimination and conspiracy claims against him should be dismissed. Even if Zandvakili were not entitled to qualified immunity, Kelton failed to present a scintilla of evidence supporting her claims against him. Kelton cannot demonstrate a prima facie case of gender discrimination against Zandvakili because she cannot establish that a male became department head or that Zandvakili, a non-decisionmaker, took an adverse action against her in connection with the headship search. There is no evidence that Zandvakili's gender-neutral submissions to the search committee were a pretext for gender discrimination. Kelton's conspiracy claim against Zandvakili is barred by the intracorporate conspiracy doctrine, and her argument that Zandvakili acted outside the scope of his employment is without merit and is fatal to all of her claims. Even if her conspiracy claim were not barred, Kelton's conclusory allegations are insufficient to establish a conspiracy, let alone one motivated by gender. Kelton's claims against Zandvakili should be dismissed.

W0068318.1

## II.  ARGUMENT

### A.  Zandvakili Is Entitled To Qualified Immunity.

Zandvakili incorporates by reference the analysis and argument from Mayer's reply memorandum explaining that Kelton's failure to address the qualified immunity defense asserted by the individual Defendants is tantamount to an admission that they should be dismissed on that basis.  (Mayer Reply Mem. at 2)

In any event, Zandvakili's support for and gender-neutral recommendations in favor of Goddard as well as his gender-neutral comments on Kelton's management style (Ex. 80) did not violate any law, much less clearly established law.  Kelton cited no authority from any court, let alone the Supreme Court or the Sixth Circuit, that would have put Zandvakili on notice that a non-decisionmaker could be liable for making a gender-neutral recommendation in favor of a respected colleague.  Zandvakili is entitled to qualified immunity and all of Kelton's claims against him should be dismissed.

### B.  Kelton's Gender Discrimination Claim Against Zandvakili Must Be Dismissed.

#### 1.  Kelton has failed to establish a prima facie case.

Zandvakili incorporates by reference the argument and analysis from Mayer's reply memorandum explaining that Kelton cannot demonstrate that a male became department head or that Zandvakili, who was not on the search committee, took an adverse action against her in connection with the headship search.  (Mayer Reply Mem. at 2-3)

#### 2.  Kelton cannot establish that Zandvakili's actions were a pretext for gender discrimination.

Kelton claims that Zandvakili discriminated against her on the basis of her gender because he encouraged Goddard to apply for the headship position, campaigned against Kelton,

and criticized Kelton in his presentation to the search committee. (Pl. Mem. Opp. at 4, 6-7) Zandvakili did prefer Goddard over Kelton, he did campaign against her, and he did criticize her in his presentation to the search committee. Zandvakili's first choice for the headship position was Wolfgang Mayer. (Zandvakili Dep. 88, 91)[1/] When Zandvakili was unsuccessful in convincing Mayer to become a candidate, Zandvakili approached Goddard about the headship position. (Id. at 88-89) Zandvakili gave his reasons for supporting Goddard over Kelton:

> . . . I wanted a person who will be inclusive, a person who will have high academic standards in terms of appreciation for scholarship, a person whom will take the department to the next level.
>       And also a person that appreciated and supported, you know, quote, unquote, the part of the department that was kind of in, rather than--because there were really, clearly division [sic]. Either you were on one side or the other. There was no kind of middle street.

(Id. at 89) In Zandvakili's opinion, Kelton lacked the attributes he sought in a department head:

> . . . I would like to see the department head who is inclusive and also has appreciation for the type of work in terms of scholarly work, in terms of teaching contribution, in terms of service contribution that I provide. And at the same time, provide a framework in which if, in fact, there are differences, those differences could be discussed in a collegial fashion. I didn't think that could be provided under her leadership.

(Id. at 90-91) Also, based on comments Kelton made to his colleagues, Zandvakili believed that if Kelton were named department head, she would marginalize his role in the department. (Id. at 39-40, 90)

In her memorandum in opposition, Kelton did not attempt to show that Zandvakili's oral or written presentations to the search committee were a pretext for gender discrimination. His

---

[1/]    Kelton's first choice for the headship was also Mayer. (Pl. Resp. Defs. Proposed Findings of Fact ¶ 4)

oral presentation was critical of Kelton, but criticism by itself is not illegal. Kelton admitted that Zandvakili's written comments to the search committee summarized his thoughts on her management style and that these comments did not mention gender. (Pl. Resp. Defs. Proposed Findings of Fact ¶ 39) As Zandvakili's gender-neutral reasons for recommending Goddard instead of Kelton are undisputed, Kelton's gender discrimination claim against him must be dismissed. See Betkerur v. Aultman Hosp. Ass'n, 78 F.3d 1079, 1095 (6th Cir. 1996) (affirming summary judgment for search committee member where the plaintiff offered no evidence indicating that the legitimate, non-discriminatory reason why the search committee member voted for the plaintiff's opponent was pretextual).

