Westlaw.

2004 WL 789726
--- F.3d ----, 2004 Fed.App. 0102P
**(Cite as: 2004 WL 789726 (6th Cir.(Tenn.)))**

Page 1

H

United States Court of Appeals,
Sixth Circuit.

Sheila WHITE, Plaintiff-Appellee/Cross-Appellant,
v.
BURLINGTON NORTHERN & SANTA FE RAILWAY CO.,
Defendant-Appellant/Cross-Appellee.

Nos. 00-6780, 01-5024.

Argued June 11, 2003.
Decided and Filed April 14, 2004.

**Background:** Employee brought action against railroad, claiming unlawful discrimination based on sex and unlawful retaliation. The United States District Court for the Western District of Tennessee, Jon P. McCalla, J., entered judgment on jury verdict for employee on retaliation claim and against employee on sexual harassment and punitive damages claims and denied railroad's motion for judgment as a matter of law. Upon cross-appeals, the Court of Appeals, 310 F.3d 443, reversed in part and remanded.

**Holdings:** On rehearing en banc, the Court of Appeals, Gibbons, Circuit Judge, held that:
(1) suspension of railroad employee without pay, followed thirty-seven days later by a reinstatement with back pay, was an "adverse employment action" for Title VII purposes;
(2) transferring railroad employee from her forklift operator job to a standard track laborer job was an "adverse employment action";
(3) court did not abuse its discretion in awarding railroad employee eighty percent of her attorney fees; and
(4) appropriate burden of proof on a claim for punitive damages under Title VII was a preponderance of the evidence, not clear and convincing evidence.

Affirmed and remanded.

Clay, Circuit Judge, filed concurring opinion in which Martin, Daughtrey, Moore, and Cole, Circuit Judges, joined.

Sutton, Circuit Judge, filed opinion concurring in part and dissenting in part in which Boggs, Chief Judge, and Krupansky, Batchelder, and Rogers, Circuit Judges joined.

**[1] Federal Courts** ⚖═776
170Bk776 Most Cited Cases

Denial of post-trial motion for judgment as a matter of law is reviewed de novo. Fed.Rules Civ.Proc.Rule 50(b), 28 U.S.C.A.

**[2] Federal Courts** ⚖═765
170Bk765 Most Cited Cases

**[2] Federal Courts** ⚖═801
170Bk801 Most Cited Cases

Inquiry for resolving a motion for judgment as a matter of law is the same as the inquiry for resolving a motion for summary judgment; court reviews all of the evidence in the record in the light most favorable to the nonmoving party and determines whether there was a genuine issue of material fact for the jury. Fed.Rules Civ.Proc.Rule 50(b), 28 U.S.C.A.

**[3] Civil Rights** ⚖═1119
78k1119 Most Cited Cases

Employment actions that are de minimis are not actionable under Title VII. Civil Rights Act of 1964, § 704, as amended, 42 U.S.C.A. § 2000e-3(a).

**[4] Civil Rights** ⚖═1119
78k1119 Most Cited Cases

A mere inconvenience or an alteration of job responsibilities or a "bruised ego" is not enough to constitute an adverse employment action for Title

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

2004 WL 789726
--- F.3d ----, 2004 Fed.App. 0102P
**(Cite as: 2004 WL 789726 (6th Cir.(Tenn.)))**

Page 2

VII purposes. Civil Rights Act of 1964, § 704, as amended, 42 U.S.C.A. § 2000e- 3(a).

**[5] Civil Rights ⇌1135**
78k1135 Most Cited Cases

Reassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims; however, a reassignment without salary or work hour changes may be an adverse employment action if it constitutes a demotion evidenced by a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation. Civil Rights Act of 1964, § 704, as amended, 42 U.S.C.A. § 2000e-3(a).

**[6] Civil Rights ⇌1119**
78k1119 Most Cited Cases

For Title VII purposes, an "adverse employment action" is a tangible employment action which constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. Civil Rights Act of 1964, §§ 703, 704, as amended, 42 U.S.C.A. § 2000e-2(a)(1), 2000e-3.

**[7] Civil Rights ⇌1120**
78k1120 Most Cited Cases

**[7] Civil Rights ⇌1136**
78k1136 Most Cited Cases

Suspension of railroad employee without pay, followed thirty-seven days later by a reinstatement with back pay, was an "adverse employment action" for Title VII purposes; "ultimate employment decision" standard was not the appropriate standard in determining whether employer discriminated against employee. Civil Rights Act of 1964, § 704, as amended, 42 U.S.C.A. § 2000e- 3(a).

**[8] Civil Rights ⇌1135**
78k1135 Most Cited Cases

Transferring railroad employee from her forklift operator job to a standard track laborer job was an "adverse employment action" for Title VII purposes; while the standard track laborer job paid the same as the forklift operator position, employee's new position was more arduous and "dirtier," and forklift operator position required more qualifications, which is an indication of prestige. Civil Rights Act of 1964, § 703, as amended, 42 U.S.C.A. § 2000e-2(a)(1).

**[9] Civil Rights ⇌1555**
78k1555 Most Cited Cases

In light of contradictory evidence from railroad's own officers, jury was entitled to find that railroad's asserted legitimate reasons for taking adverse employment actions against employee were false and were pretext for unlawful retaliation. Civil Rights Act of 1964, § 704, as amended, 42 U.S.C.A. § 2000e-3(a).

**[10] Federal Courts ⇌830**
170Bk830 Most Cited Cases

Court reviews a district court's determination regarding the amount of an award of attorney fees under Title VII for an abuse of discretion. Civil Rights Act of 1964, § 706, 42 U.S.C.A. § 2000e-5(k).

**[11] Civil Rights ⇌1593**
78k1593 Most Cited Cases

**[11] Civil Rights ⇌1594**
78k1594 Most Cited Cases

District court did not abuse its discretion in awarding railroad employee eighty percent of her attorney fees under Title VII; although employee, who brought sex discrimination and retaliation claims, prevailed only on retaliation claim, both of those claims arose from a common set of facts, and it would be difficult to divorce work done on one claim from work done on the other. Civil Rights Act of 1964, § 706, 42 U.S.C.A. § 2000e-5(k).

**[12] Civil Rights ⇌1575(1)**
78k1575(1) Most Cited Cases

Appropriate burden of proof on a claim for punitive damages under Title VII was a preponderance of the evidence, not clear and convincing evidence. 42 U.S.C.A. § 1981a(b)(3).

Appeal from the United States District Court for

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Case 1:02-cv-00345-HJW    Document 42-2    Filed 05/05/2004    Page 3 of 16

Page 4 of 37

2004 WL 789726
--- F.3d ----, 2004 Fed.App. 0102P
(Cite as: 2004 WL 789726 (6th Cir.(Tenn.)))

Page 3

the Western District of Tennessee at Memphis. No. 99-02733--Jon Phipps McCalla, District Judge.

ARGUED: Bryan P. Neal, Thompson & Knight, Dallas, Texas, for Appellant. William B. Ryan, Donati Law Firm, Memphis, Tennessee, for Appellee. ON BRIEF: Bryan P. Neal, Thompson & Knight, Dallas, Texas, Ralph T. Gibson, Bateman Gibson, Memphis, Tennessee, for Appellant. William B. Ryan, Donald A. Donati, DONATI LAW FIRM, Memphis, Tennessee, for Appellee. Ann E. Reesman, Robert E. Williams, McGuiness, Norris & Williams, Washington, D.C., Jenifer M. Bosco, National Employment Lawyers Association, San Francisco, California, Ralph E. Lamar IV, Collegeville, Pennsylvania, for Amici Curiae.

