**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

DR. CHRISTINA M.I. KELTON,

       Plaintiff,

    v.                              Case No. C-1-02-345

UNIVERSITY OF CINCINNATI, et al.,

       Defendants.

**ORDER**

      This matter is before the Court upon defendants' motions for summary judgment (docs. 15, 16, 17, 18, 19, 20, 21, 22), plaintiff's opposing memorandum (doc. 26), and defendants' replies (doc. 31, 32, 33, 34, 35, 36, 37, 38).

**I. Procedural and factual background**

      Plaintiff Christina Kelton brings this action against her employer, the University of Cincinnati (University), and Haynes Goddard, Wolfgang Mayer, Sourushe Zandvakili, Debashis Pal, Nicolas Williams, Jeffrey Mills and Harland Whitmore, all faculty members of the University's Economics Department. Plaintiff sues each of the individual defendants in his individual capacity. Plaintiff brings claims against the University of Cincinnati for gender discrimination and retaliation for opposing acts of discrimination in violation of Title VII, 42 U.S.C. § 2000e, et seq. (Counts I, II). Plaintiff brings a claim against the individual defendants

1

pursuant to 42 U.S.C. § 1983 for discrimination in violation of plaintiff's rights under the Equal

Protection Clause of the Fourteenth Amendment to the United States Constitution (Count III).

Plaintiff also brings a claim under 42 U.S.C. § 1985(3) against the individual defendants alleging

an illegal conspiracy to violate her right to equal protection of the laws under the Fourteenth

Amendment to the United States Constitution.

In support of her claims, plaintiff alleges that she is a tenured faculty member of the

University who, as of the date of the filing of the complaint, was a member of the Economics

Department. In approximately January 2000, plaintiff submitted her name as an official candidate

for the position of head of the Economics Department, a position for which she was fully

qualified. The University determined that a new Department Head would be selected pursuant to

an internal search process. The only other member of the department to compete for the position,

defendant Goddard, attempted to discourage plaintiff's candidacy for the position based on his

belief, shared by the other individual defendants, that plaintiff would not be a suitable individual

for the position based on her gender. Dr. Goddard, with the encouragement, cooperation, and

assistance of the other individual defendants, engaged in a campaign of harassment against

plaintiff for the purpose of vilifying her and discrediting her candidacy for the position. The

campaign was characterized by baseless and malicious accusations that plaintiff had used

department funds inappropriately; she had comported herself in an unprofessional and unethical

manner in the performance of her duties; and she had exhibited divisive and dictatorial behavior

towards and with her departmental colleagues.

Thereafter, the selection committee voted to award the position of Department Head to

defendant Goddard. Plaintiff complained to the Dean of the College of Arts and Sciences, Joseph

2

Caruso, that the selection committee's decision had been based on improper considerations, including gender. Following a poll of the faculty of the Economics Department, the selection committee's vote was declared a nullity. The individual defendants continued their campaign of harassment against plaintiff while she remained a member of the Economics Department, including registering bogus complaints to the administration concerning plaintiff's performance as director of the department's Graduate Program. The University refused to take action in response to plaintiff's requests for the University to constitute a new search committee to select a permanent head of the department and to take measures to prevent the individual defendants' ongoing acts of retaliation and discrimination against her.

Plaintiff claims that the individual defendants committed the above acts of discrimination and retaliation against her under color of state law, intentionally and maliciously, and outside the scope of their official duties so as to prevent plaintiff from becoming head of the Economics Department because of her gender and to retaliate against her for opposing defendants' acts of discrimination and intimidation. Plaintiff claims that as a proximate result of defendants' actions, she has suffered and continues to suffer from emotional distress, damage to her personal and professional reputation, and economic loss associated with her inability to obtain promotions commensurate with her qualifications, skills and performance level.

## II. Undisputed facts

1.    Plaintiff at all relevant times was a tenured professor in the Economics Department at the University of Cincinnati.

2.  Defendants Goddard, Mayer, Zandvakili, Pal, Williams, Mills and Whitmore at all relevant times have been employees of the University. Goddard, Mayer, Pal, and Whitmore were full professors in the Economics Department at the University at all relevant times.

3.  The University hired Kelton as an associate professor in the Economics Department in January 1996. Then Department Head Joseph Gallo appointed plaintiff Director of Graduate Studies in May 1997. Plaintiff's duties as Director of Graduate Studies included managing the doctoral students who remained in the program and developing a new master's degree program to launch in the absence of the doctoral program.

4.  Plaintiff applied for tenure in the fall of 1996. She was awarded tenure effective September 1997.

5.  In 1999, Joseph Gallo announced at a faculty meeting that he would be stepping down as Department Head.

6.  Mills, Williams and Zandvakili approached Goddard about running for the headship position.

7.  On January 10, 2000, Dean Joseph Caruso introduced the Headship Search Committee (Committee): Economics Department faculty members Al Berry, Ed Herman, Debashis Pal; Joel Wolfe, who was a member of the Political Science department; and Steven Howe, a member of the Psychology Department who was appointed head of the Committee. Student organizations subsequently elected an undergraduate student, Erin Moeller Suttman, and a graduate student, Nasrin Shahinpoor, to serve on the Committee.