According to Kelton, Zandvakili's allegations that she committed rule violations are false because he admitted that the economics department does not have "any working document" governing the various committees. (Pl. Mem. Opp. at 21-22) Zandvakili explained what he meant by "known rules":

> The known rules were the existing practices in the department for several decades, which basically since the department doesn't have any working document, they are all embedded in the minutes of the department. So one has to go and kind of gather all these rules that evolved with respect to the conduct of the financial aid committee, conduct of the graduate program committee, conduct of the undergraduate program committee. And on top of that, there was a motion put forth in October 1997 by [Kelton] with respect to sharpening and defining the rule of graduate program committee and the financial aid committee.

(Zandvakili Dep. 126) Zandvakili believed that Kelton had violated the department's "rules"-- the practices developed over several decades and documented in departmental minutes. The absence of one written document listing these "rules" does not make Zandvakili's beliefs false or a pretext for gender discrimination.

Kelton also claims that Zandvakili's reasons for supporting Goddard are pretextual because Zandvakili alleged that she "violated bylaws" by accepting money from the Hewett-Kautz Fund. (Pl. Mem. Opp. at 22) Zandvakili objected to Kelton's failure to present a proposal for a student field trip to the Hewett-Kautz Fund Committee or to seek approval for the trip's funding from the entire committee, not to her acceptance of the funding. (Zandvakili Dep. 24-26) As Kelton admitted, Zandvakili raised documentation issues about the committee, wanting to know more about how the fund was spent and how much money remained. (Pl. Resp. Defs. Proposed Findings of Fact ¶ 29) Kelton offered no evidence that Zandvakili's concerns about the Hewett-Kautz Fund had anything to do with her gender.

As further evidence that Zandvakili's reasons for supporting Goddard are a pretext for gender discrimination, Kelton cites Zandvakili's claim that she "would be a poor Department Head because she endorsed verbal abuse." (Pl. Mem. Opp. at 22) In their May 19, 2000 memorandum to Dean Joseph Caruso, _not_ the search committee, Zandvakili and several other professors expressed concern about an altercation between Debashis Pal and Al Berry at a Hewett-Kautz Fund meeting and stated that "the new Head must not be a person who has condoned Professor Berry's behavior." (Ex. 15) Zandvakili testified that Kelton did not do anything to protect Pal and stated his opinion that her failure to take a position, as an administrator, "is basically approval of that behavior." (Zandvakili Dep. 121, 123) Kelton failed to present any evidence that she had "taken a position" against Berry's behavior or that Zandvakili's opinion that she had condoned Berry's behavior was false, much less that his opinion was in any way related to her gender. Indeed, the memorandum also criticized Gallo, a male, for his failure to take action against Berry. (Ex. 15)

Kelton also claims that Zandvakili spread "false rumors" that she discriminated against foreign graduate students. (Pl. Mem. Opp. at 22, 34)  Zandvakili testified that graduate students--both American and foreign born--came to him and complained that Kelton treated them "like dirt." (Zandvakili Dep. 70-71)  Kelton did not offer any evidence that graduate students did not make such complaints to Zandvakili.[2/]  According to Kelton, Zandvakili's allegations concerning her treatment of graduate students are pretextual because Zandvakili did not act upon these student complaints or discuss them with Kelton.  (Pl. Mem. Opp. at 22)  Zandvakili explained that his approach was not to complain to the affirmative action office but to try "to comfort [the students], encourage them so that they would be focused on their studies." (Zandvakili Dep. 76)  Zandvakili did not go to Kelton with the graduate students' complaints because she was not his "ally" and "[s]he belonged to that set of individuals who were basically out there to destroy the researchers in the department."  (Id. at 74)[3/]  Zandvakili's failure to discuss the graduate students' complaints with Kelton had nothing to do with her gender and everything to do with the political division within the economics department and the nature of his own relationship with Kelton.