Before: BOGGS, Chief Judge; MARTIN, KRUPANSKY, BATCHELDER, DAUGHTREY, MOORE, COLE, CLAY, GILMAN, GIBBONS, ROGERS, SUTTON, and COOK, Circuit Judges.

GIBBONS, J., announced the judgment and majority opinion of the en banc court on all issues. The entire en banc court joined Parts I (Background) and III (Attorney's Fees) of the majority opinion. Part II (Adverse Employment Action) of the majority opinion was joined by BOGGS, C. J., and KRUPANSKY, BATCHELDER, GILMAN, ROGERS, SUTTON, and COOK, JJ., and Part IV (Punitive Damages) was joined by MARTIN, DAUGHTREY, MOORE, COLE, CLAY, GILMAN, and COOK, JJ. CLAY, J. (pp. 36- 51), filed a separate concurring opinion joining Parts I, III, and IV of the majority opinion and writing separately as to Parts II and V, in which he was joined by MARTIN, DAUGHTREY, MOORE, and COLE, JJ. SUTTON, J. (pp. 52-85), filed an opinion concurring in Parts I-III and dissenting from Parts IV and V, in which he was joined by BOGGS, C. J., and KRUPANSKY, BATCHELDER, and ROGERS, JJ.

OPINION

JULIA SMITH GIBBONS, Circuit Judge.

*1 In this appeal, the *en banc* court addresses the meaning of "adverse employment action" for purposes of Title VII. We decide that a thirty-seven day suspension without pay constitutes an adverse employment action regardless of whether the suspension is followed by a reinstatement with back pay. We also address several other issues raised by this appeal.

Sheila White brought this action against her employer, Burlington Northern & Santa Fe Railway Company (Burlington Northern), alleging sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-2(a)(1), 2000e-3. The jury returned a verdict in favor of Burlington Northern on the sex discrimination claim and in favor of White on the retaliation claim. The jury awarded White compensatory damages but no punitive damages. After the trial, the district court denied Burlington Northern's motion for judgment as a matter of law on the retaliation claim and granted White's motion for attorney's fees.

Burlington Northern appeals from the denial of its motion for judgment as a matter of law and from the award of attorney's fees to White. White cross-appeals, challenging the district court's jury instruction regarding punitive damages. For the reasons set forth below, we affirm the district court's denial of Burlington Northern's motion for judgment as a matter of law and the district court's award of attorney's fees to White. We conclude, however, that the district court erred in instructing the jury on the issue of punitive damages, and therefore we remand the case for further proceedings consistent with this opinion.

I. BACKGROUND

Before June 1997, Ralph Ellis operated the stationary forklift for Burlington Northern at its Tennessee Yard in Memphis. In June 1997, Ellis resigned from the forklift position in order to work on a mobile track gang, in which position Ellis earned more pay than he would have if he had continued working in the forklift position. Marvin Brown, roadmaster of the Tennessee Yard, interviewed White for a job with Burlington Northern and expressed interest in White's experience operating a forklift. On June 23, 1997, Burlington Northern hired White to work in its Maintenance of Way department at its Tennessee Yard, and following White's hire, Brown assigned

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Case 1:02-cv-00345-HJW     Document 42-2     Filed 05/05/2004     Page 4 of 16

Page 5 of 37

2004 WL 789726
--- F.3d ----, 2004 Fed.App. 0102P
(Cite as: 2004 WL 789726 (6th Cir.(Tenn.)))

Page 4

her to operate the forklift at the Tennessee Yard.

White was the only female working in the Maintenance of Way department at the Tennessee Yard. White's immediate supervisor was foreman Bill Joiner. Joiner had never supervised a woman before, and he admitted at trial that he treated White differently because of her gender. He also admitted that he did not believe that the Maintenance of Way department was an appropriate place for women to work. According to White, Joiner repeatedly expressed this belief to her while she was working under his supervision. According to Joiner, several other Burlington Northern employees also expressed the belief that women should not work on a railroad. Another Burlington Northern employee agreed at trial that there was "a general anti-woman feeling" among Burlington Northern employees at the Tennessee Yard.

*2 Despite concerns about the propriety of a woman working on the railroad, the evidence was uncontradicted that White did not have difficulty performing her job. According to Brown, he never received a complaint regarding White's performance operating the forklift. Joiner testified that White had no problems performing her job. Furthermore, another Burlington Northern foreman testified that no one expressed concern about White's ability to get along well with others in the workplace or about anything specific to White other than her gender.

On September 16, 1997, White complained to Brown and other company officials about specific incidents of alleged sexual harassment committed by Joiner. The company investigated. Following the investigation, Burlington Northern suspended Joiner for ten days and ordered him to attend a training session regarding sexual harassment.

On September 26, 1997, Brown met with White to inform her that Joiner had been disciplined pursuant to her complaint. He also, however, told her that the company had learned during the investigation of several complaints about her working in the forklift position. According to Brown, the complaints did not relate to her performance but related to the fact that the forklift position was a less arduous and cleaner job than other track laborer positions. Brown testified that other employees, including Ellis, complained about a junior employee being allowed to work the forklift instead of "a more senior man." Other witnesses testified that the forklift job was generally considered a physically easier and cleaner job than other track laborer positions, although it required more qualifications. Joiner testified that other track laborers complained about White being allowed to hold the position instead of a male employee.

During the September 26 meeting regarding the resolution of White's internal sexual discrimination complaint, Brown informed White that he was removing her from the forklift position and assigning her to a standard track laborer position because of her coworkers' complaints. Her pay and benefits remained the same, but her new job was, by all accounts, more arduous and "dirtier" than the forklift position. Brown replaced White with Ellis, the only other employee qualified to perform the forklift job. Brown admitted at trial that he had heard complaints about White being allowed to work the forklift before she complained of discrimination but that he did not remove her from the position until after she complained of discrimination.

Brown's trial testimony is inconsistent with Burlington Northern's interrogatory response. In that response, the railroad stated that it removed White from the forklift position because a more senior employee claimed the job according to the collective bargaining agreement. Brown, however, testified at trial that the forklift job was not governed by the collective bargaining agreement and that he had the discretion to place anyone he chose in that position regardless of seniority. Moreover, neither the union, nor anyone else, initiated a grievance about White's operation of the forklift. A union official testified that the union's records did not reflect any complaints regarding White's assignment to the forklift position. Only White and Ellis were qualified to perform the forklift position. Ellis, who had voluntarily resigned from the forklift job for a higher-paying job, testified that he did not complain to Brown or anyone else about White operating the forklift and that he did not request that he be returned to the position.

*3 On October 10, 1997, White filed a charge with the Equal Employment Opportunity Commission (EEOC) alleging sex discrimination and retaliation. She filed a second charge with the EEOC on

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

2004 WL 789726
--- F.3d ----, 2004 Fed.App. 0102P
(Cite as: 2004 WL 789726 (6th Cir.(Tenn.)))

Page 5

December 4, 1997, alleging retaliation. In her second EEOC charge she alleged that Brown had placed her under surveillance and was checking on her daily activities. Her second EEOC charge was mailed to Brown on December 8, 1997.

On December 11, 1997, White was working in Blytheville, Arkansas, supporting a regional tie gang. She was working under the supervision of Burlington Northern foreman Percy Sharkey. At some point during the day, Sharkey instructed White to ride in a truck with another foreman, James Key. Sharkey instructed another track laborer, Greg Nelson, to ride with him in his vehicle. According to White, when she approached Key he told her that she had to ride with Sharkey because Key wanted Nelson to ride with him. Against Sharkey's order, Nelson rode away with Key. White testified that Sharkey became very upset when she returned and told him that Nelson had ridden away with Key and that she would have to ride with him. Contrary to White's testimony, Sharkey testified that White refused to ride with Key, claiming that she had seniority over Nelson and insisting upon riding with Sharkey.