8.      On January 13, 2000, Goddard came to Kelton's office and talked with her about the headship position. Goddard had heard that Kelton was interested in the headship. Goddard told Kelton he was also interested in the position and mentioned changes he would make if appointed Department Head, such as instituting differential teaching loads and making faculty feel that their work, particularly research, was valid. Goddard also noted his qualifications for the department headship, referring to his full professorship, his work for the Environmental Protection Agency, and his outside contacts. Goddard complimented plaintiff on her work as Director of Graduate Studies, stating that he was supportive of her efforts to revive the doctoral program and implying that he would like her to remain as Director of Graduate Studies. Goddard also spoke about two professors in the sociology and geography departments who had taken department head positions while associate professors and stated that their headship had delayed their promotion to full professor.

9.      On January 14, Goddard sent an e-mail to plaintiff reiterating the comments he had made during the meeting the previous day. Goddard recognized "that anything I say can be interpreted as self-serving, since you have an interest in the headship too." Goddard again mentioned the two professors, as well as his own nine years as Director of Latin American Studies, as examples of an administrative position holding up a faculty member's promotional opportunities. Goddard expressed his concern that the new master's program would suffer without plaintiff's leadership and his preference that plaintiff "continue the great job you have been doing." Goddard concluded the e-mail with a list of his community activities he thought would be useful to the department.

5

10.    Plaintiff saw Goddard's e-mail as self-serving and an attempt to increase his chances of obtaining the leadership by removing her from the competition. On January 16, she forwarded the e-mail to the Economics Department faculty members on the Committee - Berry, Herman and Pal. Plaintiff believes that the e-mail expressly conveys that Goddard was threatening her.

11.    At the end of January or in early February of 2000, plaintiff approached Mayer about the Goddard e-mail. Plaintiff observed that Mayer "seemed rather pleased that two people were interested enough to want to take charge of the department." Mayer told plaintiff that "perhaps Dr. Goddard was a little overzealous, he already saw himself as the next department head."

12.    In early February of 2000, Committee Chairman Steve Howe consulted with Donna Bowman of the University's Office of Affirmative Action (as is routine in such searches) to discuss how to conduct the search. One item on his discussion agenda was the e-mail Goddard had sent to plaintiff in mid-January. Howe was concerned that the e-mail might cause plaintiff to drop out of the headship process, which he did not want to happen.

13.    Bowman told Howe he should consult her immediately if plaintiff did not seek the headship position.

14.    After Goddard became aware that plaintiff had claimed to Committee members that he

had "threatened" her, Goddard sent an e-mail on March 1, 2000, to some of his

colleagues, including Whitmore. In the e-mail, Goddard wrote that he had talked to

plaintiff and apologized in the event his comments had left the wrong impression.

Goddard related plaintiff's retort that his e-mail was "bizarre, and not the thing a senior

faculty would said [sic] to a junior, female colleague". Goddard opined that, "if [plaintiff]

is ambitious, and there is no doubt about that, then she has every reason to milk this for

political advantage, and probably will."

15.    About a half-hour later, Whitmore sent an e-mail to Goddard disapproving of Goddard's

January 13 talk with plaintiff and his follow-up e-mail. Whitmore stated that he did not

think plaintiff was "any more 'ambitious' than anyone else." In response to Goddard's

statement that plaintiff had claimed Goddard's note was bizarre and not something a

senior faculty member would say to a junior female colleague, Whitmore empathized with

plaintiff's reported sentiments and wrote, "[t]here probably are faculty in this department

who would be threatened by a female head."

16.    Whitmore provided his response to Goddard's e-mail to plaintiff with a handwritten note

stating, "Lest you think that [Goddard] and I see things the same way . . ."

17.    On March 13, 2000, Howe informed plaintiff and Goddard by e-mail that they represented

the slate of candidates for the position of Department Head. He asked that they make

themselves available for informal consultations with their colleagues to discuss their

"candidacy and the challenges faced by the department."

18.   Plaintiff had informal consultations with her colleagues about her candidacy. No one discussed gender in these meetings.

19.   The Committee invited Economics Department faculty members to submit materials and meet with the Committee.

20.   Berry and Herman, members of the Committee, supported plaintiff. Some individuals made presentations in support of plaintiff.

21.   On April 3, 2000, Mayer submitted a memorandum to the Committee to present his thoughts on the headship search.  He raised a number of concerns. On May 3, 2000, he wrote a second memorandum to the Committee recommending Goddard and stating his reasons for his recommendation.

22.   Zandvakili and Mills made a presentation to the Committee in favor of Goddard with strongly-worded criticisms of plaintiff. Zandvakili and Mills then prepared some comments for the Committee. Zandvakili summarized his thoughts on plaintiff's "management style". Mills included in his comments negative opinions of plaintiff's managerial style.

23.   On April 28, 2000, Whitmore sent Committee Chairman Steve Howe an e-mail endorsing neither candidate. Whitmore stated, "Frankly, after all that I have heard and observed not only during this debate, but also during my 33 year tenure here, I am so disappointed in our inability to cooperate, communicate, trust or respect each other that I am not sure the head is going to matter that much." Whitmore subsequently sent Howe another e-mail assessing the strengths and weaknesses of both Goddard and plaintiff.

24.     Goddard interviewed with the Committee on May 8, 2000. Howe, who had supported

plaintiff throughout the headship search, changed his opinion after Goddard's interview.