Kelton cites the testimony of one of Zandvakili's former students that it was rumored that Zandvakili did not like women and that in her opinion, he was condescending and not as nice to women. (Pl. Mem. Opp. at 1, 19 n.13)  Kelton cannot defeat summary judgment with rumors and opinions.  See Betkerur, 78 F.3d at 1096 (quoting Mitchell v. Toledo Hosp., 964 F.2d 577,

---

[2/]   Exhibits 4 and 6 are examples of Kelton's e-mails to the graduate students.

[3/]   Zandvakili further testified that Kelton already knew that the graduate students were unhappy with her administration of the graduate program:  "She was very well aware of their unhappiness.  Her approach was that just dismiss their whining." (Zandvakili Dep. 78)

585 (6th Cir. 1992)) ("'[R]umors, conclusory allegations and subjective beliefs . . . are wholly insufficient evidence to establish a claim of discrimination as a matter of law.'").

The comment attributed to Zandvakili that in May of 2002 he told Tina Natorp that "at most, [she] could aspire to be bank branch manager in the banking industry because [she] eventually would marry and have a family" (Pl. Mem. Opp. Ex. A ¶¶ 3-4) is also not evidence of discrimination. Assuming this comment was made, it is a gender-neutral observation regarding the familiar tension between upper level jobs and family life. This observation applies equally to males and females; it is not evidence of discrimination. At best for Kelton, this comment is an ambiguous stray remark made by a non-decisionmaker two years after the headship search which should not be considered on summary judgment. See Betkerur, 78 F.3d at 1096 (an ambiguous comment by a decisionmaker that the plaintiff was "not a selling person" made years before the decision regarding the Director of Neonatology position insufficient to avoid summary judgment). Further, there is no evidence Zandvakili's alleged comment was adopted by any decisionmaker nor could it have been since it significantly post-dates the headship search. Id. at 1097 (finding with respect to a different allegedly discriminatory comment that "no evidence suggests that the statement was adopted or relied upon in any way by hospital decisionmakers").[4/] Indeed, there is no evidence anything Zandvakili said was adopted by the University; this undisputed fact requires summary judgment in his favor even if he were biased against Kelton based on gender. Id. In fact, the evidence is the opposite: Howe rejected Zandvakili's criticisms and his presentation had no influence on Howe. (Howe Dep. 53)

---

[4/]    Kelton mischaracterizes the record when she states that Pal admitted that he was influenced by Mayer, Williams, and Zandvakili. (Pl. Mem. Opp. at 8 n.3) Pal actually testified that his decisionmaking was influenced by Mayer and Williams. (Pal Dep. 72-73)

Kelton admitted that:

- Zandvakili had a positive view of her and encouraged her to apply for tenure (Pl. Resp. Defs. Proposed Findings of Fact ¶ 12); and

- Zandvakili voted in her favor for her tenure. (Id.)

These undisputed facts create and reinforce a presumption of non-discrimination on the part of Zandvakili. See Buhrmaster v. Overnite Transp. Co., 61 F.3d 461, 463 (6th Cir. 1995).

Kelton conceded that Zandvakili joined in an e-mail to Dean Caruso criticizing all the Group A members, including eight males. (Pl. Resp. Defs. Proposed Findings of Fact ¶ 56) Kelton admitted she had no reason to believe that the views expressed in this e-mail were not the true opinions of Zandvakili and the five other professors. (Kelton Dep. 125-26) This e-mail demonstrates that Zandvakili's recommendation in favor of Goddard was not influenced by gender but by previously existing political disputes within the economics department.

Despite Kelton's mischaracterization of Zandvakili's presentations to the search committee,[5] she has not offered a scintilla of evidence that anything Zandvakili said or did was motivated by her gender. Kelton's gender discrimination claim against Zandvakili must be dismissed.