According to Sharkey, he called Brown to discuss the situation and Brown told him that, based on Sharkey's description of events, White had been insubordinate and should be removed from service immediately. On the afternoon of December 11, Sharkey informed White that she was suspended. Although Sharkey had the authority to suspend White himself, Sharkey testified that Brown made the decision to suspend White. Brown testified that Sharkey made the decision. White testified that Sharkey told her at the time that Brown had instructed him to suspend her. In a letter to the EEOC, Burlington Northern stated that Brown made the decision, but Brown testified that this letter was incorrect. Nelson received no discipline, although Sharkey acknowledged at trial that Nelson had disobeyed his direct order.

White testified that Sharkey had told her at some point before her suspension that Brown considered White a "troublemaker." Sharkey acknowledged at trial that he had told White that the railroad was trying to "get rid" of her.

The decision to suspend White occurred seven days after White filed her second EEOC charge and three days after the charge was mailed to Brown. The suspension took effect immediately and was without pay. According to company policy, the suspension without pay would automatically become a termination if White did not file a grievance with her union appealing the decision within fifteen days. White timely filed such a grievance and also filed another EEOC charge on December 15, 1997, alleging retaliation.

While her grievance was pending, White was without a job and without income and she did not know if or when she would be allowed to return to work. During this period, White sought medical treatment for emotional distress and incurred medical expenses. The grievance remained pending through the end of December and the first half of January 1998. After an investigation and a hearing, the hearing officer, who was a Burlington Northern manager, found that White had not been insubordinate and that she should not have been suspended. After being suspended without pay for thirty-seven days, White was reinstated to her position with full back pay on January 16, 1998.

*4 After exhausting her avenues for relief before the EEOC, White filed this action against Burlington Northern in the district court, alleging sex discrimination and retaliation in violation of Title VII. A jury trial was conducted from August 29, 2000, to September 5, 2000. The jury returned a verdict in favor of Burlington Northern on White's sex discrimination claim and a verdict in favor of White on her retaliation claim. The jury awarded White $43,500 in compensatory damages, including $3,250 in medical expenses, on her retaliation claim. The jury found against White on her claim for punitive damages. After the trial, pursuant to Federal Rule of Civil Procedure 50(b), Burlington Northern filed a renewed motion for judgment as a matter of law on the retaliation claim, which the district court denied. White filed a motion for an award of attorney's fees pursuant to 42 U.S.C. § 2000e-5(k), and the district court awarded White $54,285, which represented eighty percent of White's total attorney's fees.

II. MOTION FOR JUDGMENT AS A MATTER OF LAW

[1][2] We first review the district court's denial of Burlington Northern's post-trial motion for

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Case 1:02-cv-00345-HJW    Document 42-2    Filed 05/05/2004    Page 6 of 16

Page 7 of 37

2004 WL 789726
--- F.3d ----, 2004 Fed.App. 0102P
(Cite as: 2004 WL 789726 (6th Cir.(Tenn.)))

Page 6

judgment as a matter of law pursuant to Rule 50(b). Our standard of review is *de novo*. *Gray v. Toshiba Am. Consumer Prods., Inc.*, 263 F.3d 595, 598 (6th Cir.2001). The inquiry for resolving a motion for judgment as a matter of law pursuant to Rule 50 is the same as the inquiry for resolving a motion for summary judgment pursuant to Rule 56. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). We review all of the evidence in the record in the light most favorable to the nonmoving party and determine whether there was a genuine issue of material fact for the jury. *Gray*, 263 F.3d at 598.

We must affirm the jury verdict unless there was "no legally sufficient evidentiary basis for a reasonable jury to find for [the prevailing] party." Fed.R.Civ.P. 50(a). We draw all reasonable inferences in favor of the prevailing party, and we do not make any credibility determinations or weigh the evidence. *Reeves*, 530 U .S. at 150. Therefore, we "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* at 151. "That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.' " *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 300, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

Burlington Northern contends that it is entitled to judgment as a matter of law on White's retaliation claim because, according to Burlington Northern, neither White's transfer from the forklift job to a standard track laborer job nor her suspension without pay for thirty-seven days constitutes an adverse employment action for purposes of Title VII. In the alternative, Burlington Northern contends that there was insufficient evidence for the jury to conclude rationally that Burlington Northern's asserted legitimate, non-discriminatory reasons for transferring and suspending White were pretexts for retaliation.

*5 In determining whether Burlington Northern is entitled to judgment as a matter of law, we first discuss the meaning of "adverse employment action" for purposes of Title VII. Then we discuss whether White's transfer and suspension were adverse employment actions. Finally we address whether there was sufficient evidence for the jury to rationally find that Burlington Northern's asserted legitimate reasons were pretexts for unlawful retaliation.

A. Defining Adverse Employment Action

[3] Title VII's anti-retaliation provision provides:
(a) Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings
It shall be an unlawful employment practice for an employer to *discriminate against* any of his employees or applicants for employment ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.
42 U.S.C. § 2000e-3(a) (section 704(a) of Title VII) (emphasis added). Title VII does not define the phrase "discriminate against," which is repeated in Title VII's other anti-discrimination provisions, but courts have made clear that not just any discriminatory act by an employer constitutes discrimination under Title VII. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (citing cases requiring a "tangible employment action" to support a Title VII claim). Employment actions that are *de minimis* are not actionable under Title VII. *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462 (6th Cir.2000). "If every low evaluation or other action by an employer that makes an employee unhappy or resentful were considered an adverse action, Title VII would be triggered by supervisor criticism or even facial expressions indicating displeasure." *Primes v. Reno*, 190 F.3d 765, 767 (6th Cir.1999).

To prevent lawsuits based upon trivial workplace dissatisfactions, we require that a plaintiff prove the existence of an "adverse employment action" to support a Title VII claim. *Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir.1999) (defining "adverse employment action" as a "materially adverse change in the terms and conditions of [plaintiff's] employment"). [FN1] This case requires us to clarify further the meaning of "adverse employment action" for purposes of Title VII.

The first time this court required a plaintiff to

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

prove the existence of an "adverse employment action" as part of a Title VII claim was in *Geisler v. Folsom,* 735 F.2d 991 (6th Cir.1984). In *Geisler,* the plaintiff alleged that her employer violated Title VII's anti-retaliation provision by discriminating against her for filing a sex discrimination charge with the EEOC. After a bench trial, the district court found that "[p]laintiff failed to show any adverse employment action in response to her EEOC charge or any other protected activity. While additional tension arose after others became aware of [plaintiff]'s charge, such 'predictable tension' is not 'the type of adverse employment action prohibited by Title VII's retaliation clause.' " 735 F.2d at 994 (quoting the district court). This court affirmed, stating:

> *6 We agree with the district judge that a general increase of tension in the workplace would be expected to follow revelation that a claim of discrimination in employment had been filed. However, evidence of such an increase should be considered, and any discrete act or course of conduct which could be construed as retaliation must be examined carefully. After such examination we conclude that the finding that no 'adverse employment action' resulted from the filing of the EEOC charge is not clearly erroneous, particularly in view of the contrary evidence....