Howe had been uncomfortable with some of Goddard's supporters as well as his decision

to send the e-mail to plaintiff discouraging her candidacy, and he felt Goddard did not

have a great deal of departmental service on his resume. However, Howe described

Goddard's interview in very positive terms, stating that he "was stunned" by the

presentation and that he "completely altered [his] views of Haynes Goddard in the sixty

minute period of time."

25.     Plaintiff interviewed two days after Goddard on May 10, 2000. Howe felt that she did

"fine", but he found the decisive factor to be that plaintiff had not addressed the state of

the department and had not presented a thoughtful plan on which direction she would

move in. Howe did not feel that plaintiff's presentation measured up to Goddard's.

26.     Pal also felt that plaintiff performed poorly relative to Goddard during her interview. He

was also disappointed that she had mentioned only certain faculty when asked about the

assets of the department and that she had referred to herself as "number two in the

department" when Pal was the Assistant Department Head.

27.     After interviewing Kelton and Goddard, Williams, who was out of the country on a

sabbatical, spoke to the Committee by phone. He recommended Goddard. Williams also

spoke about plaintiff's strengths and said that he had helped recruit her to the University.

28.     At the end of her interview, plaintiff raised the issue of gender discrimination. When

asked what she meant, plaintiff distributed the copy of the Goddard and Whitmore e-

mails.

29.     On May 22, 2000, the Committee voted four to three in favor of Goddard. Economics professors Berry and Herman and undergraduate student Suttman voted for plaintiff. Outside professors Howe and Wolfe, economics professor Pal, and graduate student Shahinpoor voted for Goddard.

30.      On May 26, 2000, plaintiff sent an e-mail to the Committee requesting that the final headship report to Dean Caruso include a comparison of her academic service record, teaching evaluations, and scholarly activities with those of Goddard; evidence that the Committee had called some of her outside references; and a letter from an affirmative action officer verifying that the process was fair with respect to gender opportunity. Howe forwarded this e-mail to the Dean and recommended that the Dean's office investigate plaintiff's allegations of gender discrimination.

31.     Howe submitted the Committee's report to Dean Caruso on May 31, 2000.

32.     If the Dean disagrees with the Committee's recommendation, the Dean may reject the recommendation and appoint someone else as interim head.

33.     In light of the close Committee vote, Dean Caruso decided to poll the Economics Department. The department voted ten to two for plaintiff.

34.     Based on the close Committee vote in favor of Goddard and the department vote in favor of plaintiff, Caruso declared the headship search a failure on June 8, 2000. Caruso felt that he could not recommend either candidate due to the deep split in the department.

35.     Dean Caruso asked the Economics Department faculty members to nominate persons to serve as acting head.

36.    Six of the individual defendants, Mayer, Mills, Pal, Williams, Zandavakili and Goddard, sent an e-mail dated June 9, 2000, to the Dean explaining why each of ten economics faculty members, including plaintiff, should not be appointed acting head. This e-mail sharply criticized several of the male faculty members.

37.    Plaintiff claims that beginning in the fall of 2000, she found it difficult to be productive as Director of Graduate Studies or to be able to conduct committee meetings very well. The committee meetings were contentious.

38.    After the headship search, plaintiff received e-mails from Mills and Williams challenging her decisions as Director of Graduate Studies. The e-mails concerned issues involving software, financial aid, a request to meet in order to discuss the needs of the program and how those needs matched up with the faculty's preferences and talents, and funding for graduate students.

39.    Plaintiff accepted an offer from Penn State University for a three-year appointment as a senior research associate as part of its dual career program after her husband had received an offer as a department head at Penn State. She requested a one-year leave of absence from the University. She did not intend to return to the University but sought the leave of absence as "an insurance policy in case something goes wrong." On May 5, 2001, Dean Groetsch recommended that plaintiff receive a one-year leave of absence.

40.    Plaintiff left Cincinnati in June or July 2001. After plaintiff left the University, the division and problems in the department continued.

41.   By December 31, 2001, plaintiff advised Dean Groetsch that she would be returning to the University. Plaintiff's request to transfer to the College of Business Administration was granted. She has never returned to the College of Arts and Sciences as a faculty member. She does not seek the Department Head position as relief in this case.

### III. Summary Judgment Standard

Fed. R. Civ. P. 56 allows summary judgment to secure a just and efficient determination of an action.  This Court may only grant summary judgment as a matter of law when the moving party has identified, as its basis for the motion, an absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

The party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253 (1968)).  The evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 (1970)).

The court is not to weigh the evidence and determine the truth of the matter but is to decide whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.  There is no genuine issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  *Id.* at 249 (citing *Cities Serv.*,  391 U.S. at 288-289).  If the evidence is merely colorable, *Dombrowski v. Eastland,* 387 U.S. 82, 84 (1967), or is not significantly probative, *Cities Serv.*, 391 U.S. at 290, judgment may be granted.  *Anderson*, 477 U.S. at 249.