---

[5] Kelton mischaracterizes Headship search committee Chair Steven Howe's testimony by stating that he described Zandvakili's presentations as "venomous" and "inappropriate." (Pl. Mem. Opp. at 6-7) When specifically asked if he would attach the adjectives "venomous" and "inappropriate" to Zandvakili's presentations, Howe declined to do so. (Howe Dep. 57)

### C. Kelton's Conspiracy Claim Against Zandvakili Must Be Dismissed.

#### 1. The intracorporate conspiracy doctrine bars Kelton's conspiracy claim.

##### a. The intracorporate conspiracy doctrine applies to conspiracy claims against only individual defendants.

Zandvakili incorporates by reference the argument and analysis from Mayer's reply memorandum explaining that the intracorporate conspiracy doctrine applies to the actions of the individual Defendants. (Mayer Reply Mem. at 7)

##### b. Zandvakili acted within the scope of his employment.

Zandvakili incorporates by reference the argument and analysis from Mayer's reply memorandum explaining that conduct is within the scope of employment when it occurs during the course of working hours, is connected to the business of the employer, and addressed to the proper managerial authorities. (Mayer Reply Mem. at 7-9)

Kelton bases her conspiracy accusations against Zandvakili on the same reasons advanced in support of her gender discrimination claim against him--he encouraged Goddard to apply for the headship position, he joined in two memoranda from several professors to Dean Caruso and Department Head Gallo alleging that Kelton committed rule violations, and he made a presentation before the search committee in favor of Goddard. (Pl. Mem. Opp. at 34-35) Zandvakili acted during the course of University business, his conduct was related to the activities of the economics department, and he made any complaints or criticisms to the appropriate administrative authorities. Zandvakili's actions were within the scope of his employment as a member of the economics faculty.

Kelton also claims that Zandvakili "falsely accused" her of "rule violations" and spread "false rumors" that she discriminated against graduate students on the basis of national origin.

(Pl. Mem. Opp. at 34) As explained above, Kelton failed to present any evidence that Zandvakili's belief that she had violated the longstanding practices of the department was not true or that graduate students did not complain to Zandvakili about Kelton.

Even if Zandvakili's statements were not true, Zandvakili's statements addressed the activities and morale of the economics department and therefore fell within the scope of his employment. (Mayer Reply Mem. at 9)

       **c.**    **If Zandvakili acted outside the scope of his employment, all of Kelton's claims fail.**

Zandvakili incorporates by reference the argument and analysis from Mayer's reply memorandum explaining that Kelton's argument that the individual Defendants acted outside the scope of their employment is fatal to all of her claims. (Mayer Reply Mem. at 9-11)

       **d.**    **The independent personal stake exception does not apply.**

Zandvakili incorporates by reference the argument and analysis from Mayer's reply memorandum explaining that the independent personal stake exception does not apply to the actions of the individual Defendants. (Mayer Reply Mem. at 11)

       **2.**    **Kelton failed to present evidence of a conspiracy motivated by gender.**

Zandvakili incorporates by reference the argument and analysis from Mayer's reply memorandum (id. at 12) explaining that Kelton's conclusory allegation that the individual Defendants "agree[d] to prevent Dr. Kelton from becoming the Department Head based on considerations of her gender" (Pl. Mem. Opp. at 31), unsupported by any record evidence, is insufficient to establish a conspiracy claim. Kelton's conspiracy claim against Zandvakili must be dismissed.

### III. CONCLUSION

For each and all of the foregoing reasons, and those set forth in his motion for summary judgment, Zandvakili respectfully requests that this Court grant his motion and dismiss the claims against him.

Respectfully submitted,

Jim Petro
Attorney General of Ohio

By:  s/ Doreen Canton
Doreen Canton Bar Number 0040394
Attorney for Defendants
Taft, Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, Ohio 45202-3957
Telephone: (513) 381-2838
Fax: (513) 381-0205
E-mail: canton@taftlaw.com

OF COUNSEL:

W. Stuart Dornette (0002953)
Kerry P. Hastings (0066871)
Rachel S. Zahniser (0076065)
Taft, Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202-3957

Mitchell D. McCrate (0047403)
Associate Counsel
University of Cincinnati
300 Administration Building
Cincinnati, OH 45221-0623

## CERTIFICATE OF SERVICE

I hereby certify that on October 24, 2003, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following: Marc D. Mezibov, Michael N. Budelsky and Susan E. Brabenec, 920 Fourth & Race Tower, 105 W. Fourth Street, Cincinnati, Ohio 45202.

s/ Doreen Canton
Doreen Canton Bar Number 0040394
Attorney for Defendants
Taft, Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, Ohio 45202-3957
Telephone: (513) 381-2838
Fax: (513) 381-0205
E-mail: canton@taftlaw.com

W0068318.1