735 F.2d at 996 (quoting the district court's use of the phrase "adverse employment action").

A few months after deciding *Geisler,* this court stated that to support a claim for retaliation under Title VII a "plaintiff must establish: (1) that he engaged in activity protected by Title VII; (2) that he was the subject of adverse employment action; and (3) that there exists a casual [sic] link between his protected activity and the adverse action of his employer." *Jackson v. RKO Bottlers of Toledo, Inc.,* 743 F.2d 370, 375 (6th Cir.1984). The *Jackson* court did not cite *Geisler* as a basis for including "adverse employment action" among the elements of a Title VII retaliation claim; instead it relied upon cases from the Fifth, Tenth, and Eleventh Circuits. *Id.* (citing *Burrus v. United Tel. Co. of Kansas, Inc.,* 683 F.2d 339, 343 (10th Cir.1982); *Jones v. Lumberjack Meats, Inc.,* 680 F.2d 98, 101 (11th Cir.1982); *Whatley v. Metro. Atlanta Rapid Transit Auth.,* 632 F.2d 1325, 1328 (5th Cir.1980)). The cases cited by *Jackson,* like *Jackson* itself, each involved a termination of employment, and so none of these cases addressed the issue of what types of employment actions short of termination constitute adverse employment actions. [FN2]

Ever since *Geisler* and *Jackson,* the adverse-employment-action element has remained a part of a Title VII claim in this circuit. After *Geisler,* the first time that this court decided a case based on the adverse-employment- action element was in *Yates v. Avco Corp.,* 819 F.2d 630, 638 (6th Cir.1987). In *Yates,* this court reversed a district court's factual finding of retaliation, holding that it was clear error for the district court to find that a temporary job reassignment that resulted in no pay or benefits reduction was an adverse employment action cognizable under Title VII's anti- retaliation provision. For this holding, the *Yates* court relied solely upon a district court decision from Delaware. *Id.* (citing and endorsing *Ferguson v. E.I. duPont deNemours and Co.,* 560 F.Supp. 1172, 1201 (D.Del.1983), which held that a job reassignment is not an adverse employment action if it is only temporary and results in no reduction in pay or benefits).

[4] After *Yates,* it was almost ten years before we had another opportunity to develop the definition of adverse employment action. In *Kocsis v. Multi-Care Management Inc.,* this court considered the definition of adverse employment action in the context of a discrimination claim under the Americans with Disabilities Act. 97 F.3d 876, 885-87. Relying in part upon the Seventh Circuit's definition, this court held that a plaintiff claiming employment discrimination must show that she suffered "a materially adverse change in the terms of her employment." *Id.* at 885 (citing *Spring v. Sheboygan Area Sch. Dist.,* 865 F.2d 883 (7th Cir.1989), which involved an age discrimination claim). A "mere inconvenience or an alteration of job responsibilities" or a "bruised ego" is not enough to constitute an adverse employment action. *Id.* at 886 (citing *Crady v. Liberty Nat'l Bank and Trust Co.,* 993 F.2d 132, 136 (7th Cir.1993), and *Flaherty v. Gas Research Inst.,* 31 F.3d 451, 456 (7th Cir.1994)).

*7 [5] Furthermore, according to *Kocsis,* "reassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims." *Id.* at 885 (citing *Yates,* 819 F.2d at 638, which applied

2004 WL 789726
--- F.3d ----, 2004 Fed.App. 0102P
**(Cite as: 2004 WL 789726 (6th Cir.(Tenn.)))**

Page 8

to "temporary" reassignments). A reassignment without salary or work hour changes, however, may be an adverse employment action if it constitutes a demotion evidenced by "a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Id.* at 886 (citing *Crady,* 993 F.2d at 136).

[6] In this circuit, *Kocsis* is the seminal case for defining adverse employment action. [FN3] The Supreme Court in *Burlington Industries v. Ellerth* relied upon *Kocsis* and several decisions from other circuits when it stated that "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). The Supreme Court also observed that:

> A tangible employment action in most cases inflicts direct economic harm.... Tangible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates. A tangible employment decision requires an official act of the enterprise, a company act. The decision in most cases is documented in official company records, and may be subject to review by higher level supervisors.

*Id.* at 762. *But see Ray v. Henderson,* 217 F.3d 1234, 1242 n. 5 (9th Cir.2000) (rejecting the contention that *Burlington Industries* set forth a standard for adverse employment actions in the retaliation context).

In this appeal, White and the EEOC, which has filed an *amicus curiae* brief on White's behalf, urge us to revise our definition of adverse employment action for purposes of Title VII retaliation cases and adopt the interpretation included in the EEOC Guidelines. The EEOC has interpreted "adverse employment action" in the context of a Title VII retaliation claim to mean "any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter a charging party or others from engaging in protected activity." EEOC Compliance Manual § 8, "Retaliation," ¶ 8008 (1998). Although EEOC Guidelines are not binding on the courts, they "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (quoting *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)).

The EEOC claims that this court's development of the adverse-employment-action element has been unfaithful to the letter and purpose of Title VII's anti-retaliation provision. According to 42 U.S.C. § 2000e 3(a), it is unlawful for an employer to "discriminate against" an employee for engaging in protected conduct. The EEOC contends that the most natural reading of this language is that it prohibits "any form of discrimination" against an individual for opposing discrimination or filing a charge. The Ninth and Seventh Circuits have also embraced a broad interpretation of Title VII's anti-retaliation provision. *See Ray v. Henderson,* 217 F.3d 1234, 1243 (9th Cir.2000) ("This provision does not limit what type of discrimination is covered, nor does it prescribe a minimum level of severity for actionable discrimination."); *Knox v. State of Indiana,* 93 F.3d 1327, 1334 (7th Cir.1996) ("There is nothing in the law of retaliation that restricts the type of retaliatory act that might be visited upon an employee who seeks to invoke her rights by filing a complaint."). [FN4]

*8 Despite the EEOC's contention that "any form of discrimination" falls within the most natural reading of the statute, the EEOC acknowledges in its brief that its definition of adverse employment action excludes "petty slights and trivial annoyances" and anything that is not reasonably likely to deter employees from engaging in protected activity. The EEOC does not explain how it justifies excluding such discriminatory acts under its strictly literal reading of the statute, which prohibits discrimination without any explicit textual limitation regarding the type of discrimination or level of severity required. Therefore, the EEOC admits that a strictly literal reading of "discriminate against" is not a fair interpretation of Title VII since it is unlikely that Congress intended to authorize Title VII claims over trivial matters.

We developed the adverse-employment-action element to prevent the kind of claims based upon trivial employment actions that a strictly literal reading of Title VII's anti-retaliation provision would allow. Because the language of Title VII

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

2004 WL 789726
--- F.3d ----, 2004 Fed.App. 0102P
(Cite as: 2004 WL 789726 (6th Cir.(Tenn.)))

Page 9

does not explicitly provide any limit on the types of discriminatory acts prohibited, the language of Title VII does not favor the EEOC's proposed limitations over the limitations this court has developed during the last twenty years of defining the adverse-employment-action element of a Title VII claim.

The EEOC argues that the purpose of Title VII's anti-retaliation provision supports its definition. "In enacting section 2000e 3, Congress unmistakably intended to ensure that no person would be deterred from exercising his rights under Title VII by the threat of discriminatory retaliation." *EEOC v. Ohio Edison Co.,* 7 F.3d 541, 543 (6th Cir.1993). While the EEOC's proposed definition more overtly incorporates the purpose of Title VII's anti-retaliation provision, this court's definition, properly interpreted, also accomplishes the goal while appropriately counterbalancing the need to prevent lawsuits based upon trivialities. Instead of requiring district courts to determine on a case-by-case basis what actions by an employer are reasonably likely to deter an employee from engaging in protected activity, we have over the last twenty years given some shape to the definition by describing the kinds of material adverse employment actions that rise above the level of trivial. As we recognized in *Kocsis,* however, it is impossible to list every possible employment action that falls into the definition of adverse employment action and a court must consider "indices that might be unique to a particular situation." *Kocsis,* 97 F.3d at 886.