## IV. Title VII law

## A. Discrimination

Under the law of this Circuit, the same evidentiary framework applies to discrimination claims brought under Title VII and § 1983. ***Risinger v. Ohio Bureau of Workers' Compensation,*** 883 F.2d 475, 483 (6th Cir. 1990). A plaintiff claiming discrimination under these statutes may establish a prima facie case by introducing either direct or circumstantial evidence. ***McDonnell Douglas Corp v. Green,*** 411 U.S. 792, 802 (1973); ***Manzer v. Diamond Shamrock Chemicals Co.,*** 29 F.3d 1078, 1081 (6th Cir. 1994). Direct evidence is evidence which "proves the existence of a fact without requiring any inferences." ***Rowan v. Lockheed Martin Energy Systems, Inc.,*** 360 F.3d 544, 548 (6th Cir. 2004)(citing ***Manzer,*** 29 F.3d at 1081; ***Laderach v. U-Haul of Northwestern Ohio,*** 207 F.3d 825, 829 (6th Cir. 2000); ***Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.,*** 176 F.3d 921, 926 (6th Cir. 1999)).

Plaintiff may establish a prima facie case of gender discrimination through circumstantial evidence by showing that: 1) she is a member of the protected class; 2) she suffered an adverse employment action; 3) she was qualified for the position lost or not gained; and 4) her position was filled by someone outside of the protected class. ***Manzer,*** 29 F.3d at 1081 (citing ***McDonnell Douglas,*** 411 U.S. at 802; ***Gagne v. Northwestern National Insurance Co.,*** 881 F.2d 309, 313 (6th Cir. 1989)). The Sixth Circuit has set forth the elements of a prima facie case of discriminatory failure to hire as follows: (1) the plaintiff was a member of the protected class; (2) she applied for and was qualified for the position in question; (3) she was considered and was denied the position; and (4) she was rejected in favor of a person outside of the protected class with similar qualifications. ***Pucci v. Basf Corp.,*** 55 Fed. Appx. 243, 245 (6th Cir. 2002)(not

published in Federal Reporter)(citing *Betkerur v. Aultman Hosp. Association,* 78 F.3d 1079,

1095 (6th Cir. 1996)). A plaintiff may also establish the fourth element of a prima facie case by

showing that after she was rejected for the position, the position remained open and the employer

continued to seek applicants from individuals of the plaintiff's qualifications. *Furnco Const.*

*Corp. v. Waters,* 438 U.S. 567, 575 (1978)(citing *McDonnell-Douglas,* 411 U.S. at 802).

Alternatively, plaintiff may establish the fourth prong of a prima facie case of discrimination by

showing that she was treated less favorably than a similarly situated employee. *Clayton v. Meijer,*

*Inc.,* 281 F.3d 605, 610 (6th Cir. 2002).  In such a case, plaintiff must prove that all relevant

aspects of her employment situation were similar to those of the employee with whom she seeks

to compare himself. *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 352 (6th Cir.

1998).

 In order to establish an "adverse employment action", plaintiff must show "a materially

adverse change in the terms and conditions of [her] employment." *Hollins v. Atlantic Company,*

188 F.3d 652, 662 (6th Cir. 1999).

> [A] materially adverse change in the terms and conditions of employment must be
> more disruptive than a mere inconvenience or an alteration of responsibilities. A
> materially adverse change might be indicated by a termination of employment, a
> demotion evidenced by a decrease in wage or salary, a less distinguished title, a
> material loss of benefits, significantly diminished material responsibilities, or other
> indices that might be unique to a particular situation.

*Id.* (quoting *Crady v. Liberty Nat'l Bank & Trust Co. of Indiana,* 993 F.2d 132, 136 (7th Cir.

1993)).

 The Sixth Circuit recently affirmed the definition of adverse employment action which has

developed in cases such as *Kocsis v. Multi-Care Mgmt., Inc.,* 97 F.3d 876, 886 (6th Cir. 1996)

and its progeny. *White v. Burlington Northern & Santa Fe Railway Co.,* 364 F.3d 789 (6th Cir.

14

2004)(en banc). The Court stated that in order to prevent lawsuits based on "trivial workplace dissatisfactions", a plaintiff must prove the existence of an "adverse employment action" to support a Title VII claim. ***Id.*** at 795 (citing ***Hollins,*** 188 F.3d at 662). The Court stressed that "not just any discriminatory act by an employer constitutes discrimination under Title VII." ***Id.*** (citing ***Burlington Indus., Inc. v. Ellerth,*** 524 U.S. 742, 761 (1998)). The Court stated,

> If every low evaluation or other action by an employer that makes an employee unhappy or resentful were considered an adverse action, Title VII would be triggered by supervisor criticism or even facial expressions indicating displeasure.

***Id.*** (citing ***Primes v. Reno,*** 190 F.3d 765, 767 (6th Cir. 1999)).

The Court in ***White*** noted that as the one alternative to showing the existence of an adverse employment action, a plaintiff may support a Title VII claim by showing that she was subjected to "severe or pervasive" harassment by a supervisor. ***Id.*** at n.1 (citing ***Morris v. Oldham County Fiscal Court,*** 201 F.3d 784, 792 (6th Cir. 2000)). In such a case, the plaintiff must show that "the workplace is permeated with discrimination, intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment . . ." ***Ceckitti v. City of Columbus, Dept. of Public Safety, Div. of Police,*** 14 Fed. Appx. 512, 516 (6th Cir. 2001)(not published in Federal Reporter)(citing ***Harris v. Forklift Sys., Inc.,*** 510 U.S. 17, 21 (1993); ***Morris,*** 201 F.3d at 790; ***Williams v. General Motors Corp.,*** 187 F.3d 553, 562 (6th Cir. 1999)).