In addition, this court's definition has the benefit of applying equally to all Title VII discrimination claims, not only to retaliation claims. Having a different standard for different provisions of Title VII would be burdensome and unjustified by the text of the statute, which uses the same phrase "discriminate against" in each of its anti-discrimination provisions. *See Morris v. Oldham County Fiscal Court,* 201 F.3d 784, 791-92 (6th Cir.2000) (applying rules of statutory construction to hold that "discriminate against" means the same thing each time it appears in Title VII); *Mattei v. Mattei,* 126 F.3d 794, 806 (6th Cir.1997) (presuming that Congress intended the phrase "discriminate against" to have the same basic meaning each time it is used in a statute). [FN5]

*9 We therefore reject White's and the EEOC's request that we adopt a new definition of adverse employment action for purposes of Title VII retaliation cases, and we reaffirm the definition that we have developed in cases such as *Kocsis* and its progeny. Since the adverse-employment action element developed by this Circuit is an exception to a broad, strictly literal reading of Title VII's anti-discrimination provisions, we will continue to define the exception narrowly so as not to frustrate the purpose of Title VII while deterring lawsuits over trivial matters.

B. Suspension Without Pay

[7] We now apply our definition of adverse employment action to the actions at issue in the present case. We consider the suspension first. Burlington Northern argues that a suspension without pay, followed thirty-seven days later by a reinstatement with back pay, is not an adverse employment action. For this argument, Burlington Northern primarily relies upon *Dobbs-Weinstein v. Vanderbilt University,* 185 F.3d 542 (6th Cir.1999).

In May 1994, a Vanderbilt University dean denied tenure to Professor Dobbs-Weinstein and advised her that her teaching appointment at Vanderbilt would end on August 31, 1995. *Id.* at 543. Dobbs-Weinstein filed an internal grievance with Vanderbilt, alleging gender and national-origin discrimination among other things, and in May 1995, she filed an action under Title VII. *Id.* On August 31, 1995, her employment contract with Vanderbilt ended. *Id.* at 544. In November 1995, while her lawsuit was still pending, the Vanderbilt Board of Trustees reversed the decision of the dean and rehired her as a tenured professor. *Id.* The board also granted her back pay to account for the delayed promotion and the period of unemployment. *Id.* Dobbs-Weinstein persisted with her lawsuit, however, seeking interest on the back pay and compensation for emotional distress and injury to reputation. *Id.*

Despite the facts that she was initially denied tenure and her employment ended temporarily, this court held that Dobbs-Weinstein had not suffered an adverse employment action cognizable under Title VII. *Id.* at 545. We recognized that " 'tenure decisions in an academic setting involve a combination of factors which tend to set them apart

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

2004 WL 789726
--- F.3d ----, 2004 Fed.App. 0102P
(Cite as: 2004 WL 789726 (6th Cir.(Tenn.)))

Page 10

from employment decisions generally.' " *Id.* (quoting *Zahorik v. Cornell Univ.,* 729 F.2d 85, 92-93 (2d Cir.1984)). We relied upon the fact that Vanderbilt reversed the decision of its dean and granted Dobbs Weinstein back pay as the result of its internal grievance procedure. *Id.* This reversal, we reasoned, was the "ultimate employment decision." *Id.* We held that "intermediate" tenure decisions that are appealable through a tenure review process cannot form the basis of a Title VII claim. *Id.* We did not, however, cite any section of Title VII that requires exhaustion of internal grievance procedures before one files a lawsuit. [FN6] Instead, we relied upon a decision from the Fourth Circuit, *Page v. Bolger,* 645 F.2d 227, 233 (4th Cir.1981), which we interpreted as holding that Title VII applies only to "ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating." *Id.* Neither the Fourth Circuit nor the *Dobbs-Weinstein* court, however, cited a statutory provision that limits Title VII's application to ultimate employment decisions.

*10 Since deciding *Page,* the Fourth Circuit has retreated from the "ultimate employment decision" standard. *Von Gunten v. Maryland,* 243 F.3d 858, 865, 866 n. 3 (4th Cir.2001) (limiting *Page* and holding that " 'ultimate employment decision' is not the standard in this circuit"). Furthermore, the majority of other circuits have either implicitly or explicitly rejected a standard limiting Title VII's reach to ultimate employment decisions. *See id.* at 864, 866 n. 4 (citing cases). Indeed, the only other circuits where this standard even arguably has any viability are the Fifth and the Eighth. *Mattern v. Eastman Kodak Co.,* 104 F.3d 702, 707 (5th Cir.1997) (applying the "ultimate employment decision" standard); *Ledergerber v. Stangler,* 122 F.3d 1142, 1144 (8th Cir.1997) (same).

The Fifth Circuit, however, has questioned whether the "ultimate employment decision" standard survived the Supreme Court's pronouncements in *Burlington Industries* regarding the definition of tangible employment action. *Fierros v. Texas Dep't of Health,* 274 F.3d 187, 192-93 & n. 2 (5th Cir.2001) (pretermitting question); *but see Hernandez v. Crawford Bldg. Material Co.,* 321 F.3d 528, 531 (5th Cir.2003) (applying "ultimate employment decision" standard without discussing *Burlington Industries* or *Fierros* ). And while the Eighth Circuit has ostensibly adopted the "ultimate employment decision" standard, it has consistently applied a broader standard. *See, e.g., Manning v. Metro. Life Ins. Co.,* 127 F.3d 686, 692 (8th Cir.1997) (ultimate employment decision includes "tangible change in duties or working conditions that constituted a material employment disadvantage"); *Kim v. Nash Finch Co.,* 123 F.3d 1046, 1060 (8th Cir.1997) (ultimate employment decision includes reduction of duties, actions that disadvantage or interfere with the employee's ability to do his or her job, "papering" of an employee's file with negative reports and reprimands even though employee was "not discharged, demoted, or suspended").

We now join the majority of other circuits in rejecting the "ultimate employment decision" standard. [FN7] First and foremost, it is contrary to the plain language of Title VII, which provides that an employer must not "discriminate against" an employee based upon a prohibited classification. As this court has found, the words "discriminate against" literally mean "*any kind* of adverse action." *Mattei,* 126 F.3d at 805. Congress could have provided that employers shall not "discriminate against an employee when making ultimate employment decisions," but instead it chose to use the words "discriminate against" with no such qualifier.

Second, the employment action taken in the present case (suspension without pay for thirty-seven days) is not the type of employment action that this court developed the adverse-employment-action element to filter. The adverse-employment-action element is a warranted judicial interpretation of Title VII intended to deter discrimination lawsuits based on trivial employment actions, such as those that cause a "mere inconvenience" or a "bruised ego." *Kocsis,* 97 F.3d at 886. But as an exception to the strictly literal reading of the statute, the adverse-employment-action element of a Title VII lawsuit must not be interpreted too broadly. Taking away an employee's paycheck for over a month is not trivial, and if motivated by discriminatory intent, it violates Title VII. *See Lovejoy-Wilson v. NOCO Motor Fuel, Inc.,* 263 F.3d 208, 223-24 (2d Cir.2001) (holding that a suspension without pay for one week was an adverse employment action even though the employee was later reimbursed for lost wages because the employee "suffered the loss

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

2004 WL 789726
--- F.3d ----, 2004 Fed.App. 0102P
(Cite as: 2004 WL 789726 (6th Cir.(Tenn.)))

Page 11

of the use of her wages for a time").