In ***White***, the Court referred to its earlier decision in ***Geisler v. Folsom,*** 735 F.2d 991 (6th Cir. 1984), wherein the Court required for the first time that a plaintiff prove an "adverse

employment action" as part of a Title VII claim. The district court in **Geisler** found that

additional tension which arose in the workplace after others became aware of plaintiff's EEOC

charge was "predictable tension" and not the type of adverse employment action prohibited by

Title VII's retaliation clause. The Sixth Circuit affirmed, stating:

> We agree with the district judge that a general increase of tension in the workplace
> would be expected to follow revelation that a claim of discrimination in
> employment has been filed. However, evidence of such an increase should be
> considered, and any discrete act or course of conduct which could be construed as
> retaliation must be examined carefully.

**Id.** at 796.

The elements of a prima facie case are not intended to be inflexible. **Furnco,** 438 U.S. at

575. As the facts necessarily will vary in Title VII cases, different proof to establish a prima facie

case will be required depending on the factual situation. **Id**. at 576. What is true of all Title VII

cases, however, is that the "plaintiff carries the initial burden of showing actions taken by the

employer from which one can infer, if such actions remain unexplained, that it is more likely than

not that such actions were 'based on a discriminatory criterion illegal under the Act.'" **Id.** (citing

**Teamsters v. U.S.,** 431 U.S. 324, 358 (1977)). The plaintiff's burden at this point in the

proceedings is not onerous, "but merely serves to raise a rebuttable presumption of discrimination

by 'eliminat[ing] the most common nondiscriminatory reason for the [employer's treatment of the

plaintiff].'" **Cline v. Catholic Diocese**, 206 F.3d 651, 660 (2000)(citing **Hollins,** 188 F.3d at 659)

(quoting **Texas Dept. of Community Affairs v. Burdine,** 450 U.S. 248, 253-54 (1981)).

The employer is entitled to summary judgment if the plaintiff does not establish a prima

facie case. If the plaintiff establishes a prima facie case, the employer can overcome the prima

facie case by articulating a legitimate, nondiscriminatory reason for the adverse employment

action. ***McDonnell Douglas,*** 411 U.S. at 802. If the employer carries its burden, the plaintiff must prove by a preponderance of the legal evidence that the reasons offered by the employer were not its true reasons, but were a pretext for discrimination. ***Id.*** at 804.

### B. Retaliation

To prove a claim of retaliation, plaintiff must demonstrate that (1) she engaged in protected activity; (2) the exercise of her civil rights was known by defendant; (3) defendant thereafter took adverse employment action; and (4) a causal connection exists between the protected activity and the adverse employment action. ***Walborn v. Erie County Care Facility,*** 150 F.3d 584, 588-89 (6th Cir. 1998)(citing ***Wrenn v. Gould,*** 808 F.2d 493, 500 (6th Cir. 1987)); see also ***Thatcher v. Goodwill Industries of Akron,*** 117 Ohio App.3d 525, 534-35, 690 N.E.2d 1320, 1326 (1997).

To establish a causal connection, plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had plaintiff not engaged in protected activity. ***Nguyen v. City of Cleveland,*** 229 F.3d 559, 563 (6th Cir. 2000). Evidence that defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation. ***Id.***

The Sixth Circuit has found that temporal proximity between the protected activity and the adverse action is not, in and of itself, sufficient to establish a causal connection. See , e.g., ***Cooper v. City of North Olmstead,*** 795 F.2d 1265, 1272 (6th Cir. 1986)). In ***Nguyen***, however, the Sixth Circuit indicated that there may be circumstances where temporal proximity alone would be sufficient to support an inference of a causal connection, although the Court noted that such

circumstances were lacking in the case before it and gave no indication of what circumstances might suffice. 229 F.3d at 567.

Once plaintiff establishes a prima facie case of retaliation, the burden is on defendant to establish a legitimate reason for the adverse action, which plaintiff may rebut by producing credible evidence of pretext. ***Jackson v. Pepsi-Cola, Dr. Pepper Bottling Co.,*** 783 F.2d 50, 54 (6th Cir. 1986).

## VII. Opinion

### A. Gender discrimination claim against the University

Defendant University alleges that plaintiff cannot establish a prima facie case of gender discrimination because she cannot show that she was rejected in favor of an employee with similar qualifications who was not in the protected class. Defendant claims this is so because the headship position was filled by a female faculty member in the Economics Department, Gisela Escoe. Defendant further alleges that plaintiff cannot demonstrate that the University's reasons for declaring the headship search a failure were pretextual. Defendant claims that Dean Caruso rejected the Committee's recommendation of Goddard and declared the search a failure because of a controversy and a decades-old division in the Economics Department. Defendant alleges that the actions of those individual who were not decision-makers are legally irrelevant. Plaintiff contends that there is direct evidence of discrimination and that she has established a prima facie case.