*11 Third, the "ultimate employment decision" standard contravenes "the purpose of Title VII to make persons whole for injuries suffered on account of unlawful employment discrimination." *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). While the standard ensures that a wrongfully suspended employee eventually receives back pay, it allows an employer unilaterally to cut off the employee's claims for other damages, which have been explicitly authorized by Title VII since the Civil Rights Act of 1991, such as interest on the back pay, attorney's fees, emotional suffering, and punitive damages. 42 U.S.C. §§ 1981a(b); 2000e-5(g), (k). Although Burlington Northern argues that it made White whole when it granted her back pay, Congress has declared that part of making a Title VII plaintiff whole is compensating her for interest on the back pay, attorney's fees, and emotional suffering. In this case, the jury found that White had suffered $43,500 in damages other than back pay due to Burlington Northern's retaliation.

Lastly, the "ultimate employment decision" standard is in tension with Supreme Court cases holding that the statute of limitations on a Title VII claim is not tolled during the pendency of an internal grievance process. *See, e.g., Int'l Union of Elec. Workers v. Robbins & Myers, Inc.,* 429 U.S. 229, 236, 97 S.Ct. 441, 50 L.Ed.2d 427 (1976). According to the Supreme Court, a Title VII claim arises on the date the alleged discriminatory decision occurs, even though an employee has challenged the decision via an internal grievance process. *Id.* at 234. The Supreme Court has rejected the argument that the pendency of an internal grievance process renders the employment decision "tentative" or "non-final" for purposes of Title VII. *Id.* The Supreme Court has also rejected the argument that "the danger of possible conflict between the concurrent pursuit of both collective-bargaining and Title VII remedies should result in tolling the limitations period for the latter while the former proceeds to conclusion." *Id.* at 239. The alleged discriminatory decision in the present case was the suspension without pay. White's election to challenge this decision through an internal grievance process does not render the decision not actionable under Title VII.

The Equal Employment Advisory Council (the EEAC) argues in its *amicus curiae* brief on behalf of Burlington Northern that employers must maintain the prerogative to suspend summarily employees suspected of wrongdoing pending an investigation without facing the risk of Title VII liability. Otherwise, according to the EEAC, employers will be faced with the dilemma of either allowing potentially dangerous or disruptive individuals to remain in the workplace or suspending them pending an investigation, thereby risking Title VII liability.

In response to the EEAC's concerns, we initially note that an employer taking an adverse employment action against an employee, including a suspension without pay, only risks Title VII liability if there exists sufficient evidence to prove that the employer took the action based upon illegal discrimination. To the extent the EEAC's concerns for an employer's risk of Title VII liability are valid, however, they are allayed by *Jackson v. City of Columbus,* which holds that a suspension *with* pay and full benefits pending a timely investigation into suspected wrongdoing is not an adverse employment action. 194 F.3d 737, 752 (6th Cir.1999). In *Jackson,* we held that there was no adverse employment action when a mayor effectively suspended with pay a police chief for four days pending an investigation of the police chief's alleged improper conduct in office. *See id.* at 744 (noting that the mayor referred to the suspension with pay of the police chief as a reassignment "to his residence"). [FN8]

C. Job Transfer

*12 [8] Next we consider whether the job transfer at issue in the present case was an adverse employment action. Burlington Northern appeals the district court's decision that transferring White from her forklift operator job to a standard track laborer job was an adverse employment action. We agree with the district court.

While the standard track laborer job paid the same as the forklift operator position, White's new position was by all accounts more arduous and "dirtier." Furthermore, the forklift operator position required more qualifications, which is an indication of prestige. *See Kocsis,* 97 F.3d at 886-87 (finding that the plaintiff had failed to show an adverse

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Case 1:02-cv-00345-HJW    Document 42-2    Filed 05/05/2004    Page 12 of 16

Page 13 of 37

2004 WL 789726
--- F.3d ----, 2004 Fed.App. 0102P
(Cite as: 2004 WL 789726 (6th Cir.(Tenn.)))

Page 12

employment action because, among other things, her job reassignment did not entail any loss in prestige). According to Burlington Northern's own witnesses, the transfer occurred because the forklift operator position was objectively considered a better job and the male employees resented White for occupying it. In essence, as the district court found, the reassignment was a demotion evidenced by "indices ... unique to [the] particular situation." *Kocsis,* 97 F.3d at 886; *see also Burlington Indus., Inc.,* 524 U.S. at 761 (defining "tangible employment action" for purposes of Title VII liability as including a job "reassignment with significantly different responsibilities"); *Mattei,* 126 F.3d at 808 (stating that transferring an employee at the same salary to "some wretched backwater" is "clearly" actionable in a retaliation claim).

D. Evidence of Pretext

[9] Having rejected Burlington Northern's arguments that there was no adverse employment action taken against White, we now address Burlington Northern's alternative argument in support of reversing the district court's denial of its motion for judgment as a matter of law. Burlington Northern appeals the district court's decision that there was sufficient evidence from which the jury reasonably concluded that Burlington Northern's asserted legitimate, non-discriminatory reasons for removing White from the forklift position and then suspending her were pretexts for unlawful retaliation. We agree with the district court.

White presented to the jury substantial evidence to contradict Burlington Northern's asserted legitimate reasons, including contradictory statements from Burlington Northern's own officers. Burlington Northern asserted one reason for transferring White in its interrogatory response, but then Brown, the official who made the decision to transfer White, asserted a different, contradictory reason at trial. Furthermore, Brown testified that he transferred White in part based upon complaints from Ellis, but at trial Ellis denied complaining about White. Regarding the suspension, the evidence was not even consistent regarding who made the decision, much less the motivation for the decision. Brown testified that Sharkey made the decision to suspend White, while Sharkey testified that Brown made the decision. Burlington Northern asserts that Brown suspended White for insubordination, but another Burlington Northern official who served as a hearing officer for White's internal grievance concluded that White had not been insubordinate. White's second EEOC charge accused Brown of violating Title VII, and White was suspended three days after this charge was mailed to Brown.

*13 Based upon all the evidence, including the contradictory evidence from Burlington Northern's own officers, the jury was entitled to find that Burlington Northern's asserted legitimate reasons were false and were pretext for unlawful retaliation. *See Reeves,* 530 U.S. at 147 (holding that a jury is entitled to treat a party's dishonesty about a material fact as evidence of culpability).

III. ATTORNEY'S FEES

Burlington Northern's last issue on appeal is a challenge to the amount the district court awarded White in attorney's fees. The district court awarded White eighty percent of her attorney's fees based on her degree of success in the lawsuit. Burlington Northern argues that White was not as successful as the district court found and that her attorney's fee award should be reduced.

[10] We review a district court's determination regarding the amount of an award of attorney's fees under Title VII for an abuse of discretion. *Scales v. J.C. Bradford and Co.,* 925 F.2d 901, 909 (6th Cir.1991). "This deference, 'is appropriate in view of the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters.' " *Id.* (quoting *Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)). Under Title VII, a district court has discretion to award a prevailing party "a reasonable attorney's fee." 42 U.S.C. § 2000e-5(k). In determining what constitutes a reasonable attorney's fee, the degree of success achieved in the lawsuit is a crucial factor. *Scales,* 925 F.2d at 910.