As direct evidence of discrimination, plaintiff relies on two pieces of evidence: (1) the e-mail which Whitmore sent to Goddard in which Whitmore stated, "There probably are faculty in this department who would be threatened by a female head"; and (2) Goddard's statement in his

e-mail to Whitmore that plaintiff was "ambitious". These statements, considered singly or in combination, do not constitute direct evidence of discrimination. The statements do not prove without requiring any inferences that gender bias was a motivating factor for any adverse action taken against plaintiff.

Not only do the statements fail to qualify as direct evidence, but they also fail to give rise to an inference that the University acted with a discriminatory motive. Plaintiff has essentially disavowed any connection between these statements and the University's motives, stating, "it is clear that the Faculty Defendants were not acting for or on behalf of the University when they campaigned against [her] candidacy for the headship" but the faculty defendants, none of whom hold management positions with the University, were acting pursuant to their own personal interests when they sought to affect the results of the search. (doc. 26, pp. 30-31).

Because plaintiff does not have direct evidence of gender discrimination, she must establish a prima facie case in order to survive the University's motion for summary judgment on this claim. In response to defendant's arguments regarding her prima facie case, plaintiff contends that defendant has inappropriately applied the analysis for a failure to promote case when the case should be construed as a failure to hire. In any event, plaintiff notes that the framework for an analysis of a discrimination claim should never be rigidly applied and argues that a Title VII violation occurred when she was denied a fair and equal opportunity to compete for the job of Department Head because of her gender. Plaintiff argues that it is not appropriate to preclude her from being able to establish a prima facie case simply because the Economics Department failed to complete the hiring process and select a permanent head.

Whether this case is characterized as a failure to promote or a failure to hire case or is analyzed under any other prima facie framework, the outcome is the same. First, plaintiff cannot establish the fourth prong of a prima facie case by showing that she was rejected in favor of a person outside of the protected class. No other individual was placed in the headship position after the headship search was declared a failure except Escoe, a female.

Second, the elements of a prima facie case set forth in ***Furnco*** are not satisfied. Plaintiff cites to Mayer's deposition testimony for the proposition that the University continued to seek an individual to fill the position temporarily occupied by Escoe. (See Mayer depo., pp. 5-6). Plaintiff's representation is not supported by the portion of Mayer's deposition which plaintiff cites. Mayer did not state in his deposition that the search for a Department Head continued after Escoe was appointed as Acting Department Head. Rather, Mayer stated that there was a new search for a Department Head in 2003 (Mayer depo., p. 5). Moreover, plaintiff admits in her opposing memorandum that "nothing occurred with respect to a new search for more than two years." (doc. 26, p. 8). The fact that a new search was initiated over two years after the first search was declared a failure does not satisfy the requirement that the University continued to seek someone to fill the Department Head position after plaintiff was rejected.

Even accepting as true plaintiff's assertion that Escoe did not fill the same position plaintiff sought, that the position remained open, and that defendant continued to seek candidates for the position, plaintiff still cannot satisfy the requirements of a prima facie case. Given that the University rejected the Committee's choice of a male as the new Department Head and instead selected a female, Escoe, to serve as Interim Acting Department Head, one cannot reasonably infer that defendant's failure to offer plaintiff the position of Department Head, if unexplained,

was more likely than not based on plaintiff's gender. Simply stated, if the University did not want a female in the Department Head position, then it would make no sense for the University to not place the male recommended by the Committee in that position and to instead fill the position on an emergency basis with a female. Accordingly, no reasonable juror could infer from the University's failure to agree with the Committee's recommendation of Goddard and defendant's alleged continued search for an individual to fill the Department Head position that plaintiff was denied the position on account of her gender. For these reasons, the Court finds that plaintiff has failed to establish a prima facie case of discrimination.

Assuming plaintiff had presented sufficient evidence to establish a prima facie case, defendant has proffered a legitimate, nondiscriminatory reason for its action. The University claims that Dean Caruso rejected the Committee's recommendation of Goddard and declared the search for Department Head a failure because there was too much controversy and unhappiness at that time in the department for him to accept Goddard as Department Head. Defendant has described what the various divisions and controversies in the department were.

Plaintiff alleges that defendant's explanation is not the real reason because defendants have not adequately explained the division in the department. Plaintiff also points to statements by Goddard and Escoe as evidence of pretext. Specifically, plaintiff relies on Goddard's testimony that he had not noticed any animosity with the "always very congenial" department and that the departmental division arose from plaintiff's lawsuit (Goddard depo., pp. 15, 35). Plaintiff also relies on testimony by Escoe that while there was a division in the department resulting from differing personalities and priorities, Escoe never quite understood the division (Escoe depo., pp. 24-25).

21

Plaintiff has not presented evidence which creates a genuine issue of material fact as to whether the reason offered by defendant for its actions are pretextual. The record is replete with evidence which substantiates Dean Caruso's belief that the department was, in fact, beset by controversy and unhappiness. Allegedly contrary statements by Goddard, who was likewise denied the Department Head position, and Escoe's deposition testimony that she did not understand the division she perceived in the department are nowhere near sufficient to call into question the legitimacy of the reason articulated by Dean Caruso for the University's actions. Plaintiff's additional arguments regarding the motivations of the individual Committee members which she offers as evidence of pretext have no bearing on whether the reason offered by the University for Dean Caruso's rejection of Goddard as Department Head and for declaring the search a failure is legitimate. Because plaintiff has not come forward with sufficient evidence to establish pretext on the part of the University, summary judgment in favor of the University on plaintiff's gender discrimination claim is appropriate.