[11] Although we may have awarded a different amount if we were considering the issue *de novo,* we do not find that the district court abused its discretion in awarding White eighty percent of her attorney's fees. White brought two claims in this lawsuit (sex discrimination and retaliation) but only prevailed on one (retaliation). As the district court correctly stated in its written decision, however,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

2004 WL 789726
--- F.3d ----, 2004 Fed.App. 0102P
(Cite as: 2004 WL 789726 (6th Cir.(Tenn.)))

Page 13

both of these claims arose from a common set of facts, and it would be difficult to divorce work done on one claim from work done on the other. In light of this consideration and others addressed by the district court in its decision, we find that the district court did not abuse its discretion in awarding White eighty percent of her attorney's fees.

## IV. PUNITIVE DAMAGES

[12] In her cross-appeal, White asserts that the district court erred in charging the jury on punitive damages. The district court instructed the jury that punitive damages may be considered if White showed by "clear and convincing" evidence that Burlington Northern acted "either intentionally, recklessly, maliciously, or fraudulently." The jury did not award White punitive damages. White contends that the appropriate burden of proof on a claim for punitive damages under Title VII is a preponderance of the evidence, not clear and convincing evidence. White is correct.

According to Title VII, "[a] complaining party may recover punitive damages under this section against a respondent ... if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1); see also Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1998) (discussing what a plaintiff must prove to recover punitive damages under Title VII). Title VII is silent concerning the evidentiary standard for demonstrating malice or reckless indifference for purposes of a punitive damages claim. In the absence of more specific guidance, "[c]onventional rules of civil litigation generally apply in Title VII cases, and one of these rules is that parties to civil litigation need only prove their case by a preponderance of the evidence." Price Waterhouse v. Hopkins, 490 U.S. 228, 253, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (plurality decision) (internal citation omitted); see also Desert Palace, Inc. v. Costa, 539 U.S. 90, 123 S.Ct. 2148, 2154, 156 L.Ed.2d 84 (2003) (holding that Title VII's silence with respect to an evidentiary standard suggests that a conventional preponderance of the evidence standard applies).

*14 Other circuits have reached this same conclusion with respect to punitive damages claims generally, see Simpson v. Pittsburgh Corning Corp., 901 F.2d 277, 282-83 (2d Cir.1990) (declining to apply a higher standard of proof than preponderance of the evidence for punitive damages award in products liability case because "such a change is best left for Congress or for higher judicial authority"); In re Exxon Valdez, 270 F.3d 1215, 1232 (9th Cir.2001) (applying preponderance standard to award of punitive damages in maritime case because Congress has not legislated a higher standard), and with respect to punitive damages in Title VII suits, see Karnes v. SCI Colorado Funeral Servs., Inc., 162 F.3d 1077, 1080-82 (10th Cir.1998) (concluding that a preponderance of the evidence standard is applicable to claims for punitive damages under Title VII); Notter v. N. Hand Prot., No. 95-1087, 1996 WL 342008, at *10-11 (4th Cir. June 21, 1996) (rejecting argument that the standard of proof for punitive damages in Title VII case is clear and convincing evidence because "[i]n discrimination cases brought under federal law, punitive damages need be proven only by a preponderance of the evidence").

The dissenting opinion states that punitive damages are an unconventional form of relief and therefore deserve a heightened standard of proof. Unquestionably, punitive damages serve a different purpose than compensatory damages. The requirement that punitive damages be awarded only when a defendant acts maliciously or recklessly recognizes this difference in purpose and ensures that punitive damages will be awarded only in the most egregious cases. Punitive damages are not, however, unconventional in the sense that they are a new or nontraditional form of relief. In fact, punitive damages have a long history in American civil litigation, where the traditional standard of proof has been "preponderance of the evidence." See generally Jury Determination of Punitive Damages, 110 Harv. L.Rev. 1513, 1531-32 (1997) (recognizing that preponderance of the evidence is the traditional civil standard of proof). Cf. Smith v. Wade, 461 U.S. 30, 53-56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983) (noting that "[t]here has never been any general common-law rule that the threshold for punitive damages must always be higher than that for compensatory liability" and rejecting actual malicious intent requirement for punitive damage award in § 1983 cases, even when

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

2004 WL 789726
--- F.3d ----, 2004 Fed.App. 0102P
(Cite as: 2004 WL 789726 (6th Cir.(Tenn.)))

Page 14

underlying standard of liability for compensatory damages is recklessness).

The dissent, unable to point to any precedent imposing a higher standard of proof for Title VII punitive damages claims than preponderance of the evidence, also relies on authority not directly germane to the issue at hand. For instance, the dissent notes that, in recent years, public policy concerns, primarily about excessive punitive damage awards, have prompted many states to adopt a "clear and convincing" standard of proof for punitive damages. Trends at the state level, however, do not inform our consideration of punitive damages claims under the federal Title VII statute. In fact, the dissent's statistics indicate that, while many states applied a heightened standard of proof to state punitive damage claims at the time that Title VII was amended to permit such claims in 1991, a *majority* of states at that time chose not to apply a heightened standard.

*15 Moreover, to the extent that concerns about excessive punitive damage awards prompted the adoption of heightened standards of proof before or after 1991, those concerns do not exist under the Title VII statutory scheme. Under Title VII, damage awards--both compensatory and punitive--are capped, with $300,000 being the largest sum that can be awarded to a claimant against the largest employers, those with 500 or more employees. [FN9] 42 U.S.C. § 1981a(b)(3)(D). The $300,000 limit is imposed on the sum of the compensatory and punitive damage awards; there is no separate limit for each type of damages. 42 U.S.C. § 1981a(b)(3). Thus, Title VII's own quite substantial restrictions on punitive damage awards guard against excessive awards.

Besides identifying trends at the state level, the dissent also cites cases that involve due process challenges to the application of a preponderance of the evidence standard of proof. Some of these cases concern situations wholly unrelated to punitive damages claims. *See Addington v. Texas,* 441 U.S. 418, 431-33, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) (resolving, in the face of a due process challenge, the standard of proof required in a civil commitment hearing); *Santosky v. Kramer,* 455 U.S. 745, 747-48, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (determining the standard of proof that due process demands in the context of a parental rights termination proceeding). Other cases cited by the dissent implicate a due process challenge to large punitive damage awards. *See State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 123 S.Ct. 1513, 1519-20, 155 L.Ed.2d 585 (2003); *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 19, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). While the Supreme Court has found excessive punitive damages awards to be violative of due process, *State Farm,* 123 S.Ct. at 1526, the Court has specifically rejected the notion that the Due Process Clause requires a higher standard of proof for punitive damages claims than preponderance of the evidence. *Pacific Mut. Life Ins.,* 499 U.S. at 23 n. 11. The sole bit of assistance derived from any of these cases is the Court's direct rejection in *Pacific Mutual* of the notion that the Constitution requires a standard of proof any higher than preponderance of the evidence for punitive damages claims.

The only case relied on by the dissent that could be instructive is *Woodby v. INS,* 385 U.S. 276, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966), where the Supreme Court considered the standard of proof for a deportation hearing. As in the instant case, the Court in *Woodby* was confronted with determining the standard of proof when "Congress has not addressed itself to the question of what degree of proof is required...." *Id.* at 284. In *Woodby,* the Court held that for deportation proceedings, the standard of proof was "clear, unequivocal, and convincing evidence," *id.* at 286, which the dissent apparently references for the proposition that we should apply the same standard of proof here. While *Woodby* is helpful in its reminder that the judiciary has traditionally resolved the question of the proper standard of proof under a federal statute when Congress has not addressed the issue, *id.* at 284, it gives us no direction in this case. Its reasoning is based on the immediate hardship of deportation. Deportation, as an outcome of an administrative and judicial proceeding, bears little similarity to an award of damages, particularly an award under Title VII, which Congress has carefully restricted to limit its potential harm to employers.