## B. Retaliation claim against the University

Defendant University contends that it is entitled to summary judgment on plaintiff's retaliation claim. Defendant claims that plaintiff did not engage in good faith protected activity because she could not reasonably believe that Goddard's comments to plaintiff and either his or Whitmore's e-mail violated Title VII. Defendant claims that her subjective motivation for making assertions of gender discrimination was to influence the Committee. Defendant asserts that although plaintiff accused Goddard of threatening her in his e-mail, she did not challenge any action as discriminatory through an established procedure or channel at the University. Defendant also contends that plaintiff did not suffer an adverse employment action because faculty

members' acts of sending her e-mails, criticizing her decisions as Director of Graduate Studies, and challenging her authority in committee meetings do not constitute an adverse employment action.

Defendant also claims that plaintiff's retaliatory harassment claim fails because no one who retaliated against her was a supervisor, the alleged harassment was not severe and pervasive, and the University took remedial action in response to alleged problems in the Department. Specifically, Escoe and Associate Dean Scanio attended Graduate Program Committee meetings at plaintiff's request, plaintiff admitted that Escoe "was very supportive" of plaintiff (Plaintiff depo., p. 131), and the Provost and Dean held a meeting and instructed the department to behave in a more civil fashion. Defendant also argues that plaintiff cannot establish a causal connection between any protected activity and an adverse action.

Finally, defendant alleges that plaintiff's Title VII retaliation claim is barred by the Eleventh Amendment because Congress exceeded its enforcement authority in enacting Title VII's retaliation provisions. In support of this argument, defendant cites several authorities for the proposition that the right to be free from retaliation for opposing practices made unlawful by Title VII is solely a statutory right and not one derived from the Fourteenth Amendment. Defendant then draws from that proposition the conclusion that Congress exceeded its enforcement authority in enacting Title VII's retaliation provisions, but defendant cites no authority in support of the conclusion it draws.

Plaintiff asserts that she has established a prima facie case of retaliation. Plaintiff alleges that she had a good faith belief that Goddard was threatening her with not receiving a future promotion to full professor if she applied for the headship and that she raised the issue of gender

discrimination with the Committee, which she believed at that time had been unlawfully influenced by the individual defendants' gender bias. Plaintiff also contends that she opposed the University's toleration of the harassment, believing it to be unlawful (Ex. 33). Finally, plaintiff notes that she filed an EEOC charge. (Complaint, exh. A). Plaintiff also contends that defendants were aware of her complaints about gender discrimination. Plaintiff argues that denial of the Department Head position on May 22, 2000, and defendants' retaliation against her through a variety of e-mails and incidents constitute adverse employment actions. Plaintiff complains that the harassment was severe and pervasive and made the department an unbearably hostile place to work, leading her to accept a temporary appointment at Penn State and to transfer out of the Economics Department to the College of Business upon her return to the University.

Initially, the Court finds that the University has not presented a cogent argument in support of its contention that plaintiff's Title VII retaliation claim against it is barred by the Eleventh Amendment. Accordingly, the Court will not dismiss the claim on grounds of sovereign immunity.

The Court finds the defendant University is entitled to summary judgment on plaintiff's retaliation claim because she has failed to come forward with evidence to create a genuine issue of material fact as to this claim. Plaintiff did not make a complaint of gender discrimination to the University or file an EEOC charge before the University made the decision to declare the headship search a failure, but the Court will assume for purposes of summary judgment that plaintiff's presentation of Goddard's e-mail and Whitmore's response to the Committee  could reasonably be construed as a complaint of gender discrimination. Plaintiff nonetheless cannot establish the remaining elements of a prima facie case of retaliation because there is absolutely no

evidence that the University declared the search a failure and appointed Escoe as Acting Department Head based on a complaint of gender discrimination by plaintiff to the Committee.

As to the allegedly harassing communications which plaintiff received from faculty members beginning in the fall quarter of 2000, plaintiff has not pointed to any evidence which indicates that the University, acting through its supervisors, condoned or participated in the alleged harassment. Nor does the evidence suffice to link plaintiff's alleged complaint of gender discrimination to the Committee in May 2000 with the University's purported failure to take any action in response to her complaints of faculty harassment several months later. The evidence presented simply does not permit an inference that the University failed to react to plaintiff's complaints of harassment, which were based on faculty members' e-mails challenging plaintiff's decisions as Director of Graduate Studies and raising issues involving matters such as financial aid and graduate funding, because she allegedly raised a complaint of gender discrimination before the Committee some months earlier. For these reasons, defendant is entitled to summary judgment on plaintiff's retaliation claim against the University.

### C. Gender discrimination claim against the individual defendants

Plaintiff brings her gender discrimination claim against the individual defendants pursuant to 42 U.S.C. § 1983. Plaintiff claims that she has established a prima facie case of discrimination against these defendants because a similarly-situated individual, Goddard, received more favorable treatment than plaintiff. Specifically, plaintiff claims that Goddard competed for the Department Head position in the absence of gender bias against him and was considered for the position whereas the defendants exercised their power as members of the department to ensure that plaintiff could not be hired as the Department Head. Plaintiff also contends that she can

establish the fourth prong of a prima facie case of failure to hire as to these defendants because she was denied the position and the University continued to seek applicants. Finally, plaintiff argues that it is clear the faculty defendants were not acting for or on behalf of the University when they campaigned against her candidacy because they are members of a collective bargaining unit and none hold management positions with the University.