*16 Accordingly, in determining the proper standard of proof for a punitive damage claim under Title VII, we receive no specific guidance from the statutory language of the Act. Supreme Court precedent offers some assistance, however.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

2004 WL 789726
--- F.3d ----, 2004 Fed.App. 0102P
**(Cite as: 2004 WL 789726 (6th Cir.(Tenn.)))**

Page 15

Deriving that guidance from *Price Waterhouse* and *Desert Palace*-- both of which specifically discuss standards of proof in Title VII cases--is more appropriate than looking to the Supreme Court's views on the standard of proof in dissimilar contexts or its stray comments about state or federal standards of proof in the course of deciding other issues. While there have been developments concerning the standard of proof for punitive damages claims at the state level, these trends do not support the conclusion that the "clear and convincing" standard applies to federal punitive damage claims under Title VII, which has its own limitations on punitive damage awards. Furthermore, as this case does not implicate a due process challenge to the size of a punitive damages award, or to the standard of proof used in civil commitment hearings, hearings terminating parental rights, or in the context of deportation, we do not find the dissent's cited authority to be persuasive. Rather--in deciding the standard of proof to be applied to plaintiff's claim for punitive damages under Title VII--we choose to follow the guidance provided by the Supreme Court that "[c]onventional rules of civil litigation generally apply in Title VII cases." *Price Waterhouse*, 490 U.S. at 253.

Therefore, the district court erred when it instructed the jury that White must prove her case for punitive damages by clear and convincing evidence. The district court, however, also erred when it instructed the jury that White only needed to prove that Burlington Northern acted "either intentionally, recklessly, maliciously, or fraudulently." As noted above, a plaintiff seeking punitive damages under Title VII must prove that the defendant acted "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." This standard requires a plaintiff to prove more than merely intentional discrimination. *Kolstad*, 527 U.S. at 536-37 (explaining standard). In addition, the Supreme Court has stated that only under certain conditions may an employer be vicariously liable for punitive damages under Title VII. *Id.* at 545 (specifying conditions).

Finally, the dissent questions whether plaintiff has presented sufficient evidence to submit the punitive damages issue to a jury under either standard and would resolve the issue in defendant's favor without remand. While defendant argues generally that plaintiff's evidence was insufficient to permit an award of punitive damages, the parties did not analyze the evidence with any specificity under either potentially applicable standard of proof in their briefing to this court. Nor have we focused on the sufficiency of the evidence to permit a punitive damage award, since this was not the reason we granted an *en banc* hearing. We cannot find that the evidence is insufficient on a damage issue simply because judicial officers may disagree on an issue relating to liability, as the dissent suggests. Rather, in order to decide whether a trier of fact could award punitive damages in this case, a careful examination of the entire record is required. This exercise is most appropriately undertaken in the first instance by the district court. If the district court determines on remand that the evidence is sufficient to support a claim for punitive damages under the standard announced by the Supreme Court in *Kolstad*, then the district court should conduct a new trial on the issue of punitive damages only.

V. CONCLUSION

*17 For all these reasons, we affirm the district court's denial of Burlington Northern's motion for judgment as a matter of law and the district court's award of attorney's fees to White. We conclude, however, that the district court erred in instructing the jury on the issue of punitive damages, and therefore we remand the case for further proceedings consistent with this opinion.

CLAY, Circuit Judge, concurring.

CONCURRENCE

I join Parts I, III, and IV of the majority opinion. I also agree with Part II insofar as it rejects the untenable "ultimate employment action" doctrine, concludes that Sheila White's removal from her forklift position and her thirty-seven-day suspension constitute adverse employment actions within the meaning of Title VII, and affirms the district court's denial of Burlington's Rule 50 motion. Although the majority properly rejected the "ultimate employment action" doctrine this court embraced in *Dobbs-Weinstein v. Vanderbilt Univ.*, 185 F.3d 542, 545-46 (6th Cir.1999), I would be remiss if I

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

2004 WL 789726  
--- F.3d ----, 2004 Fed.App. 0102P  
(Cite as: 2004 WL 789726 (6th Cir.(Tenn.)))

Page 16

failed to point out that such an express rejection of the "ultimate employment action" doctrine effectively overrules *Dobbs-Weinstein.* I write separately, however, because I disagree with the rule the majority today embraces with respect to what constitutes an adverse employment action within the meaning of Title VII's anti-retaliation provision, 42 U.S.C.2000e- 3(a). Instead, I believe that the appropriate standard is the one articulated in the Ninth Circuit and advocated by the EEOC; i.e., an employer's retaliatory action is sufficiently adverse for § 704(a) purposes if it would be "reasonably likely to deter [employees] from engaging in protected activity." *Ray v. Henderson,* 217 F.3d 1234, 1242-43 (9th Cir.2000). The "reasonably likely to deter" standard is more consistent with § 704(a)'s statutory language and congressional intent, as well as Supreme Court case law.

A. Why the "Reasonably Likely to Deter" Rule is the Appropriate Standard for a Retaliation Case

*1. Statutory and Case Law Support*

The Supreme Court has repeatedly instructed courts, as a first step in interpreting a statute, "to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.,* 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808, (1997). The inquiry is at an end "if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.' " *Id.* (quoting *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 240, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)). It is readily apparent from a reading of § 704(a) that Congress placed no limitations on the reach of the anti-retaliation provision.

Section 704(a) states that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge ... under this subchapter." 42 U.S.C. § 2000e-3(a). The word "discriminate," in turn, is not defined in Title VII, but the scope is impliedly quite broad. A review of other Title VII provisions is revealing, inasmuch as § 703(a) prohibits employers from "fail[ing] or refus[ing] to hire or to discharge any individual, or otherwise *to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment,* because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1) (emphasis added). Thus, both §§ 703(a) and 704(a) use the term "discriminate," but only the general discrimination provision (§ 703(a)) places limitations on the word "discriminate." Congress chose not to place any limitations on "discriminate" within the meaning of § 704(a). Thus, a straightforward reading of the § 704(a)'s plain text makes clear that there is no statutory support for the idea that a decision to undertake retaliatory action must materially affect the terms and conditions of employment in order to violate its proscriptions. Indeed, the most natural reading of this language is that it prohibits any form of discrimination against an individual for opposing discrimination or filing a charge, regardless of whether that discrimination takes the form of, for example, termination, suspension, lateral transfer, harassment, or discipline. At least some of the circuits have expressly agreed. *Smith v. Sec'y of Navy,* 659 F.2d 1113, 1119 n. 56 (D.C.Cir.1981) (noting that the language of the anti-retaliation provision "speaks unconditionally" and is not "limit[ed] to acts causing particular harms such as the loss of a particular job or promotion"); *Ray,* 217 F.3d at 1243 (noting that language of the anti-retaliation provision "does not limit what type of discrimination is covered, nor does it prescribe a minimum level of severity for actionable discrimination"); *Knox v. State of Indiana,* 93 F.3d 1327, 1334 (7th Cir.1996) ("There is nothing in the law of retaliation that restricts the type of retaliatory acts that might be visited upon an employee....").

*18 Incorporating by reference the limitations placed on "discriminate" in § 703(a) into "discriminate" in § 704(a) is altogether inappropriate. Such incorporation by reference is appropriate only when it is consistent with Congress' expressed intent. Section 704(a)'s legislative history is scant, and therefore we are left to look to its plain legislative text. Congress could quite easily have placed the same limitation on § 704(a) as it did on § 703(a), yet it chose not to do so. Congress' legislative intent, by all indications, was to remove all obstacles from an employee's ability to defend his or her Title VII rights by filing EEOC charges.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works