Defendants Mayer, Mills, Zandvakili, Williams contend that they are entitled to summary judgment on plaintiff's § 1983 claim because the Department Head position was not filled by a male; they were not decision-makers and they lacked the power to take adverse action against plaintiff; they were not members of the Committee but merely made recommendations to the Committee; there is no evidence that their recommendations for Goddard cost plaintiff the Department Head position; and there is no evidence that their recommendation of Goddard for Department Head was motivated by gender. Defendant Goddard raises similar arguments. Defendant Whitmore raises the additional argument that he did not make a recommendation to the Committee and there is no evidence that any action he took with regard to plaintiff's candidacy was motivated by gender. Defendant Pal, who was on the Committee, argues that plaintiff has no evidence to support her gender discrimination claim against him. Finally, all of the individual defendants argue that they are entitled to qualified immunity.

At the outset, the Court questions whether a claim for employment discrimination against non-supervisory, non-managerial employees is cognizable under § 1983. Regardless, the Court finds that plaintiff cannot prevail on her § 1983 employment discrimination claim against the individual defendants in this case based on their actions relative to her candidacy. Defendants' role in the selection process for a Department Head was limited to providing their personal input

26

and/or non-binding recommendations regarding the candidates. As a matter of law, such conduct by an employee who lacks decision-making authority does not rise to the level of an "adverse employment action" for purposes of an employment discrimination claim, particularly when the ultimate employment decision is contrary to the employee's position on the matter under consideration.

Plaintiff likewise cannot establish the fourth prong of a prima facie case of discrimination against the individual defendants. The Department Head position did not go to a male, and the only individual with whom plaintiff seeks to compare herself, Goddard, was treated identically with respect to the ultimate employment decision in issue; i.e., neither one of them was offered the Department Head position. Moreover, plaintiff has not produced evidence to show she was treated less favorably than Goddard in that he was allowed to compete for the Department Head position in the absence of gender bias whereas plaintiff was not. There is ample evidence that certain individual defendants disliked plaintiff and strongly disfavored her candidacy for the Department Head position. What is missing from the record, though, is evidence which would permit an inference that these or other defendants were motivated by gender bias or that gender bias on the part of any defendant contributed to plaintiff's failure to obtain the Department Head position. Statements and actions by Goddard, who was competing against plaintiff for the position and was not involved in the decision-making process, are not competent evidence of gender bias on the part of individuals who played a role in the selection process. Whitmore's e-mail to Goddard in which he stated that some unnamed department members might be threatened by a female head is not evidence that Whitmore himself had a gender bias or that any individual involved in selecting a Department Head was motivated by bias. Plaintiff has not presented other

27

evidence to show that any individual defendant was motivated by her gender in making recommendations and providing input about plaintiff's candidacy or, in the case of Pal, voting for Goddard as the Committee's choice to fill the Department Head position. Absent such evidence, the individual defendants are entitled to summary judgment on plaintiff's claim under § 1983.

### D. Plaintiff's conspiracy claim

In order to establish a conspiracy claim under § 1985(3), plaintiff must show (1) a conspiracy involving two or more people, (2) who have the purpose of depriving a person of the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) resulting injury or a deprivation of any right or privilege of a United States citizen. *Johnson v. Hills & Dales General Hospital,* 40 F.3d 837, 839 (6th Cir. 1994).

Defendants contend that plaintiff's conspiracy theory must fail because she lacks evidence of gender discrimination and conspiracy. Defendants also allege that the intracorporate conspiracy doctrine, which provides that employees or agents of an entity cannot enter into a conspiracy, bars plaintiff's claim. Plaintiff claims that the doctrine does not apply where the acts are performed outside the scope of employment and the fact that the faculty defendants conspired with each other and not with the University suffices to take this matter outside the general rule. Plaintiff also contends that the "independent personal stake" exception takes this case outside of the intracorporate conspiracy doctrine.

The Court need not determine whether the intracorporate conspiracy doctrine bars plaintiff's claim under § 1985(3) because plaintiff has failed to come forward with evidence to establish the elements of such claim. Plaintiff asserts that defendants conspired to prevent her from securing the Department Head position. She points to many actions which she alleges were

28

taken in furtherance of the alleged conspiracy. Plaintiff fails, however, to draw any link between these actions and considerations of gender. As discussed above, the evidence which plaintiff has proffered to establish gender discrimination, i.e., Goddard's and Whitmore's e-mails and statements, is insufficient to permit an inference that any individual involved in selection of the Department Head acted with a discriminatory motive. For these reasons, the individual defendants are entitled to summary judgment on plaintiff's conspiracy claim.

### V. Conclusion

In accordance with the foregoing, defendants' motions for summary judgment are **GRANTED.** This case is **DISMISSED** and is **TERMINATED** on the docket of the Court at plaintiff's cost.

**IT IS SO ORDERED.**

S/ Herman J. Weber
HERMAN J. WEBER
SENIOR JUDGE, UNITED STATES DISTRICT COURT

J:\HJWA\02-345msjgender.wpd

29